**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>DEQSER LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 25-10687 (CTG)<br>(Joint Administration Requested) |

**DECLARATION OF SANG CHO**
**IN SUPPORT OF**
**CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**[2]

I, Sang Cho, pursuant to 28 U.S.C. § 1746, do hereby declare under penalty of perjury under the laws of the United States of America that the following is true and correct to the best of my knowledge as of this 16th day of April 2025:

1. I am an Authorized Signatory and shareholder in Deqser LLC ("**Deqser**"), a New Jersey limited liability company and one of debtors and debtors-in-possession in the above-captioned case. Deqser, in turn, is the Manager of KNY 26671 LLC, a Delaware limited liability company (the "**Company**" or "**KNY",** and together with Deqser, the "**Debtors**"), the other debtor and debtor-in-possession in the above-captioned case. I am Chief Executive Officer of KNY and oversee all of the operations there. As a result of my positions at both Deqser and KNY, I am generally familiar with the Debtors' day-to-day operations, business, financial affairs, and books and records.

---

[1] The Debtors in these Chapter 11 cases, along with the last four (4) digits of their federal tax identification numbers, are: (i) Deqser LLC (8269) and (ii) KNY 26671 LLC (9132) (collectively, the "Debtors"). The Debtors' mailing address is: c/o Cooperative Laundry, 1 Eastern Road, Kearny, NJ 07032.
[2] Capitalized terms not defined herein have the meanings given them in the applicable First Day Motion.

2. On April 10, 2025 (the "**Petition Date**"), the Debtors commenced their cases by each filing a petition for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101 et seq. The Debtors are seeking to have their cases jointly administered, and so, I am filing this Declaration on behalf of both Debtors. The Debtors are currently operating their business and managing their affairs as debtors-in-possession pursuant to Bankruptcy Code §1107 and 1108. KNY is the operating company, while Deqser indirectly controls KNY and serves as its manager pursuant to KNY's Operating Agreement. To date, no creditors' committee has been formed, and no trustee or examiner has been appointed.

3. I submit this declaration (the "**Declaration**") to provide an overview of the Debtors, their business, and the chapter 11 cases, as well as to support the Debtors' chapter 11 petitions and the motions and applications seeking various types of relief upon commencement of the cases (collectively, the "**First Day Motions**"). I have been in a management position with the Debtors since their inception. As a result of my work with the Debtors, my review of relevant documents, and my discussions with our advisors and others familiar with the Debtors, I am familiar with the Debtor's day-to-day operations, business affairs, financial affairs, and books and records. Except as otherwise noted, I have personal knowledge of the matters set forth herein, and all facts set forth in the Declaration are based on my personal knowledge, my discussions with others familiar with the Debtors, my review of relevant documents, or my opinion based on my experience and knowledge of the Debtors' operations and financial conditions. In making this Declaration, I have relied in part on information and materials that the Debtors' management and advisors have gathered, prepared, verified and provided to me, in each case under my ultimate supervision, at my direction, and/or for my benefit in preparing the Declaration. I am authorized to submit this

Declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

4. This Declaration is divided into three parts. Part I provides background information about the Debtors, their business, and the events leading up to the filing of the cases. Part II discusses the Debtors' capital structure. Part III sets forth the relevant facts and considerations in support of each of the First Day Motions.

**PART I**
**The Debtors**

**A. History and Business of the Debtor; Events Leading to Chapter 11**

5. The Debtors were incorporated as limited liability companies in 2018 for the purpose of building a commercial laundry business for hotels and restaurants within hotels which would be one of the most technologically advanced commercial laundries in North America. Deqser (LLC) was incorporated as a Delaware limited liability company. It serves solely as a holding company. It was originally envisioned that there would be a roll up of multiple commercial laundries into Deqser, but that has not occurred. Accordingly, when I speak of the "**Debtor**" herein, I am really speaking about KNY 26671 LLC, unless otherwise noted, which is the operating entity. KNY 26671 LLC was incorporated as a New Jersey limited liability company in 2018. It operates a commercial laundry facility in Kearny, New Jersey which employs approximately 180 employees through a Professional Employer Organization ("**PEO**"), 40 of whom are clerical, and 140 of whom are non-clerical.

6. The Debtors were founded by Benjamin Gerut, a seasoned financial investor with hospitality experience, and myself, Sang Cho. I have been in the laundry business exclusively since 2003 when I left the Marine Corps. I started in a family commercial laundry business, grew the business, and sold it in 2013. In mid-2017, I met Mr. Gerut and began planning a commercial

laundry which we envisioned as being the most technologically forward laundry in North America. We began building it in 2017, and ordered equipment from Herbert Kannegeiser GmbH ("**Kannegeiser"**). It was our understanding that this would be the first complete assembly line of Kannegeiser equipment in the United States, and we believe that the Kannegeiser equipment was more technologically advanced than anything currently existing in the US.

7. The business opened in the fourth quarter of 2018, and was a state-of-the-art commercial laundry. The business was very successful and by the summer of 2019, we were working at full capacity. As a result, we decided to take on additional debt and raise equity in the summer of 2019 to increase our footprint by 50%. That summer we raised a total of $7.5 million for our expansion.

8. Our expanded facilities came online in February 2020, and we expected to fully utilize the expanded facility. Unfortunately, immediately upon opening our expanded facility, the Covid pandemic hit, which affected all of our clients, since, all of them are in the hospitality industry. We immediately went from 120,000 pounds of laundry **a day** to 20,000 pounds or less of laundry **a week,** which was disastrous for our business.

9. For the next three and half years, our business was extremely volatile and unpredictable, and we struggled to survive. We were starting to do better, just when the Omnicron variant of the Covid virus hit, and took our business back down to zero. It was a constant roller coaster ride, and we were just doing our best to hang on.

10. Finally, in the summer of 2023, our business was starting to return to pre-Covid levels. Just when we thought we were going to be out of the woods, Kannegeiser caused a massive equipment failure in August 2023. It is my understanding that they were trying to update their software, and one line of code was not updated properly. As a result, once the new code was

entered, all of our dryers went down, and we were prevented from doing any laundry for 3 to 4 days. The effect on the business was catastrophic. We could not deliver laundry to our customers, and as a result, we permanently lost a huge number of customers and suffered reputational damage, which was magnified by an expert tester which is discussed below.

11. I quickly met with both the German and American CEOs of the Kannegeiser business. I was promised that they would do a deep review of what happened; that we would receive free technician visits to make sure nothing like this could happen again; and that once the facts were known they would discuss appropriate reparations to the Debtor. Shortly after this meeting, the German CEO of Kannegeiser resigned, and there has been no follow-through on any of the promises made at that meeting. To this day, Kannegeiser has never compensated the Debtor for the losses which they caused, but rather has exacerbated our problems by bringing suit against the Debtor and freezing the Debtor's bank accounts.

12. While the Debtor was still reeling from the repercussions of the Kannegeiser software glitch, in March 2024, there was an electrical fire in the Debtor's primary ironer. There was horrible smoke damage throughout the facility, and the Debtor could not operate for several days until the building was cleared of smoke. Our inability to deliver laundry for several days exacerbated the reputational damage started by the Kannegeiser software glitch. In just a few days, we lost approximately one third of our customer base.

13. Without our ironers, it was difficult to service our clients, but we felt we had to find a way to service clients to protect the customer base from further erosion. Without a primary ironer, and with the damage to the facility, we could not operate efficiently, and had to incur substantial overtime, which cut into our profits. We also had to outsource a lot of our laundry, which virtually eradicated all profit margins. We had hoped this would be extremely temporary, and we were

willing to operate at a loss to protect the customer base for a short time; however, Kannegeiser dragged its feet replacing the ironer. A new ironer did not come online until December 2024. The holiday season is our busiest season, so having the ironer come on in December was completely useless to us. We missed our most profitable season.

14. As a result of the fire, we had two insurance claims, one against our policy on the plant and equipment, and one against our business interruption policy. Kannegeiser was named as an additional payee on our plant and equipment policy, but not on our business interruption policy, in which it had no interest. Nonetheless, after we filed our business interruption claim for approximately $5 million with Ascot Insurance, a lawyer for Kannegeiser reached out to Ascot and reported to claim that the money on the insurance claim belong to them, and Ascot should not pay it to the company. It is my understanding from the insurance company that they also made extremely disparaging remarks about the company and its management. Although, Kannegeiser's allegations were factually incorrect, it gave the insurance company a perfect excuse to "investigate" and not pay the claims immediately. Eventually the claims with respect to the plant and equipment were paid, but not until the Debtor suffered severe continued losses from not having the money to replace the equipment. The business interruption claim of approximately $5 million has not been paid to this day, nor has it been denied. The insurance company continues to "investigate" Kannegeiser's allegations. I believe that if Kannegeiser had not interfered with our relationship with Ascot, and Ascot had timely paid the two insurance claims, our business would be in a strong position today.

15. Given the perfect storm of the delay in payment on the plant and equipment insurance, no payment on the business interruption insurance, slow delivery of the replacement ironer, and the already eroding customer base due to the glitch in the Kannegeiser software, it

became apparent that the company could not continue in business and meet its obligations. Not surprisingly, many of our lenders brought suit against the company, and trying to defend such suits in different fora became expensive and untenable. In a desperate attempt to bring cash into the business, the Debtor sold the proceeds of its business interruption insurance claim for $1 million. This proved to be only a temporary fix, and with the continuing problems, it became apparent that something must be done, or the entire value of the company would be consumed in the various lawsuits.

16. Accordingly, the Debtor tried its best to orchestrate an out-of-court sale process. Although it went very far down the road with two separate potential buyers, eventually the sales fell through, partly because Kannegeiser would not agree to release its lien in an out-of-court sale, and partly because of the Debtor's deteriorating financial condition.

17. In the meantime, the Debtor became behind on its lease payments, and the facility is integral to its business. Counsel to the landlord sent a notice to terminate the lease effective March 21, 2025. After extended negotiations, the termination date was extended to April 11, 2025. At the time of the negotiations, the Debtor believed it would have a signed Asset Purchase Agreement before that date which would provide sufficient comfort to the landlord to not terminate the lease. When the potential buyer walked away, it became apparent that the Debtors' only choice was to file for protection pursuant to Chapter 11, but the Debtor did not have sufficient funds on hand to finance a successful chapter 11. The potential buyer had made a deposit of $275,000, to which the Debtors became entitled if they walked away. We had expected that if worse came to worse and they walked away, we would have this amount to finance chapter 11 filings; however, the buyer alleges that the Debtors breached the agreement, and have demanded that the deposit be returned. Although we are confident that we did not breach the agreement, and the deposit

rightfully belongs to the Debtors, under the circumstances, the deposit remains in the trust account of our attorneys.

18. Management, therefore, looked diligently for DIP Financing, but was unable to find financing on any terms, due to the many secured liens against the Debtors. We even went to a company that specializes in placing DIP loans, and they could not help us.

19. As a result, some industry leaders who believe in our company, as well as some insiders who believe in our company, put together an SPV to be the DIP Lender. The only way we could file was that the SPV provided a bridge loan to fund all the necessary payments to get into Chapter 11, with the expectation that it would be rolled up into the DIP Loan. We would not have been able to file without this bridge loan, as it paid for the preparation of the bankruptcy materials, retainers to professionals, and payroll to keep the Debtor going until filing. Despite the fact that the SPV was our only potential source of DIP Financing, I believe they have agreed to very reasonable terms which are in the best interests of the Company.

20. The DIP Loan, if approved, will not only fund the operations necessary to get to an effective reorganization, but will also allow us to update and repair our equipment, so that, we are able to operate optimally with larger profit margins than currently. Returning to optimal operating levels is necessary to a successful reorganization.

## PART II
## <u>Debtors' Capital Structure and Financial Condition</u>

21. The equity of Debtor Deqser LLC is owned 60% by Benjamin Gerut and 40% by Sang Cho, the founders of the Debtors. The equity of Debtor KNY 26671 LLC is owned 51% by Debtor Deqser LLC and 49% by Kuzari Investor 26671 LLC.

22. As of the Petition Date, KNY 26671 LLC had secured debt of approximately $17 million.[3] to the extent Deqser has secured debt, it is for guarantees of the below debt of KNY 26671 LLC. The larger secured claims of KNY 26671 LLC are as follows:

| **Creditor** | **Amount** |
|---|---|
| Merchant Financial Corporation | $3,250,000 |
| Feenix Venture Partners | $1,672,260 |
| Irazuk LLC | $1,974,000 |
| Eastern Funding | $5,326,140 |
| Deutche Leasing USA, Inc (Kannegeiser) | $3,757,759 |

23. As of the Petition Date, the Debtors consolidated unsecured debt was approximately $15 million, with the largest claims as follows:

| **Creditor** | **Claim Amount** |
|---|---|
| Kuzari Asset Management LLC | $1,900,000 |
| Sang Cho | $1,100,000 |
| KPIP Urban Renewal I LLC | $625,223 |
| MCA Servicing Company | $631,907 |
| Amtrust Audit United States | $573,514 |

24. The Debtors do not have current information on the value of their assets.

[3] This is exclusive of merchant loans, which purport to be true sales, but which also purport to be secured. In any event, Debtors believe that such arrangement, if loans, are "out of the money" and would not be secured, and, if loans, may be usurious and hence voidable if they are deemed to be loans.

## PART III
## <u>First Day Motions</u>

25. In furtherance of these Chapter 11 Cases, and in order to transition into bankruptcy with as little disruption to the business as possible, the Debtors expect to file a number of motions and applications close to the Petition Date. I am referring to these pleadings as "First Day Motions", and would like to provide the Court with the rationale for filing these First Day Motions. I have reviewed each of these First Day Motions and proposed orders (including the exhibits thereto), and the facts set forth therein are true and correct to the best of my knowledge, information, and belief. Moreover, I believe that the relief sought in each of the First Day Motions is vital to enable the Debtor to transition into Chapter 11 and to maximize value during the cases. I have had the opportunity to ask my advisors about the customary practice with respect to First Day Motions, and believe that I understand the rationale for all of the pleadings.

**A. Professional Retentions**

**1. General Counsel**

26. Debtor is filing an application for entry of an order authorizing the employment of Mayerson & Hartheimer, PLLC ("**M&H**") as its general counsel, effective as of the Petition Date.

27. I have been working with M&H for about a year now and know them to be highly competent bankruptcy counsel. In addition, they are familiar with the Debtors, their books and records, their creditors and business plans, and they have been instrumental in helping us develop a strategy which management believes will preserve going concern value and maximize value for all constituencies. I believe that their knowledge of the Debtors and the Bankruptcy Code is critical to a successful outcome of these cases. I believe that their fees are in line with, or less than, the fees of bankruptcy professionals with similar credentials. Accordingly, I believe that it is in the best interests of the Debtors, their estates, their creditors and equity holders to have the services of M&H.

**2. Delaware Counsel**

28. Management considered its options concerning venue, and determined that it was in the best interests of the Debtors and their estates to file in Delaware**.** I understand that under these circumstances, the Debtors are required to have Delaware counsel. Our General Counsel has recommended the firm of Gellert Seitz Busenkell & Brown LLC ("**GSBB**"). M&H have advised myself and Management that they have worked with GSBB leading up to the filing of the petitions and have been impressed with both their knowledge of bankruptcy law and Delaware custom and practice, as well as by their efficiency. I have reviewed their credentials and believe them to be experts in the field of bankruptcy. The Debtor is particularly looking to its Delaware counsel for their knowledge of Delaware custom and practice and for efficient, cost-effective representation. Based on the recommendation of our General Counsel, I believe that GSBB is exactly what the

Debtor needs, and that the retention of GSBB will serve the best interests of the Debtors, their estates, their creditors and equity holders.

**B. Other First Day Motions.**

**1. The DIP Motion**

29. The Debtor immediately needs to obtain postpetition financing in order to pay its employees and continue its business operations. Without access to debtor-in-possession financing, the Debtor has extremely limited cash on hand, and does not expect to be able to generate sufficient levels of cash flow through operations of the Debtor's business to cover cash needs and the projected costs of these Chapter 11 Cases. Furthermore, the agreement of certain of the Debtor's prepetition lender to use of cash collateral is premised upon approval of the proposed DIP Documents.

30. As it became apparent that Debtors were facing a liquidity crisis, the Debtors and their advisors examined a variety of options for resolving their liquidity issues without resorting to a chapter 11 filing. This process took many months. The Debtors explored raising capital and selling the company, but neither of these proved feasible. Debtor also contacted several sources of debt financing, but since virtually all of the Debtor's assets are pledged to their various prepetition lenders, therefore they could not find anyone interested in coming in with new debt. Without DIP financing, the Debtors were afraid that they were facing liquidation, which would provide very little value for anyone.

31. The situation looked very bleak when a group of potential funders offered to provide the financing necessary for the expenses of the Chapter 11 Cases, and for operations during the Chapter 11 Cases. . It is important to note that Benjamin Gerut, who is one of the founders of

the Debtors is a participant in the DIP Lender group. Due to the nature of his various roles, Mr. Gerut recused himself from the Debtors decision to enter into the DIP Term Sheet.

32. This funding group's agreement to provide financing was truly a lifeline for the Debtors. Without the proposed financing as set forth in the DIP Facility, the Debtors would not have sufficient funds to preserve their assets and continue KNY's operations and would have been forced to liquidate and relinquish their interest in its assets to its creditors. I believe that the Debtor's true value is as a going concern, and therefore, any liquidation would produce only nominal value to the Debtors' creditors as the equipment owned by KNY is heavily installed, and much of its value would be lost in a liquidation. I truly believe that the DIP Facility is in the best interests of the Debtors, their estate, and all constituencies, and that without it, the Debtors would have been forced to liquidate; whereas, I believe we now have a plan to successfully reorganize.

32. The negotiation of the DIP Facility was at arm's-length. The Debtors were represented by experienced, independent bankruptcy counsel, M&H. The DIP lender was also represented by experienced, independent bankruptcy counsel, as were the secured lenders whose agreement to subordinate and permit use of cash collateral is critical to the DIP Facility. The negotiations involved several rounds of give-and-take, and it took some time to develop a term sheet for the DIP Facility to which everyone could agree. There is no doubt in my mind that the negotiation of the DIP Facility was conducted at arm's-length and in good faith, and I believe that the terms are customary, fair and reasonable.

33. From our prior extensive attempts to get financing I know that we could not get unsecured financing (including financing based just on an administrative or superpriority claim) or secured financing junior or *pari passu* to existing liens of the pre-petition lenders. The Debtor has no unencumbered assets to offer a debtor-in-possession lender. During the lengthy negotiations

of the DIP Documents, and recognizing that this DIP Lender is the only party willing to provide any financing to the Debtor under the circumstances, it became apparent that the Debtor would not be able to obtain financing without providing a superpriority lien, priming the existing secured lenders and providing a first priority lien on all unencumbered assets, and providing a junior lien on any encumbered assets, such as assets encumbered by Non-Consensual Liens of which the Debtor is not aware. Fortunately, certain of the pre-petition secured lenders agreed to subordinate to the DIP Facility, so long as, the Debtor provided a superpriority claim and postpetition liens to those existing lenders in the amount of any diminution in the value of their collateral. I believe that the Debtor would not have been able to obtain postpetition financing without these concessions, and that the concessions are fair and reasonable.

34. The DIP Facility also has a Carveout for professional fees, and the fees of the US trustee, and the liens and superpriorities granted in the DIP Facility are subject to any existing Non-Consensual Liens. I believe this is also protective of all parties.

35. In the days leading up to the filing, the DIP Lender made a secured bridge loan available for the benefit of the Debtors (the "**Bridge Loan**"). The purpose of the Bridge Loan was to fund the filing of the Chapter 11 Cases and to fund the payroll of KNY. Prior to the filing, the Debor utilized $390,000 and post-petition the Debtor Utilized $160,000. Without the Bridge Loan, the Debtors would not have had the funds available to file these Chapter 11 Cases and fund payroll.

. 36. The DIP Facility will be used to cover the costs associated with preserving the Debtor's operations and running these Chapter 11 Cases through to a plan of reorganization. I have been closely involved in preparing the budget on which the DIP Facility is based, and I believe that if the Interim Order is entered promptly, followed by the Final Order, the Debtor will have sufficient funds to operate and restructure, to the benefit of all of its constituencies.

37. The DIP Facility represents the best source of financing available to the Debtors under the circumstances, and was negotiated at arm's-length with the prepetition lenders, resulting in terms that the Debtors submit are reasonable and appropriate to meet the Debtors' financing needs during this Chapter 11 Cases. I do not believe that the Debtors can obtain credit on more favorable terms than those offered by the DIP Lenders under the DIP Facility. Accordingly, the relief requested in the DIP Motion should be granted as it is in the best interests of the Debtors, its estates, their creditors, their equity holders, and all parties in interest.

**2. The Wages Motion**

38. The Debtors have filed a motion for interim and final orders permitting payment of prepetition wages and certain other employee benefits up to a cap of $17,150.00 per employee (the "**Wages Motion**"). KNY has approximately one hundred and eighty (180) workers, of which 40 are clerical and 140 are non- clerical. The payroll for such workers is approximately $160,000 a week. Of the next $160,000 payable to ADP, approximately $100,000 relates to work performed pre-petition.

39. By the Wages Motion, the Debtors seek authority, but not direction, among other things, to: (i) pay all prepetition wages, salaries, reimbursements, and compensation and related administrative and incidental costs (collectively, the "**Employee Compensation Obligation**s") and prepetition employee benefits (collectively, the "**Employee Benefit Obligations**") up to a maximum of $17,150 per person; (ii) pay all employment, unemployment, Social Security, and federal, state, and local taxes relating to the Employee Compensation Obligations and Employee Benefit Obligations, whether withheld from wages or paid directly by the Debtor to governmental authorities (collectively, "**Payroll Taxes**"), and make other payroll deductions, including but not limited to, voluntary deductions for benefits, health insurance, and the like (collectively with the

Payroll Taxes, the "**Payroll Deduction Obligations**" and collectively with the Employee Compensation Obligations and Employee Benefit Obligations, the "**Prepetition Employee Obligations**"); and (iii) honor and continue the Debtor's prepetition programs, policies, and practices as described in this Motion with respect to the Prepetition Employee Obligations in the ordinary course of business.

40. I believe that any delay in paying pre-petition Employee Compensation Obligations will adversely impact the Debtor's relationship with its Employees and irreparably impair the Employees' morale, dedication, confidence and cooperation with the chapter 11 process. Some employees may even quit if they are not paid. At this early stage in the case, the Debtors simply cannot risk the substantial damage to its business that would inevitably result from a decline in the Employees' morale and cooperation attributable to the Debtor's failure to honor its pre-petition Employee Obligations. Again, the amounts to be paid are relatively small, but the damage to the Debtor's business would be huge if employees are not timely paid.

41. Accordingly, I believe that the relief requested is in the best interests of the Debtors, their estate, their creditors and equity holders.

**3. The Utilities Motion**

42. In the normal course of its business, the Debtor has relationships with approximately three utilities (the "**Utility Companies**") for the provision of utility services (the "**Utility Services**") which are critical to the conduct of Debtor's business.

43. The Debtors cannot operate their business without utility service. Should any Utility refuse or discontinue service, the Debtors would be forced to cease or limit their operations. Such a cessation would substantially disrupt the Debtors' operations and result in revenue loss, which could irreparably harm and jeopardize the Debtors' business.

44. Accordingly, to ensure that Utility Services who would be prohibited from altering, refusing, or discontinuing service are adequately protected, the Debtors propose to establish a segregated account into which Debtors will deposit the sum of $78,603.00, which is equal to approximately half a month of Utility Services calculated on a historical basis, and additionally have proposed termination procedures to address any request made by a Utility Company for additional adequate assurance. I believe that our outstanding record of payment to the Utility Companies offers them further assurance of future performance.

45. For the foregoing reasons, I believe that the relief requested in the Utilities Motion is in the best interests of the Debtors, their estate, their creditors, and their equity holders, and therefore should be approved.

**4. Joint Administration Motion**

46. The Debtors are filing a motion in these Chapter 11 Cases to be procedurally consolidated under one caption and jointly administered. It is my understanding that this will streamline procedures and save money by allowing the Debtors to file one motion or report in the future, whereas otherwise, they might each have to file a separate motion and report and serve it in both cases, which have overlapping creditors. As the Debtors have very limited resources, I am all in favor of anything that saves money and eliminates redundancies. I am also advised that a joint administration is a procedural matter only, and does not affect the substantive rights of any party. I, therefore, believe that it is in the best interests of the Debtors, their estates and their creditors, to allow joint administration in these Chapter 11 Cases.

**5. The Insurance Motion**

47. KNY maintains various insurance programs providing coverage for, among other things, general liability, workers' compensation liability, commercial auto, property, boiler and

commercial umbrella (collectively, the "**Insurance Programs**"). The Insurance Programs include coverage primarily from the insurance policies from the following insurance companies: (i) the Travelers, (ii) Starr Indemnity & Liability Co., (iii) Lloyd's of London, (iv) Gotham Insurance Co., (v) Arch Specialty Insurance Co., (vi) Kinsale Insurance Company, and (vii) National Fire Insurance Co. of Hartford (the "**Insurance Policies**"), some of which KNY has obtained through a third-party insurance broker (the "**Insurance Broker**"), and some of which KNY has obtained directly from the Travelers.

48. All of these policies are essential to the business of the Debtors. A number of the policies including the umbrella insurance are required by our lenders. The Workmen's Comp. insurance is required by law. Additionally, we must maintain the legally mandated minimum insurance on our vehicles. The Debtors get a great deal of benefit from their insurance policies, which, for the most part, are either mandated by law or required by our lenders, including the proposed DIP Lender.

49. Additionally, the Debtor has been unable to pay in the ordinary course of business pursuant to 11 U.S.C. § 364(a), the premiums for the Insurance policies provided by (i) Starr Indemnity & Liability Co., (ii) Lloyd's of London, (iii) Gotham Insurance Co., (iv) Arch Specialty Insurance Co., (v) Kinsale Insurance Company, and (vi) National Fire Insurance Co. of Hartford Directors, and has been unable, after reasonable efforts, to obtain unsecured credit for such payment pursuant to 11 U.S.C. § 364(b).

50. The Debtors have engaged in discussions with various companies in the business of providing insurance premium financing and has determined that IPFS Corporation ("**IPFS**") offers the most advantageous terms for such financing.

51. Finally, while KNY does not believe there are any prepetition amounts owing to the Insurance Carriers with respect to the Insurance Policies, KNY is one month behind in its premium finance facility with IPFS. KNY seeks authority to pay IPFS any pre-petition amounts in respect to the Insurance Policies, and to continue to pay post-petition costs with respect to its premium finance facility with IPFS in the ordinary course of business during the pendency of these cases.

52. It is essential to the business operations of the Debtors that they maintain their insurance without interruption. Accordingly, I have authorized the Debtors to make a motion to continue all prepetition insurance policies without interruption, including the payment of all premiums, whether they accrued prepetition or postpetition. The Debtors are not seeking to assume the insurance contracts at this time, but merely to continue them in force by paying any prepetition amounts owed, including any amounts owed for premium financing. I estimate that approximately $42,876.00. in the aggregate will be necessary to pay prepetition amounts due to IPFS. Without approval to pay these amounts, insurance policies could lapse, causing a default in both our prepetition and postpetition loans, and failure to meet legal requirements for the operation of the business. I, therefore, submit that it is in the best interests of the Debtors, their estates, and their creditors to authorize the continuation of the insurance policies and payment of all amounts due.

**6. Tax Motion**

53. The Debtors requests that the Court (a) authorize, but not direct, the Debtors to pay certain prepetition taxes, including, sales and use taxes and similar taxes and fees in the ordinary course of business, as the Debtors, in their sole discretion, and deem necessary, (b) authorize and direct the banks at which the Debtors' bank accounts are maintained (the "**Banks**") to honor and process check and electronic transfer requests related to the foregoing and (c) grant related relief.

54. In the ordinary course of business, the Debtor incurs or collects and remits certain taxes including sales, use, and various other taxes, fees, charges, and assessments (the "**Taxes and Fees**"). The Debtor remits such Taxes and Fees to various federal, state, and local taxing and other governmental authorities and/or certain municipal or governmental subdivisions or agencies of those states (the "**Taxing Authorities**") in connection with the operation of its business. The Taxes and Fees are paid monthly, quarterly, semi-annually, or annually to the respective Taxing Authorities, depending on the given Tax or Fee and the relevant Taxing Authority to which it is paid. As of the Petition Date, KNY owes the IRS $312,000 as a result of over-drawing Employee Retention Credits ("**ERC**"), and owes the State of New Jersey $250,000 on account of unremitted sales tax. Deqser does not owe any amount in unremitted Taxes and Fees but may owe an amount during the pendency of these cases, a portion of which will be attributed to prepetition Taxes and Fees.

55. The Debtor seeks authority to pay all prepetition Taxes and Fees in the ordinary course of business owed to the Taxing Authorities.

56. Any regulatory dispute or delinquency that impacts the Debtors' ability to conduct business in a particular jurisdiction could have a wide-ranging and adverse effect on the Debtor's operations as a whole and on the value of its estate. Specifically, the Debtors failure to remit the Taxes and Fees could adversely affect KNY's business operations because, among other things (a) the Taxing Authorities could initiate audits of the Debtors or seek to prevent the Debtors from continuing their business and administering their estates, which, even if unsuccessful, would unnecessarily divert the Debtors' attention from the process of maximizing the value of the estate; (b) the Taxing Authorities could attempt to suspend KNY's operations, file liens, seek to lift the automatic stay and pursue other remedies that will harm the estates; (c) some of the Taxing

Authorities may seek to collect penalties, cancel licenses, or undertake other unfavorable enforcement actions if the Debtors do not pay the Taxes and Fees; and (d) certain of the Debtors', officers, and employees might be subject to personal liability, even if such a failure to remit such Taxes and Fees was not a result of malfeasance on their part, which would undoubtedly distract these key people from their duties related to these Case.

57. Further, the Debtors' payment of the Taxes and Fees is an exercise of sound business judgment and is necessary to maximize the value of the Debtors' estate for the benefit of creditors. If the Debtors do not continue paying the Taxes and Fees when they come due on a timely basis, it is possible that Taxing Authorities, or those parties who ordinarily collect the Taxes and Fees, may interfere with the Debtors' business and the efficient administration of the estate.

58. For the foregoing reasons, it is in the best interests of the Debtors, their estates, their creditors, and all other parties in interest that the Court grant the relief requested in the Tax Motion.

**7. Critical Vendors' Motion**

59. KNY relies on a number of third-party vendors to provide it with goods and services used in the ordinary course of business. While the Debtors believes that many of KNY's vendors provide invaluable services, the Debtors and their advisors have carefully reviewed and analyzed Debtors' books and records, consulted with key personnel, and identified 4 vendors of services that are absolutely critical to Debtors' operations (the "**Critical Vendors**," and such claims, the "**Critical Vendor Claims**").

60. Specifically, in identifying the Critical Vendors, Debtors examined the vendor relationships and the services provided with the following criteria in mind:

- whether a vendor is a sole- or limited-source or high volume supplier or service provider;

- whether alternate vendors exist to provide the same or similar goods or services on equal or better terms;
- whether the Debtors could efficiently transition its business with a Critical Vendor to a replacement vendor, taking into account the costs of replacing a vendor (including, pricing, transition expenses, professional fees and lost sales or future revenue) and the degree to which replacement costs exceed the amount of the vendor's prepetition claim;
- whether a contract exists by which the Debtors could compel the vendor's continued performance on prepetition terms and, if so, whether the Debtors could enforce it in a timely, cost-efficient manner without the undue burden on, or disruption of, the Debtors' businesses and operations;
- whether certain specifications and/or requirements unique to the Debtors' operations would prevent obtaining goods or services from alternate sources;
- whether failure to pay all or part of the vendor's prepetition claim could trigger financial distress for the applicable vendor;
- whether failure to pay all or part of a particular vendor's claim could cause the vendor to refuse to ship goods or to provide critical services on a postpetition basis; and
- whether failure to pay a particular vendor could result in a contraction of trade terms as a matter of applicable non-bankruptcy law or regulation.

61. As a result of Debtors' vetting process, we have identified four (4) Critical Vendors. The Critical Vendors are all key suppliers to the Debtors due to the nature of the Debtors' business in the commercial laundry sector. Replacing these suppliers would be inefficient and costly; and would ultimately create further delays in restarting Debtors' operations.

62. Although we are asking for the flexibility to pay up to $417,344.00 to critical vendors, we hope not to spend that entire amount, and would only pay vendors if their refusal to supply us postpetition would cause a disruption in the business. The amount for which we are seeking authority will not be paid in a lump sum, but would be paid in the ordinary course of business, as, such vendors continue to supply Debtors. We would not pay any vendor prepetition amounts unless they agree to continue to supply Debtors post-petition. We have asked for a pool

from which to pay critical vendors and have not named the critical vendors because (i) we have not negotiated with any of our vendors yet, and do not know where any sticking points might be; and (ii) we believe it would cause consternation among our vendors if they knew who was receiving a prepetition payment. I, therefore, believe that the relief requested is in the best interests of the Debtors, their estates and their creditors.

**CONCLUSION**

I hereby declare under the penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief, and I respectfully request that all of the relief requested in the First Day Motions be granted, together with such other and further relief as this Court deems just and proper.

Dated: April 17, 2025

**Deqser, LLC, et al.,**

BY: */s/ Sang Cho*
Sang Cho