**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>DEQSER LLC., et al.,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 25-10687 (CTG)<br><br>(Jointly Administered)<br><br>**Re: D.I. 15** |

**OBJECTION BY THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO THE DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (II) GRANTING SECURITY INTERESTS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (III) GRANTING ADEQUATE PROTECTION TO CERTAIN PREPETITION SECURED CREDIT PARTIES, (IV) MODIFYING THE AUTOMATIC STAY, (V) AUTHORIZING THE DEBTORS TO ENTER INTO AGREEMENTS WITH CSV CAPITAL LLC, (VI) AUTHORIZING NON-CONSENSUAL USE OF CASH COLLATERAL, (VII) SCHEDULING A FINAL HEARING, AND (VIII) GRANTING RELATED RELIEF**

The Official Committee of Unsecured Creditors (the "Committee") for the jointly administered bankruptcy estates of Deqser LLC, *et al.* (the "Debtors"), by its proposed undesigned counsel, submits this objection (the "Objection") to the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Security Interests and Superpriority Administrative Expense Status, (III) Granting Adequate Protection to Certain Prepetition Secured Credit Parties, (IV) Modifying the Automatic Stay, (V) Authorizing the Debtors to Enter into Agreements with CSV Capital LLC, (VI) Authorizing Non-Consensual Use of Cash Collateral, (VII) Scheduling a Final Hearing, and (VIII) Granting Related Relief*

[1] The Debtors in these Chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: Deqser LLC (8269) and KNY 26671 LLC (9132).

[Docket No. 15] (the "DIP Motion").[2] In support of this Objection, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT[3]

1. While the Committee would like to see and help facilitate an efficient and successful chapter 11 process, the Committee unfortunately cannot evaluate the propriety of approving the DIP Facility on a final basis at this time due to several concerns and a significant and persisting information vacuum. The DIP Facility, as proposed, provides no clear path to recovery to unsecured creditors, as all unencumbered assets, including avoidance actions and pre-petition tort actions, would be part of the DIP Collateral, in addition to waivers of rights under sections 506(c) and 552(b) of the Bankruptcy Code, among other items. Further, based on the budget annexed to the DIP Motion and an updated budget recently shared with the Committee, it is unclear if between the DIP Facility and the Debtors' income there will be sufficient funding in this case to pay administrative expenses.

2. Since retaining counsel on May 5, 2025, the Committee made repeated requests to the Debtors for various information, including for the identities of the DIP Lender members. The Debtors and the DIP Lender finally disclosed the DIP Lender members to the Committee's counsel on a professional-eyes-only basis on May 13, 2025. The disclosure, which revealed that a pre-petition lender is among the DIP Lender group, raised more questions, including whether one of the DIP Lender members acquired some of the pre-petition secured debt. The prolonged lack of disclosure and apparent need for secrecy raise a number of concerns about the Debtors and DIP

---

2 Unless otherwise defined in this Objection, capitalized terms shall have the same definition as set forth in the DIP Motion.

3 The Committee reserves all of its rights, including, without limitation, Challenge rights, and none of the facts set forth herein should be construed as an admission that facts asserted by the Debtors are true or as a waiver of the Committee's rights to dispute such facts.

Lender's potential motivations, including if through the DIP Liens and potential releases they are seeking to insulate insiders from claims by burying avoidance and pre-petition tort actions that otherwise could provide some recovery for unsecured creditors.[4] Adding to the confusion, the Debtors' pre-petition debt structure, including the relative priority of claims and collateral of the pre-petition lenders is unclear based on the Debtors' filings, as the filings only identify lenders and amounts. The Committee also requires information with respect to, among other things, (i) Kannegiesser's assertions that the Debtor received approximately $775,000 in pre-petition insurance proceeds; (ii) the basis and timeline for the $507,500 in repairs that were included in the interim budget (but apparently not made);[5] and (iii) and the use of the interim DIP draw.

3. Given the issues and lack of information, the Court should not grant the DIP Motion on a final basis. In the alternative, the Committee proposes that a further use of the DIP Facility be approved on a further interim basis for a limited period with an amount demonstrated to be necessary for the Debtors' operations during that period. This will provide additional time for the Debtors to provide the Committee and other parties with missing information so that parties can better evaluate the DIP Facility and potential paths forward in the case.

## BACKGROUND

### A. Procedural History and General Background

4. On April 10, 2025 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under Chapter 11 of the Title 11 of the United States Code (the "Bankruptcy Code"), 11 U.S.C. §§ 101, *et seq*. No trustee or examiner has been appointed in the Debtors' cases, and the

---

[4] The Debtors have yet to file schedules, so the extent of potential avoidance and pre-petition tort claims is presently unclear.

[5] To the extent repairs are made, the Committee requests that it be provided with weekly reports detailing what equipment was repaired or replaced and the costs.

Debtors continue to operate their businesses as debtors in possession, pursuant to Section 1107(a) and 1108 of the Bankruptcy Code.

5. On April 17, 2025, the Debtors filed the DIP Motion [D.I. 15].

6. Also on April 17, 2025, the Debtors filed the *Declaration of Sang Cho In Support of Chapter 11 Petitions and First Day Motions* [Docket No. 16] (the "First Day Declaration"). Additional information regarding the Debtors' operations, the Debtors' capital structure, and the circumstances surrounding the commencement of these Chapter 11 Cases can be found in the First Day Declaration.

7. By Order entered on April 21, 2025 [Docket No. 34] (the "Joint Administration Order"), the Court consolidated the Debtors' cases for procedural purposes only, and ordered the joint administration of the Debtors' cases, pursuant to Fed. R. Bankr. P. 1015(b), under *In re Deqser LLC, et al*, Case No. 25-10687 (CTG) (the "Chapter 11 Cases").

8. On April 30, 2025, the Office of the Trustee for District of Delaware (the "U.S. Trustee") appointed three members to the Committee, pursuant to Section 1102(a)(1) of the Bankruptcy Code [Docket No. 55]. The members of the Committee are: (i) KPIP Urban Renewal II, LLC; (ii) Hub Truck Rental Corp.; and (iii) Facsimile Communications Industries, Inc. dba Atlantic Tomorrows Office. On May 5, 2025, the Committee selected Fox Rothschild LLP to serve as Committee's counsel.

9. As of the date of this Objection, the Debtors have yet to file their Schedules and Statements. Pursuant to the *Order Pursuant to Fed. R. Bankr. P. 1007(c) Extending the Time to File Schedules of Assets and Liabilities and Statements of Financial Affairs* [Docket No. 72], the Debtors initially had until May 12, 2025 to file their Schedules and Statements, however, on May 12, 2025, the Debtors filed a subsequent motion for additional time to file their Schedules and

Statements, through and including May 15, 2025. *See* Docket No. 83. The fact that the Debtors have not yet filed schedules is notable in light of the fact that the DIP Lender is seeking liens on avoidance actions and pre-petition tort actions. Without schedules, the Committee is unable to begin to ascertain the potential value of potential avoidance and pre-petition tort claims.

**B. Prepetition Secured Debt**

10. As more fully set forth in the First Day Declaration, the Debtors allege that, as of the Petition Date, they are liable for approximately $17 million in secured debt obligations (excluding merchant loans that the Debtors dispute being secured loans). *See* First Day Declaration, at ¶ 22. The Debtors allege that all of the secured debt is owed by Debtor KNY 26671 LLC ("KNY"), and to the extent Debtor Deqser LLC ("Deqser") has any secured debt, it is for guarantees of the obligations owed by KNY. *Id.*

11. The Debtors assert that several secured lenders financed various aspects of the Debtors' business and the Debtors provided a summary chart of their credit facilities (collectively, the "Prepetition Credit Facilities"), which has been reproduced below:

| **Creditor** | **Amount** |
|---|---|
| Merchant Financial Corporation | $3,250,000 |
| Feenix Venture Partners | $1,672,260 |
| Irazuk LLC | $1,974,000 |
| Eastern Funding LLC | $5,326,140 |
| Deutsche Lease USA, Inc (Kannegeiser) | $3,757,759 |

*See id* at ¶¶ 21-22; DIP Motion, at ¶¶ 10-11.

12. The relative priority and collateral of the various pre-petition secured debt is unclear from the Debtors' filings. The Debtors recently provided the Committee's counsel with

pre-petition loan documents, but time is needed to review the materials and determine the priority of claims and extent of liens.

**C. The DIP Motion and DIP Facility**

13. The DIP Motion was among several "first day" motions filed by the Debtors following the Petition Date. The DIP Motion sought, among other relief, authorization for (i) the Debtors to obtain post-petition financing from the DIP Lender, (ii) the granting of post-petition liens and superiority administrative expense status to the DIP Lender (subject to certain restrictions with the Prepetition Credit Facilities), (iii) the use of cash collateral on a consensual and nonconsensual basis, and (iv) the granting of adequate protection to the Prepetition Secured Parties. The salient terms of the DIP Facility[6] are described herein.

14. On April 21, 2025, the Court held a hearing on the Debtors' various first day motions (the "First Day Hearing").

15. To address comments received by several parties in interest, following the First Day Hearing, on April 25, 2025, the Debtors filed the *Certification of Counsel Regarding Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Security Interests and Superpriority Administrative Expense Status, (III) Granting Adequate Protection to Certain Prepetition Secured Credit Parties, (IV) Modifying the Automatic Stay, (V) Authorizing the Debtors to Enter into Agreements with CSV Capital LLC, (VI) Authorizing Non-Consensual Use of Cash Collateral, (VII) Scheduling a Final Hearing, and (VIII) Granting Related Relief* [Docket No. 49], which attached a revised proposed interim DIP order.

16. On the same day, the Court entered the revised DIP order, approving the DIP Motion on an interim basis [Docket No. 50] (the "Interim Order"), including the scheduling of a

[6] The DIP Facility is memorialized in the *DIP Facility Term Sheet* attached to the Interim Order.

final hearing for May 12, 2025, at 11:00 a.m. (prevailing Eastern Time) (the "Final Hearing"). By agreement between the Debtors and the Committee, the Committee's objection deadline has been continued from May 5, 2025 to May 14, 2025, and the Final Hearing has been adjourned to May 16, 2025 at 1:00 p.m. (prevailing Eastern time).

17. As disclosed in the DIP Motion, Benjamin Gerut, a founder and insider of the Debtors, is also a member of the DIP Lender group. *See* DIP Motion, at ¶ 12. According to the First Day Declaration, Mr. Gerut is the largest of two equity holders in Deqser, owning 60% of the company's equity. *See* First Day Declaration, at ¶ 21. In the DIP Motion, the Debtors aver that Mr. Gerut recused himself from the Debtors' decision to enter into the DIP Term Sheet. DIP Motion, at ¶ 12.[7] While Mr. Gerut is the only insider expressly identified in the DIP Motion, the First Day Declaration suggested that there may be multiple insiders who were involved in the formation of the DIP Lender. *See* First Day Declaration, at ¶ 19 ("[S]ome industry leaders who believe in our company, as well as ***some insiders*** who believe in our company, put together an SPV to be the DIP Lender.") (emphasis added). On May 13, 2025, shortly before the filing of this Objection, the identity of the DIP Lender members were finally disclosed to the Committee's counsel on a professional-eyes-only basis. The DIP Lender members include a pre-petition lender.[8] Further, based on a subsequent discussion with DIP Lender's counsel on May 13, 2025, the DIP Lender or a member of the DIP Lender may have acquired other pre-petition secured debt. None of this has been disclosed in the Debtors' filings, raising several questions, including with respect to Mr.

---

[7] As the Committee was not yet formed, neither the Committee nor its counsel were present at the first day hearing, though the Committee understands that there was a clarification that Mr. Gerut may not have actually recused himself from the Debtors' decision to enter into the DIP Term Sheet.

[8] The Committee's professionals will abide by the professional-eyes-only agreement not to identify the DIP Lender members at this time, but given the significant questions and concerns and the lack of disclosure in this case, it is believed that it is important for the Court to have some context.

Gerut's relationship with the DIP Lender members and certain pre-petition lenders. The fact that the Debtors and DIP Lender would not disclose the DIP Lender members until now, and have only done so with the caveat of maintaining secrecy, only adds to the intrigue.

18. Importantly, the Interim Order includes an indemnification provision, which requires the Debtors to indemnify and hold harmless the DIP Lender and its affiliates, directors, officers, employees, agents, attorneys, or any other Person affiliated with or representing the DIP Lender from all claims and losses. *See* Interim Order, at ¶ 8. Further, the DIP Term Sheet provides that any Final Order will include a release by the Debtors of the DIP Lender; its affiliates; its current and former directors, managers, officers, principals, members, employees, and other agents and representatives from any and all claims or causes of action the Debtors may have against such parties related to these Chapter 11 Cases. *See* DIP Term Sheet, at p. 28. As discussed more below, while the Committee believes such a release is entirely inappropriate in this context, at the very least, given that the DIP Lender group does include an insider, the Committee submits that the entire DIP Facility and the related transaction must be subject to rigorous scrutiny before the indemnification provision and any release can be approved. As of the date of this Objection, the Committee has yet to see a draft of the Final Order.

19. Pursuant to the DIP Motion, the Debtors now seek final approval of debtor-in-possession financing from the DIP Lender, consisting of a non-amortizing priming, super-priority senior secured multiple-draw term loan in the aggregate principal amount not to exceed $2,500,000. *See* DIP Motion, at ¶ 19, p. 10; DIP Term Sheet, at pp. 1-2.

20. Notably, the DIP Facility includes a roll-up (the "Roll Up") of the outstanding secured bridge loan, in the aggregate amount of $550,000 (the "Bridge Loan"), provided by the DIP Lender to the Debtors. The Bridge Loan consists of (i) $390,000 in pre-petition funds

advanced in the days leading up to the Chapter 11 Cases, and (ii) $160,000 in funds advanced post-petition. *See* DIP Motion at ¶ 19, p. 10; DIP Term Sheet, at p. 11. As such, 15.6% of the DIP Loan consists of amounts provided to the Debtors' pre-petition, and only 78% of the DIP Loan will actually constitute new money.

21. Pursuant to the Interim Order, the DIP Obligations shall constitute allowed senior administrative expense claims against each Debtor and their estates (the "DIP Superpriority Claims") with priority in payment over any and all administrative expenses; provided, further, that the DIP Superpriority Claims shall have recourse to and be payable from all prepetition and postpetition property and assets of the Debtors and the estates and all DIP Collateral[9] and all proceeds thereof, and the proceeds of any and all Avoidance Actions, pre-petition tort claims, including claims against the Debtors' current and former directors and officers and the proceeds thereof. *See* Interim Order, at ¶ 9.

22. Effective immediately and automatically as of the entry of the Interim Order, as security for the DIP Obligations, the DIP Lender is granted (i) a Senior Secured Lien on post-

---

[9] As defined in the Interim Order:

> The term "DIP Collateral" means collectively all of the Debtors' right, title and interest in, to and under all of the Debtors' assets, including, but not limited to the following, in each case, whether now owned or existing or hereafter acquired, created or arising and wherever located: all assets and property of such Debtor and its estate, real or personal, tangible or intangible, now owned or hereafter acquired, whether arising before or after the Petition Date, including, without limitation, contracts, contract rights, licenses, general intangibles, instruments, equipment, accounts, documents, goods, inventory, fixtures, documents, cash, cash equivalents, accounts receivables, chattel paper, letters of credit and letter of credit rights, investment property (including, without limitation, all equity interests owned by any Loan Party in its current and future subsidiaries), commercial tort claims, arbitration awards, money, insurance, receivables, receivables records, deposit accounts, collateral support, supporting obligations and instruments, fixtures, all interests in leaseholds and real properties, all patents, copyrights, trademarks, all trade names and other intellectual property (whether such intellectual property is registered in the United States or in any foreign jurisdiction), together with all books and records relating to the foregoing, all proceeds, products, accessions, rents and profits of or in respect of any of the foregoing (as such terms are defined in the Uniform Commercial Code as in effect from time to time in the State of New Jersey) and, subject to the entry of a Final Order, (i) proceeds of actions brought under section 549 of the Bankruptcy Code to recover any postpetition transfer of DIP Collateral and (ii) the Avoidance Action Proceeds.

Interim Order, at ¶ 10(a).

petition acquired assets (including but not limited to avoidance actions) and accounts receivable that are directly generated from the post-petition loans; (ii) except for post-petition collateral to the extent provided by operation of 11 U.S.C. § 552, the DIP Lender shall have a position junior to Merchant on Merchant's collateral; (iii) the DIP Lender shall have a position junior to both any valid first liens with respect to equipment collateralizing those secured positions; and (iv) with respect to all other Secured Creditors, the DIP Lender is granted continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected priming first lien security interests in and liens (collectively, the "DIP Liens") on all DIP Collateral. *See* Interim Order, at ¶¶ 10-11.

23. The DIP Loans will bear interest at a rate per annum equal to 8% payable in cash or at 11% payment in kind, at the election of the DIP Lender (the "Interest Rate"). *See* DIP Motion at ¶ 19, p. 10; DIP Term Sheet, at p. 2. Further, upon the occurrence of an Event of Default, all DIP Obligations will bear interest at an additional 5% per annum. *Id.*

24. Paragraph 15 of the Interim order addresses the priority and amount of the professional fee carve out (the "Carve Out"). While the DIP Liens and the DIP Superpriority Claims are subordinate to the Carve Out, it should be noted that the Carve Out only allocates an aggregate total of $150,000 to cover the combined fees of all professionals retained by both the Debtors and the Committee, as well as the U.S. Trustee's fees under 28 U.S.C. § 1930(a)(6). Interim Order, at ¶ 15; DIP Term Sheet, at p. 11. Professional fees are not included in the budget annexed to the DIP Motion or the subsequently provided budget to the Committee.

25. Additionally, paragraph 16 of the DIP Motion sets forth the limitations on the Committee's ability to bring a challenge to investigate the validity, enforceability, perfection, priority, and extent of the Prepetition Liens (each such proceeding or appropriate pleading

commencing a proceeding or other contested matter, a "Challenge"). The Committee is permitted to use no more than $25,000 of the Carve Out to pursue such Challenges (the "Investigation Budget Amount"). Interim Order, at ¶ 16. Further, the Committee is only entitled to use the Investigation Budget Amount to pursue any such Challenges for thirty (30) days following its appointment. *Id.* The Interim Order also provides that the general deadline to raise Challenges for parties-in-interest is no later than seventy-five (75) days following the entry of the Interim Order (the "Challenge Deadline"). *Id.* at ¶ 17(a).

26. An initial budget (the "DIP Budget") was included as Schedule 1 to the DIP Term Sheet that was attached to the Interim Order. Among other things, the DIP Budget reflects a 13-week cash flow forecast for obtaining DIP Financing and the use of Cash Collateral. *See* DIP Term Sheet, at Schedule 1. Notably, the DIP Budget suggests that there will only be a remainder of about $68,000 in DIP Financing at the conclusion of the 13-week period. *Id.* Further, there is reason to believe that the remainder may be significantly less, given that the DIP Budget currently omits Chapter 11 professional fees and other administrative expenses. *Id.*

27. The DIP Budget also includes a line-item expense of $507,500 for "Supplies & Misc" during the week of April 14, 2025. The Committee understands that this amount is for repairs to the Debtors' equipment but that it was not paid during the interim period as envisioned by the DIP Budget and is now intended to be paid in the coming weeks. It is unclear what these costs are based on (e.g. are there any formal estimates for repairs), whether all of the repairs need to be done imminently, and what kind of boost in revenue may result from the repairs and when.

28. Subject to entry of the Final Order, the Interim Order also waives certain rights of the Debtors, including: (i) their right to surcharge the DIP Collateral, pursuant to Section 506(c); (ii) the "equities of the case" exception under Section 552(b); and (c) the equitable doctrine of

"marshalling," and other similar doctrines with respect to the DIP Collateral and the Prepetition Collateral. *Id.* at ¶¶ 18-19.

29. Additionally, the objection filed by Kannegiesser to the DIP Motion noted that noted that the Debtor received approximately $775,000 in pre-petition insurance proceeds. *See* D.I. 62 at ¶ 9 (the "Kannegiesser DIP Objection"). The disposition of these funds is unknown.

## OBJECTIONS

### A. The DIP Motion Should Not Be Approved Given the Insider-Nature of the Transaction and General Lack of Information Disclosed.

30. In order to obtain post-petition financing under Sections 364(c) or (d) of the Bankruptcy Code, a debtor in possession must demonstrate that (i) it is unable to obtain unsecured credit under Section 364(a) or (b) of the Bankruptcy Code; (ii) the proposed credit is necessary to preserve the assets of the estate; and (iii) the terms of the financing are fair, reasonable and adequate. *In re Ames Dept. Stores, Inc.,* 115 B.R. 34, 37–39 (Bankr. S.D.N.Y. 1990). In particular, "a proposed financing will not be approved where it is apparent that the purpose of the financing is to benefit a creditor rather than the estate." *Id.* at 39; *see also In re Aqua Assocs.*, 123 B.R. 192, 195–98 (Bankr. E.D. Pa. 1991) ("[C]redit should not be approved when it is sought for the primary benefit of a party other than the debtor."). To this end, courts should approve post-petition financing to the extent it is "in the best interests of the general creditor body." *In re Roblin Indus.*, 52 B.R. 241, 244 (Bankr. W.D.N.Y. 1985).

31. The Debtors have largely failed to satisfy the standards outlined above. The DIP Motion provides scant details on the Debtors' attempts to obtain post-petition financing and summarily states that "[a]fter considering and exhausting all options, it is apparent that the DIP Facility is the best financing proposal available to the Debtors . . . ." DIP Motion, at ¶ 6. Beyond cursory remarks regarding "extensive arm's-length, good-faith negotiations with the DIP Lender

and other potential providers of similar facilities," no other specific facts are mentioned regarding the quantity of lenders the Debtors engaged with and the nature of those negotiations. *Id.* at ¶ 7.

32. Beyond the statements in the DIP Motion, the First Day Declaration is the only evidence that the Debtors submitted in support of the requested relief. The First Day Declaration lacks any analysis or data demonstrating the reasonableness of the DIP Facility's terms. Similar to the DIP Motion, the First Day Declaration simply notes that the Debtors "contacted several sources of debt financing, but since virtually all of the Debtor's assets are pledged to their various prepetition lenders, therefore they could not find anyone interested in coming with new debt." First Day Declaration, at ¶ 30. The First Day Declaration also notes that the Debtors reached out to "a company that specializes in placing DIP loans, and they could not help us," without any further explanation. *Id.* at ¶ 19. *See In re Crouse Group, Inc.*, 71 B.R. 544, 550 (Bankr. E.D. Pa. 1987) (concluding that approaching only one lending institution is insufficient to demonstrate "the requisite exhaustive unsuccessful efforts to obtain credit on terms in accordance with §346(b)").

33. Most importantly, given the presence of at least one insider on both sides of the proposed transaction and the new revelation that the DIP Lender members include a pre-petition lender (and that more secured pre-petition debt may have been acquired), the Debtors' conclusory remarks regarding the fairness and necessity of the DIP Facility provide little comfort to the Committee and other parties-in-interest. "An insider's dealings with the debtor are subject to rigorous scrutiny by the court, with the insider bearing the burden of showing the 'entire fairness' of the transaction at issue." *In re Latam Airlines Grp. S.A.*, 620 B.R. 722, 769 (Bankr. S.D.N.Y. 2020) (holding that a postpetition financing transaction between a debtor and an insider was subject to heightened scrutiny); *In re Winstar Cmmcn's Inc.*, 554 F.3d 382, 412 (3d Cir. 2009) ("A claim arising from the dealings between a debtor and an insider is to be rigorously scrutinized by

the courts.") (citing *Fabricators, Inc. v. Technical Fabricators, Inc. (In re Fabricators, Inc.)*, 926 F.2d 1458, 1465 (5th Cir. 1991)). Where the directors of the Debtors are not disinterested or independent, the Debtors may not rely on the business judgment rule, and instead, the Court must review the Debtors' decision by "applying the entire fairness standard." *In re Los Angeles Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011). In particular, the dealings of a "dominant or controlling stockholder . . . with the corporation are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the director or stockholder not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein." *Pepper v. Litton*, 308 U.S. 295, 306 (1939).

34. As highlighted above, the Debtors have identified Mr. Gerut as the controlling equity-holder of the Debtors and a member of the DIP Lender; however, neither the DIP Motion nor the First Day Declaration adequately explain Mr. Gerut's role or involvement with respect to the DIP Lender group. While the DIP Motion does state that Mr. Gerut recused himself from the decision to enter into the DIP Term Sheet, the Committee understands that based on comments at the first day hearing that may not actually be the case and it is not clear what steps (if any) he took to remain independent. Moreover, given that the DIP Lender appears to have been formed, in part, by insiders of the Debtors for the sole purpose of providing post-petition financing to the Debtors, there are strong reasons to suspect that the DIP Facility presents a conflict of interest. *See* First Day Declaration, at ¶ 19 ("[S]ome industry leaders who believe in our company, as well as ***some insiders*** who believe in our company, put together an SPV to be the DIP Lender.") (emphasis added). In the absence of any additional details regarding the relationship between the DIP Lender, the Debtors, and Mr. Gerut, the Committee does not have enough evidence to conclude that the

DIP Facility was negotiated at arms' length or in good faith, and the Committee submits that the Debtors have failed to meet the "entire fairness" standard.

35. Lastly, given the need to highly scrutinize transactions of this nature and the dearth of information concerning the identities of the DIP Lender members and the relationship between any insider DIP Lender members and the Debtors, the Committee contends that it would be highly inappropriate for the Final Order to provide for any releases to the DIP Lender. *See* DIP Term Sheet, at p. 28. It is unclear whether such a release would preclude the Committee from pursuing any future claims for the benefit of the Debtors' estates and the creditors, should it be determined later that there was in fact a conflict of interest. Moreover, as noted above, the proposed release relates broadly to any and all claims or causes of action the Debtors may have against such parties related to these Chapter 11 Cases. *See* DIP Term Sheet, at p. 28. To the extent the Court determines that the DIP Facility is in the best interest of the estates, any Final Order should reserve the rights of the Committee to later raise claims regarding the self-dealing or conflicts associated with the DIP Facility.

**B. The DIP Motion Should Not be Approved on a Final Basis Because the Roll Up is Not Fair or Reasonable.**

36. Roll-up provisions are generally a disfavored form of post-petition financing because they improve the priority of a prepetition creditor without providing any additional post-petition value to the debtor's estate. Effectively, a roll-up cross-collateralizes a portion of a lender's prepetition debt with post-petition collateral, and grants that debt super-priority administrative expense status. That cross-collateralization and grant of a super-priority administrative claim for prepetition debt improperly circumvents the Bankruptcy Code's priorities and distribution framework. *See, e.g.*, *In re Saybrook Mfg. Co., Inc.*, 963 F.2d 1490, 1494–96 (11th Cir. 1992) (noting that post-petition cross-collateralization is an "extremely controversial form of Chapter 11

financing" before holding it was not authorized by section 364 of the Bankruptcy Code); *see also Official Comm. of Unsecured Creditors of New World Pasta Co. v. New World Pasta Co.*, 322 B.R. 560, 569 n.4 (M.D. Pa. 2005) (noting that roll-up provisions "have the effect of improving the priority of a prepetition creditor"). Roll-ups are also disfavored because they improve the position of prepetition secured creditors without providing any new consideration for an already existing obligation.

37. The Roll Up is being used by the DIP Lender to improve its position relative to the Debtors' other creditor constituencies and to cure deficiencies in their prepetition loans. This is particularly alarming where, as detailed above, at least one member of the DIP Lender is an insider of the Debtors.

38. The proposed Roll Up would therefore result in the insider DIP Lender having substantially improved collateral positions on their prepetition claims at the expense of unsecured creditors. The DIP Facility should not be approved when it stands to primarily benefit one particular creditor, especially when that one creditor is an insider. *See Aqua Assocs.*, 123 B.R. at 195–98.

### C. The DIP Lenders Should Not be Granted Postpetition Liens on Unencumbered Assets, Including Avoidance Actions and D&O Claims.

39. The Interim Order at paragraphs 10 and 11 provide the DIP Lender with the DIP Liens in a broad set of DIP Collateral, including, but not limited to commercial tort claims, arbitration awards, money, insurance, receivables, and (subject to entry of the Final Order) (i) proceeds of actions brought under section 549 of the Bankruptcy Code to recover any postpetition transfer of DIP Collateral and (ii) the Avoidance Action Proceeds. *See* Interim Order, at ¶¶ 10, 11. The liens on commercial tort claims and insurance proceeds may encompass claims against the Debtors' directors and officers ("D&O Claims").

40. Indisputably, avoidance actions are an important tool for providing recovery to unsecured creditors. *See Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd., Partnership IV*, 229 F.3d 245, 250 (3d Cir. 2000) ("[w]hen recovery is sought under section 544(b) of the Bankruptcy Code, any recovery is for the benefit of all unsecured creditors."); *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.)*, 226 F.3d 237, 243–45 (3d Cir. 2000) (finding that a fraudulent transfer claim is not an asset of the debtor). *Mellon Bank, N.A. v. Glick (In re Integrated Testing Prods. Corp.)*, 69 B.R. 901, 904–05 (D.N.J. 1987) (observing that avoidance actions should be pursued for the benefit of all unsecured creditors); *In re Roblin Industries*, 52 B.R. 241, 243 (Bankr. W.D.N.Y. 1985) (debtor-in-possession financing denied where debtors were required to waive avoidance actions as a condition of the loan); *see also Official Comm. of Unsecured Creditors v. Gold Electronics Corp. (In re Gold Electronics Corp.)*, 1993 WL 408366, at *3–4 (N.D. Ill. Sept. 22, 1993) (vacating lien on preference actions).

41. Preference actions alone under section 547 of the Bankruptcy Code may thus be a significant source of recovery for unsecured creditors (in addition to yet to be ascertained potential fraudulent transfer claims). The Committee has not yet been able to fully review payments made by the Debtors to third parties in the 90-day period preceding the Petition Date (or one year period for insiders, which under the circumstances is of particular concern to the Committee) in order to ascertain what, if any, preference claims exist. Preference claims are a significant source of recovery for unsecured creditors and the Committee must preserve this potential source of recovery in this case.

42. In order to ensure the unsecured creditors have potential sources of recovery for repayment of their claims, the Committee must ensure the preservation of unencumbered assets

and avoidance claims. The DIP Lender, particularly given that it includes at least one insider, should not be provided with additional benefits to the exclusion and detriment of unsecured creditors such as liens on avoidance claims. *See e.g.*, *In re Texas General Petroleum Corp. v. Evans (In re Texas General Petroleum Corp.)*, 58 B.R. 357, 358 (Bankr. S.D. Tex. 1986) ("[B]oth pre-Code and post-Code, neither a trustee in bankruptcy, nor a debtor-in-possession, can assign, sell or otherwise transfer the right to maintain a suit to avoid a preference"); *United Capital Corp. v. Sapolin Paints, Inc. (In re Sapolin Paints, Inc.)*, 11 B.R. 930, 937 (Bankr. E.D.N.Y. 1981) (same).

43. Moreover, given the insider aspects of the DIP Lender, there is concern that the proposed DIP Liens on avoidance actions and pre-petition tort actions coupled with the possibility for broad releases, were conceived to insulate potential insider liability at the expense of potential recovery for unsecured creditors.

44. Accordingly, avoidance actions (including claims under sections 502(d), 544, 545, 547, 548, 549, 550, and 553 of the Bankruptcy Code) and proceeds and property recovered therefrom should be expressly excluded from the definition of DIP Collateral in the Final Order.

45. Similarly, the D&O Claims should be expressly excluded from the DIP Liens and DIP Collateral. The pursuit of D&O Claims, should it be determined that any exist, could be a source of significant recovery for unsecured creditors, thereby underscoring the need to preserve these claims unencumbered for the estate. It is a bit circular in a case where the DIP Lender is an insider that any recoveries against said insider would then be used to pay the insider's new collateral.

**D. The DIP Budget is Inadequate.**

46. The budget (the "DIP Budget") annexed to the Interim Order is woefully inadequate. If the DIP Budget stands and the DIP Financing is not increased, these cases appear

destined for administrative insolvency. The current DIP Budget omits several significant, anticipated administrative expenses – there are no professional fees whatsoever in the 13-week DIP Budget proposed and the DIP Budget also improperly limits the Committee's investigation of potential Challenges in this insider-driven cases.

47. First, the DIP Budget only covers the first thirteen weeks of the cases. Any final budget must extend beyond this DIP Budget period and should run through the projected effective date of chapter 11 plan.

48. Second, the Committee has reservations as to whether the DIP Budget sufficiently reserves funds for trailing administrative expenses that need to be paid after the end of the budget period. The Final Budget should include a priority claim reserve that is sufficient to cover anticipated priority claims.

49. Third, there must be a professional fee line item for Debtors' professionals and Committee counsel, in order for the Committee's counsel to fully represent the interests of unsecured creditors and investigate potential Challenges. The current DIP Budget does not include any reserve or budgeting for professional fees. It seems that the insider DIP Lender is putting itself in a position to be able to acquire the Debtors' business via credit bid, leaving nothing behind for unsecured creditors.

### E. The Committee is Unduly Restricted by Certain Challenge Limitations

50. The Committee is unduly constrained by certain of the Challenge parameters set forth in the Interim Order. Specifically, the Committee is limited to only thirty (30) days to use their Investigation Budget Amount of $25,000. However, the Challenge Deadline for other parties is no later than seventy-five (75) days following the entry of the Interim Order. We understand that this discrepancy will be resolved by further language in a final order, however, the Committee

simply reserves its right with respect to this issue. The limited Investigation Budget Amount is problematic. Given the insider nature of the DIP Lender, the onus is on the Committee, as a fiduciary, to investigate the prepetition liens of the secured creditors and raise a Challenge, if necessary.

51. Similarly, the Committee's carveout for the Challenge investigation should be increased to $75,000 to ensure that the Committee has sufficient resources to investigate and, if appropriate, assert Challenges. The need for an expanded investigation budget is particularly necessary in light of (i) the lack of details in the Debtors' papers regarding the Debtors' prepetition debt structure, and (ii) the new revelation that a pre-petition lender is among the DIP Lender members and that other pre-petition secured debt may have also been acquired by DIP Lender members. Additionally, the Committee's rights to seek to extend the Challenge Deadline for cause should be expressly reserved.

52. Further, given that the Committee may need to seek standing to file certain claims or causes of action, the Committee requests that the following language be added to the Final Order:

> If the Committee files a motion seeking authority, derivatively or otherwise, to commence a challenge specifically identified in such motion on or prior to the Challenge Deadline, the Challenge Deadline for the Committee to commence such identified challenge shall be tolled through the earlier of (a) the date of the withdrawal of such motion, or (b) the date that is fourteen (14) days after the entry of a dispositive ruling on such motion.

53. The Committee as a fiduciary should not be unduly restricted in the nature or scope of its investigation. The limited investigation budget deliberately forces the Committee's professionals to finance matters related to this case and harms the adversarial system characteristic of the chapter 11 process. *See In re Tenney Vill. Co., Inc.*, 104 B.R. 562, 568 (Bankr. D.N.H. 1989) (finding a cap on fees unacceptably limited the right of debtor's counsel to payment for bringing



171777052.5

actions against the DIP lenders, creating an economic incentive to avoid bringing such actions in disregard of its fiduciary duties toward the estate, and therefore, refusing to approve the post-petition financing).

**F. The Debtors' Proposed Waivers under §§ 506(c) and 522(b) are Inappropriate.**

54. The Interim Order waives the Debtors' (and any successors) right to surcharge the DIP Collateral or the DIP Lender under Section 506(c) of the Bankruptcy Code. Section 506(c) provides that a debtor "may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim…" 11 U.S.C. § 506(c).

55. The cost of a debtor's restructuring should not be borne by the unsecured creditors. *See Precision Steel Shearing v. Fremont Fin. Corp. (In re Visual Indus., Inc.)*, 57 F.3d 321, 325 (3d Cir. 1995) (noting that "section 506(c) is designed to prevent a windfall to the secured creditor … The rule understandably shifts to the secured party … the costs of preserving and disposing of the secured party's collateral, which costs might otherwise be paid from the unencumbered assets of the bankruptcy case…"); *see also Kivitz v. CIT Group/Sales Fin., Inc.*, 272 B.R. 332, 334 (D. Md. 2000) (observing that the purpose of Section 506(c) is to protect unsecured creditors from "bear[ing] the cost of protecting property that is not theirs.").

56. The Section 506(c) waiver is inappropriate in this case given the budget concerns and the insider nature of the DIP Facility. Consequently, the Debtors' (and successors) right to surcharge collateral under section 506(c) should be preserved.

57. Similarly, the Interim Order waives the Debtors' right to assert the "equities of the case" exception under section 552 of the Bankruptcy Code. The "equities of the case" exception allows for the exclusion of post-petition proceeds from prepetition collateral on equitable grounds.

*See In re Muma Servs.*, 322 B.R. 541, 558–59 (Bankr. D. Del. 2005) (*quoting Delbridge v. Prod. Credit Ass'n & Fed. Land Bank*, 104 B.R. 824, 826 (E.D. Mich. 1989) ("The purpose of the equity exception is to prevent a secured creditor from reaping benefits from collateral that has appreciated in value as a result of the [debtor in possession's] use of other assets of the estate (which normally would go to general creditors) to cause the appreciated value."). These rights should also be preserved.

**G. The Estates' Equitable Marshaling Rights Should be Preserved.**

58. Paragraph 19 of the Interim Order provides that, subject to entry of the Final Order, "in no event shall the DIP Lender, with respect to the DIP Collateral, be subject to the equitable doctrine of 'marshaling' or any other similar doctrine, and all proceeds of such DIP Collateral shall be received and used in accordance with this Interim Order." Equitable marshaling can be an important tool for safeguarding value for an estate, as it was "developed to prevent injustice to junior creditors and to foster fair dealing, justice, and common honesty." *Official Comm. V. Hudson United Bank (In re America's Hobby Ctr.*, 223 B.R. 275, 287 (Bankr. S.D.N.Y. 1998).

59. The proposed waiver of marshaling in this case could eliminate the Debtors' ability to secure a meaningful recovery for unsecured creditors. Accordingly, the Debtors' marshaling rights should be preserved.

**H. Need for Additional Disclosures**

60. In addition to the missing information discussed above, including with respect to further disclosures regarding the DIP Lender members and the role of Benjamin Gerut, additional information needed to evaluate the appropriateness of the DIP Facility includes, among other things: (i) the basis for the approximate $500,000 budgeted for repair costs, including more information on when repairs may realize an increase in revenue; (ii) the disposition of the interim

DIP Financing given that the $507,500 budgeted for repairs during the week of April 14, 2025 was not done; and (iii) the disposition of the $775,000 in pre-petition insurance proceeds received by the Debtor as noted in the Kannegiesser DIP Objection.

61. All told, while the Committee wants to be supportive of a successful and efficient restructuring, the dearth of critical information combined with the oppressive terms of the DIP Facility that leave no clear path to recovery for the Committee, unfortunately mean that the Committee must object to the DIP Facility being approved on a final basis at this time. The Committee remains open, however, to discussing a reasonable further interim order.

## CONCLUSION

62. Based on the foregoing, the Committee respectfully requests that the Court (i) deny the DIP Motion unless the terms of the DIP Facility and the Final Order are modified as set forth herein, and (ii) grant such further relief as is just and proper.

Dated: May 14, 2025

**FOX ROTHSCHILD LLP**

By: */s/ Stephanie Slater Ward*
Stephanie Slater Ward, Esq. (DE No. 6922)
1201 N. Market Street, Suite 1200
Wilmington, DE 19801
Phone: (302) 654-7444
Facsimile: (302) 656-8920
Email: sward@foxrothschild.com

*-and-*

Michael R. Herz, Esq. (admitted *pro hac vice*)
49 Market Street
Morristown, NJ 07960
Phone (973) 992-4800
Email: mherz@foxrothschild.com

*Proposed Counsel to the Official Committee of Unsecured Creditors*