**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re:<br><br>DEQSER LLC, et al.,[1]<br><br>    Debtors. | Chapter 11<br><br>Case No. 25-10687 (CTG)<br>(Jointly Administered)<br><br>**Hearing Date: January 20, 2026 at 10:00 am (ET)**<br>**Objection Deadline: January 13, 2026 at 4:00 pm (ET)** |

## <u>DEBTORS' MOTION TO COMPEL MEDIATION</u>

Deqser LLC ("**Deqser**") and KNY 26671 LLC ("**KNY**"), the debtors and debtors-in-possession in the above-captioned chapter 11 case (the "**Case**"), by and through their undersigned counsel, hereby move pursuant to 11 U.S.C. §105(a) and Local Bankruptcy Rule 9019-5 for an order compelling Herbert Kannegiesser GmbH ("**HK**") and Kannegiesser ETECH, Inc. ("**ETECH**", and together with HK, the "**HK Parties**") to engage in mediation with the Debtors pursuant to Local Bankruptcy Rule 9019-5 of all disputes between the HK Parties and the Debtors, including, without limitation, (i) whether the contract between HK and the Debtors is a lease or a true sale; (ii) the amount and nature of the claims of the HK Parties, including what is a secured claim and what is unsecured; (iii) whether all or any part of the claims of the HK Parties should be equitably subordinated due to the egregious behavior of the HK Parties both before and during the Case, and whether HK should be stripped of any liens due to equitable subordination; (iv) breach of contract and warranty; (v) tortious interference with the business contract by the HK Parties; (vi) fraudulent inducement to buy the Vectura Management System ("**Vectura**"), and concomitant

---

[1] The Debtors in these Chapter 11 cases, along with the last four (4) digits of their federal tax identification numbers, are: (i) Deqser LLC (8269) and (ii) KNY 26671 LLC (9132) (collectively, the "<u>Debtors</u>"). The Debtors' mailing address is: c/o Cooperative Laundry, 1 Eastern Road, Kearny, NJ 07032.

tort and breach of contract claims for the failure of Vectura to ever perform as promised, and (vii) obligations for future sales and service. In support thereof, the Debtors respectfully aver as follows:

## PRELIMINARY STATEMENT

1.      Both prior to the filing of the Case, as well as during the Case, the actions and intransigence of the HK Parties has been the primary issue preventing the Debtors from achieving success. Not only has their equipment never lived up to the promises made at the time of purchase, but also, as outlined in *Declaration of Sang Cho in Support of the Debtors' Chapter 11 Petitions and First Day Motions* (the "**First Day Declaration**") [D.I. 16], the HK Parties' direct intervention with the Debtors' insurance company after a fire, in which the HK Parties made false allegations about the Debtors' misuse of insurance proceeds while demanding that insurance proceeds which HK Parties had no right to be paid directly to the HK Parties, created the fiscal crisis that led directly to the bankruptcy filing. Once the Case was filed, the HK Parties continued with their obstructionist ways. As soon the Debtors testified that their reorganization plan relied on refurbishing the Kannegiesser equipment, the HK Parties immediately informed the Debtors that they would no longer sell parts or service the Kannegiesser equipment (the "**HK Refusal**"), which in turn would not just prevent reorganization, but would also put the Debtors out of business. Throughout the Case, the HK Parties have continued to be obstructionist, filing objections to try to prevent the Debtors from obtaining DIP Financing, as well as, on information belief, trying to sell the company and convince other major creditors to force a sale.

2.      The HK Parties constitute a very large potentially secured creditor in the Case. Most of the equipment necessary to Debtors' business is Kannegiesser equipment on which much of

such equipment, they purport to have a lien.[2] On the Petition Date, KNY owed HK $3,767,759.35. ETECH was owed $1,004,864.34. Yet, with no explanation, HK is asserting they are owed $5,370,055.33, and ETECH is owed $1,421,414.62. Furthermore, when the Debtors asserted that HK's secured claim would be limited to the value of their collateral on the Petition Date. The HK Parties, again with no explanation, asserted that instead, the secured claim would be equal to the full replacement value of the equipment, including installation and commissioning costs, which the HK Parties themselves admit far exceeds the face value of their claim.

3.      In addition to these anomalies, as detailed below, the Debtors believe that the conduct of the HK Parties has been so egregious that they are entitled to equitably subordinate the claims of the HK Parties, and/or strip the HK Parties of their liens altogether. The HK Parties, of course, refute this.

4.      Obviously, resolution of these issues is paramount to a successful reorganization. Accordingly, the Debtors tried in vain to negotiate with the HK Parties prior to filing the Case. After the Case was filed, the Debtors continued to try to negotiate to no avail. The HK Parties have steadfastly asserted that they are entitled to more than the face amount of their claim. As a result of the HK Refusal, the Debtors negotiated a settlement with the HK Parties which required the Debtors to make a written proposal to the HK Parties for settlement of all disputes between them, and required the HK Parties to respond in writing. The Debtors were hopeful that this would initiate a settlement process that could lead to a resolution of the HK Parties' claims. The Debtors did make a comprehensive proposal, but the HK Parties failed to respond. After numerous reminders from the Debtors that the HK Parties had missed a court-ordered deadline to respond, they finally wrote a terse response merely saying that the proposal was unacceptable and failing to provide any

---

[2] One of the issues in the mediation will be whether KNY owns the Kannegiesser equipment, and Kannegiesser has a security interest in same, or the equipment is owned by HK and leased to Debtor KNY.

counterproposal. Recently, the Debtors have tried to engage the HK Parties in settlement negotiations again without success. The HK Parties indicated that they were only interested in discussing a sale process.

5.      With no ability to engage in meaningful negotiation with the HK Parties, the Debtors formally requested the HK Parties agree to mediation pursuant to Local Rule 9019-5. Debtors asserted that this would save everyone time and money and lead to a quicker reorganization. The HK Parties declined.

6.      The Debtors recognize that if they file an adversary proceeding against the HK Parties, these disputes will be referred to mandatory mediation pursuant to Local Rule 9019-5(a). Accordingly, the Debtors assert that it makes more sense to immediately go to mediation for several reasons. First and foremost, the Debtors believe that in order to file an appropriate complaint, they would need to outline in great detail all of the egregious conduct by the HK Parties. The Debtors believe that airing this in public will not promote settlement, but rather will harden the position of the HK Parties, as they will feel a need to defend their business reputation. Accordingly, the Debtors believe that a more private airing of their complaints in the course of a mediation has a better chance of succeeding in obtaining resolution. Secondly, it is very expensive and time-consuming for the Debtors to pursue a formal adversary proceeding, and despite the extra time and expense, they will still end up in the same mediation. Hence, it makes more sense to go directly to the mediation. Finally, the filing of a formal complaint unleashes other time-consuming and expensive protocols, such as discovery, status conferences, agreed Rule 26 orders, and the like. All of these would be an unnecessary expense and burden on the Debtors if the parties can reach a consensual agreement.

7.      At this point, the parties have never sat down together to try to resolve their differences, even though, the Debtors have tried to do so. The hostility between the parties begs for a neutral arbiter to facilitate settlement. Due to the significant number of issues in dispute, litigation would be exceptionally time-consuming and costly, and would reduce the resources available to pay all creditors. The Debtors believe that a court-ordered mediation presents the most time and cost-efficient way to resolve the disputes between the Debtors and the HK Parties, which in turn will allow the Debtors to proceed to reorganization.

### JURISDICTION AND VENUE

8.      This Court has jurisdiction over the subject matter of this motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A) and (O). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutes pursuant to which relief is requested are 11 U.S.C. ¶ 105(a) and Local Bankruptcy Rule 9019-5. The Debtors consent to entry of a final order.

### RELIEF REQUESTED

9.      By this Motion, the Debtors request an order compelling the HK Parties to engage in good faith mediation pursuant to Local Bankruptcy Rule 9019-5 with the Debtors of all disputes between the HK Parties and the Debtors, including, without limitation, (i) whether the contract between HK and the Debtors is a lease or a true sale; (ii) the amount and nature of the claims of the HK Parties, including what is a secured claim and what is unsecured; (iii) whether all or any part of the claims of the HK Parties should be equitably subordinated due to the egregious behavior of the HK Parties both before and during the Case, and whether HK should be stripped of any liens due to equitable subordination; (iv) breach of contract and warranty; (v) tortious interference with the business contract by the HK Parties; and (vi) fraudulent inducement to buy the Vectura

Management System ("**Vectura**"), and concomitant tort and breach of contract claims for the failure of Vectura to ever perform as promised.

**ARGUMENT**

10.     Bankruptcy Code § 105(a) provides that "The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 28 U.S.C. § 105(a). For the reasons stated above and detailed more below, the Debtors believe it is appropriate to enter an order compelling mediation in an attempt to avoid the cost, time, and uncertainty of litigation.

11.     This Court may also appoint a mediator and direct parties to mediation pursuant to Local Bankruptcy Rule 9019-5(a) which provides that this Court may refer "any dispute" to mediation. Del. Bankr. L.R. 9019-5(a). ("The Court may assign to mediation any dispute arising in an adversary proceeding, contested matter or otherwise in a bankruptcy case."). This Rule complements the provisions of Bankruptcy Code § 105 of the Bankruptcy Code cited above. S*ee also In re A.T. Reynolds & Sons, Inc.*, 424 B.R. 76, 85 (Bankr. S.D.N.Y. 2010) ("While it goes without saying that a court may not order a party to settle, this Court has authority to order the parties to participate in the process of mediation, which entails discussion and risk analysis."), *rev'd on other grounds*, 452 B.R. 374 (S.D.N.Y. 2011). Courts have increasingly relied on mediation to streamline cases, narrow issues, and reduce the costs of litigation which, in many cases, can become quite burdensome on the parties and the judicial system.

12.     Indeed, if an order compelling mediation is not issued now, the Debtors will be obliged to file a complex adversary proceeding, which will result in mandatory mediation anyway. Del. Bankr. L.R. 9019-5(a). ("Except as may be otherwise ordered by the Court, all adversary proceedings filed in a business case will be referred to mandatory mediation, except an adversary

proceeding in which (i) the U.S. Trustee is the plaintiff; (ii) one or both parties are pro se; or (iii) the plaintiff is seeking a preliminary injunction or temporary restraining order."). The requirement for mandatory mediation demonstrates courts' reliance more and more on mediation and other forms of streamlined dispute resolution.

13.    In the instant case, the Debtors have numerous disputes with the HK Parties, any one of which alone could involve months of discovery and litigation. These include, but are not limited to:

a.    As stated above, there is a material difference between the amount the Debtors believe the HK Parties are owed, and what the HK Parties claim is owed. More importantly is the issue of how much of the HK claim is secured. Putting aside equitable subordination for the moment, the Debtors believe that the amount of the secured claim is limited to the value of the collateral on the Petition Date. HK believes that they are entitled to more than the face amount of their contract claim. To resolve these claims, one must not only determine the value of the collateral, but also determine whether the contract between HK and KNY is a lease or a true sale.

b.    Debtors have breach of contract claims against the HK Parties which they believe are worth millions. The equipment was designed by the HK Parties as a proprietary system for the Debtors which was to be completely automated and allow the business to function 24/7. The equipment has never operated so as to allow the plant to function 24/7, and the HK Parties have never delivered under their warranty to make the equipment function as intended. In addition, there was a massive equipment failure in August 2023 occasioned by a problem with the HK software, which caused the dryers to not work for several days. This resulted not only in a loss of revenue, but also in a permanent loss of business and reputation. The Debtors addressed this issue in a meeting with the HK Parties and were promised reparations, as well as free technician visits

to understand how the problem happened and prevent it from happening again. There has never been any follow-up on the reparations or the promised technician visits.

c.      As to tortious interference, after a fire at the Debtors' premises, the Debtors submitted an insurance claim for business interruption. While the HK Parties had certain claims to the insurance proceeds for destruction of equipment, they had no claims to the business interruption proceeds. That did not stop them from contacting the Debtors' insurance company directly and making false allegations about Debtors' misuse of insurance proceeds, while demanding that the insurance proceeds be paid directly to the HK Parties and not to the Debtors. This gave the insurance company a perfect excuse to " investigate", which they have been doing for four years while withholding the proceeds of the business interruption claim. The conduct of the HK Parties constituted tortious interference with the Debtors' contractual business relationship with Ascot Insurance. The resulting damages from this tortious interference have been in the multimillions. Furthermore, prior to the bankruptcy, due directly to the undercapitalization caused by the insurance company withholding funds as a direct result of the HK Parties' interference, KNY could not deliver on its promises to its customers, which caused it not only to lose identifiable business, but also multimillion dollar reputational damage which it is still struggling to overcome. Furthermore, due to the extreme financial distress that KNY experienced because the insurance company withheld funds due to the tortious interference of the HK Parties, KNY was forced to sell its claim to the insurance proceeds at a substantial discount just to have enough cash to survive.

d.      The Debtors also have tort and breach of contract claims related to Vectura. The Debtors were fraudulently induced to purchase this expensive system to control and integrate the laundry function. They were told that the system would allow the laundry to operate 24/7, which has never happened. Not only has Vectura never operated as promised, in breach of the

contract, but also, its many outages take down the whole line frequently and have caused considerable damages. KNY is at the point where it is considering scrapping this entire $1.2 million system altogether in order to *increase* functionality.

e.      The Debtors believe that these claims demonstrate a pattern of egregious conduct including multiple, deliberate breaches of contract; failure to honor warranties; and tortious interference with a business relationship which forced the Debtors into bankruptcy. But even more disturbing is the conduct of the HK Parties since the Petition Date, which has continued their pattern of dealing with the Debtors with unclean hands. Although the HK Parties are a single source supplier of parts and service to the equipment purchased for millions of dollars by the Debtors, and their website refers to how they will always be there for their customers, they deliberately tried to put the Debtors out of business by the HK Refusal, in which they refused to provide further parts or service, knowing that the Debtors cannot operate without parts and service from the HK Parties. From the demands of the HK Parties, it was clear that this was done to put pressure on the Debtors to pay adequate protection, even though, the HK Parties had never brought a motion requesting adequate protection. Debtors believe this was both illegal and a violation of the automatic stay, from which they suffered significant damages. Although the Debtors have reached a temporary resolution of this issue, it is only temporary and does not address the important issue of supplies and service going forward.

f.      On information and belief, since the Petition Date, the HK Parties have been actively trying to sell the Debtors and convince other major creditors of the need for an immediate sale. The sale only benefits the HK Parties and would leave the Debtors without sufficient assets to pay other creditors.

g.      For all of the above reasons, and more, the Debtors believe that the HK Parties have a long history of dealing with the Debtors in bad faith with unclean hands. As a result, they believe that the claims of the HK Parties should be equitably subordinated, and their liens stripped.

14.     As one can see, each dispute by itself is extremely complex. Litigation of all of the disputes could take years and hundreds of thousands of dollars, if not more. This, in turn, would draw attention away from reorganizing the business, and resources away from other creditors. Alternatively, the Debtors continue to believe that a global resolution can be reached, recognizing the pros and cons of each party's position and establishing a monetary resolution consistent with same without litigating each and every issue. But a third-party, such as a mediator, would be necessary to help each side see the other party's side.

15.     The Debtors also feel that it would be counterproductive to commence an adversary proceeding at this time, because, they would have to go into much greater detail about the egregious conduct of the HK Parties. The Debtors believe that by "airing their dirty linen" in public, it will harden parties' positions and make it harder to reach a resolution. It would also be quite costly, and significantly delay reorganization while the claims are being determined.

16.     The Debtors have never had an opportunity to sit down and try to reach a global resolution with the HK Parties. Although they have tried to negotiate, they have been stonewalled by the HK Parties, who have never provided a counterproposal, and merely say NO. When they asked the HK Parties to stipulate to mediation, the HK Parties declined.

17.     For these reasons, the Debtors believe that a neutral mediator could facilitate a global resolution of the parties' disputes prior to the commencement of costly litigation. The cost savings alone could well fund payments to unsecured creditors!

## NOTICE

18. The Debtors will provide notice of this Motion to: (a) the Office of the United States Trustee for Region 3, serving the District of Delaware (Attn: Jon Lipshie, Esq.); (b) counsel to landlord for the Lease; (c) counsel to the Official Committee of Unsecured Creditors; (d) counsel to Kannegiesser ETECH, Inc.; (e) counsel to the Debtors' lenders: (i) Eastern Funding, (ii) Kannegiesser GmnH, (iii) MCA Servicing Co, (iv) Merchant Financial Corporation, (v) Parkside Funding Group LLC, (f) counsel to the Debtors' DIP Lender, CSV Capital Partners LLC; and (g) any party entitled to notice pursuant to Bankruptcy Rule 2002 as of the time of service. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## NO PRIOR REQUEST

19. No prior motion for the relief requested herein has been made to this or any other Court.

## PRAYER FOR RELIEF

**WHEREFORE**, the Debtors respectfully request that this Court enter an order (A) compelling Herbert Kannegiesser GmbH and Kannegiesser ETECH, Inc. to engage in good faith mediation with the Debtors pursuant to Local Rule 9019-5 of all disputes between the HK Parties and the Debtors, including, without limitation, (i) whether the contract between HK and the Debtors is a lease or a true sale; (ii) the amount and nature of the claims of the HK Parties, including what is a secured claim and what is unsecured; (iii) whether all or any part of the claims of the HK Parties should be equitably subordinated due to the egregious behavior of the HK Parties both before and during the Case, and whether HK should be stripped of any liens due to equitable subordination; (iv) breach of contract and warranty; (v) tortious interference with the business contract by the HK Parties; and (vi) fraudulent inducement to buy Vectura Management System

11

("**Vectura**"), and concomitant tort and breach of contract claims for the failure of Vectura to ever perform as promised, and (vii) obligations for future sales and service, and (B) granting such other relief as this Court may feel is just and appropriate.

Dated: January 5, 2026

GELLERT SEITZ BUSENKELL & BROWN LLC

*/s/ Ronald S. Gellert*
Ronald S. Gellert (DE 4259)
1201 North Orange Street, Suite 300
Wilmington, DE 19801
Tel:(302) 425-5806
rgellert@gsbblaw.com

and

MAYERSON & HARTHEIMER, PLLC
Sandra E. Mayerson, Esq. (admitted *pro hac vice*)
David H. Hartheimer, Esq. (admitted *pro hac vice*)
Mayerson & Hartheimer, PLLC
845 Third Avenue, 11th Floor
New York, NY 10022
Tel: (646) 778-4381
Fax: (646) 778-4384
sandy@mhlaw-ny.com
david@mhlaw-ny.com

*Counsel for Debtors and Debtors in Possession*

12