**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| DEQSER, LLC, *et al.*, | Case No. 25-10687 (CTG) |
| Debtors. | (Jointly Administered) |
| | **Related Docket Nos. 318, 340** |

<u>**MEMORANDUM OPINION**</u>

The debtors in these cases own and operate a commercial laundry business, located in northern New Jersey, whose customer base is primarily hotels located in New York City.[1]  These bankruptcy cases, which were filed about one year ago, have been bumpy.  The debtors have suffered operating losses of about $200,000 per month since the cases were filed.  There have been problems with the debtors' post-petition financial reporting and various disputes with secured creditors, insurers, and a lessor of trucks that the debtors use to pick up and deliver laundry.

In the face of all of that, the U.S. Trustee, appropriately concerned about the risk of administrative insolvency and the possibility that post-petition creditors might end up holding the bag if the efforts to reorganize proved unsuccessful, moved to convert the cases to ones under chapter 7.  The U.S. Trustee argued that the continuing losses and the absence of a likelihood of rehabilitation amounted to "cause" under § 1112(b)(4)(A) of the Bankruptcy Code.

---

[1] Deqser LLC is a New Jersey limited liability company.  Deqser LLC is the manager of KNY 26671 LLC, a Delaware limited liability company, which is the operating business.  The companies are referred to collectively as the "debtors."

In response to that motion, the debtors filed a plan of reorganization. The plan would give most of the equity of the reorganized debtor to the DIP lender, an entity with which one of the debtors' founders and current owners is involved. As will be described further below, the Court does not believe it appropriate at this early stage to declare that plan dead on arrival. But it is fair to say, at the very least, that the existing plan (which the debtors have made clear they intend to improve) would face serious obstacles to confirmation.

The Committee and several of the secured creditors have expressed serious reservations about the proposed plan and the overall status of the case.[2] None, however, believes that conversion to chapter 7 will maximize the value of the estate or creditor recoveries. Certain creditors have moved for the appointment of an "examiner with expanded powers" whom they believe should be charged with marketing and selling the business while the debtors remain in possession and existing management continues operating the business.

The Court conducted an evidentiary hearing on these motions on April 15, 2026. Closing arguments spilled over to April 17, 2026. As the Court noted at the conclusion of the April 17 hearing, the Court will deny both the motion to convert and the motions seeking the appointment of an examiner with expanded powers. This Memorandum Opinion is intended to clarify the reason for those decisions. In short, however, the motion to convert will be denied because the debtors have now committed to amend their plan. The debtors will still seek to obtain confirmation of

---

[2] The Official Committee of Unsecured Creditors is referred to as the "Committee."

a traditional plan of reorganization under which (a) their DIP lender will acquire the equity of the reorganized debtor and (b) secured creditors will be crammed down under § 1129(b)(2)(A) of the Bankruptcy Code.  The amended plan, however, will contain a "toggle" that will provide that if that aspect of the plan cannot be confirmed, the debtors will immediately turn to selling their assets, as a going concern, under the plan.  No one suggests that a plan that provides for a sale of the debtors' assets and the distribution of the proceeds to creditors would not be confirmable.  And as described below, this Court concludes that a going concern sale of the business is a form of "rehabilitation" within the meaning of § 1112(b)(4)(A).

The Court will deny the motion to appoint an examiner with "expanded powers" because, under the Bankruptcy Code, examiners conduct examinations. Because the request that the Court "expand" the powers of the examiner to market and sell the debtors' businesses is outside the scope of what the Bankruptcy Code contemplates or permits, that motion will be denied.[3]

---

[3] In addition to these motions, the Court also took up, at the April 15, 2026 hearing, (a) a motion by the debtors seeking to reject a lease with HUB Truck Rental Corp. ("HUB") [D.I. 342]; (b) a motion by HUB seeking to compel payment of an administrative claim [D.I. 371]; (c) a motion by the debtors to assume an unexpired lease in their principal facility [D.I. 300]; and (d) a motion by the debtors to extend the period of exclusivity [D.I. 322].  The two motions related to HUB were ultimately resolved consensually between the parties.  One of the resolutions is reflected in an order and is not otherwise addressed in this Memorandum Opinion.  D.I. 393.  The Court understands that the parties are negotiating a form of order on the second.  The debtors' motions to assume the lease and to extend exclusivity were granted for reasons set forth on the record during the April 17, 2026 hearing.  Those rulings will also be reflected in orders that the parties are negotiating and are not otherwise addressed in this Memorandum Opinion.

## Factual and procedural background

Many of the relevant facts are set forth in a stipulation that the parties helpfully reached in advance of the hearing, though the Court also heard live testimony from Marc Ross, the debtors' financial advisor, and Sang Cho, the debtors' principal.[4]

The basic underlying facts are not particularly disputed.  The debtors were incorporated as limited liability companies in 2018 for the purpose of developing a commercial laundry business serving hotels and restaurants.  As of the petition date in April 2025, the debtors had approximately 180 employees.  A variety of factors are said to have caused the bankruptcy filing, including an electrical fire in the debtors' facility that damaged the debtors' primary ironer and an alleged software glitch in the debtors' technologically advanced dryers, made by Kannegiesser, which is also one of the debtors' secured creditors.[5]

These bankruptcy cases have been beset with challenges.  The debtors came into bankruptcy seeking a DIP loan from an entity in which one of its owners was a participant that would have primed other secured creditors under § 364(d)(1) of the Bankruptcy Code.  While the debtors argued that there was sufficient equity to

---

[4] That stipulation was handed up to the Court at the beginning of the hearing in a redline form, as the parties continued to negotiate it leading up to the start of the hearing.  This Court has docketed the redlined version that was handed up, and represented by the parties as agreed, at D.I. 394.

[5] D.I. 16 ¶¶ 9-13.  These facts from the first-day declaration are included only by way of background.  The Court's resolution of the pending motion relies only on the factual record developed in this contested matter.  Herbert Kannegeisser GmbH and its affiliates are referred to as "Kannegeisser."

4

provide adequate protection to the secured creditors (as § 364(d)(1)(B) requires), the evidentiary record established that the debtors undertook extensive efforts to obtain a genuine third-party loan, and that no lender was willing to make a non-priming loan based on the collateral package the debtors were able to offer.  The Court viewed that evidence of what the market would bear to be more reliable evidence of value than any conclusion the Court might draw based on the debtors' cashflow projections.[6] On that basis, the Court declined to approve the debtors' proposed priming DIP loan and encouraged the parties to continue discussions about a consensual means to preserve the business.[7]

The parties were ultimately able to work out a consensual form of DIP financing.[8]  Even so, the parties agree that the debtors have incurred operating losses (which do not include the substantial costs associated with the restructuring process) of approximately $2 million during the year that the company has been in bankruptcy.  While the record established at the hearing revealed that the debtors still have material availability on the DIP facility, the case has also seen more than its fair share of administrative creditors coming to court seeking orders compelling the payment of administrative claims.[9]  And the testimony during the evidentiary hearing revealed that the debtors have been managing their cash very tightly,

---

[6] *See generally Bank of Am. Nat'l Trust and Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999) (reflecting the Bankruptcy Code's general preference for market-based valuations over judicial valuation).

[7] May 16, 2025 Hr'g Tr. at 156-163.

[8] D.I. 182; D.I. 279.

[9] D.I. 338; D.I. 371.

especially during the pendency of the motion to convert.  Approximately $350,000 in professional fees are unpaid, though the restructuring professionals have agreed to defer those payments for the time being.  And wherever there has been a colorable basis to dispute an administrative obligation, the debtors have made clear that they were in no rush to resolve those disputes.  At bottom, the record reveals that while the debtors' first choice is for their business to succeed and everyone to be paid, if that turns out to be unsuccessful and someone is going to suffer a loss, the debtors would rather it be parties who provided post-petition goods and services than its DIP lender (in which one of its owners is participating).

The Court found Sang Cho, the debtors' principal, to be a generally credible witness.  The Court has no doubt that Cho is committed to the success of the business and brings real skill and expertise to commercial laundry operations.  He has not, however, managed the companies' books and records in the manner expected of a debtor in chapter 11.  In December of 2025, at the insistence of the Committee, the debtors moved to employ a financial advisor.[10]  Marc Ross, has been serving in that role since that time (the order authorizing his retention was effective as of November 19, 2025).[11]  The record reveals that the company's monthly operating reports and general chapter 11 hygiene have, since Ross' arrival, been more in line with the general expectations of debtors in chapter 11 cases, even if imperfections remain.

---

[10] D.I. 269.

[11] D.I. 295.

There is some cause for optimism.  The number of hotel rooms that the debtors' business is serving (a key financial metric) has continued to grow as a result of Cho's sales efforts.  The record suggests that the debtors' business is now at or above EBITDA positive.  The debtors project sufficient growth in the coming months such that the business should be able not only to meet its current operating expenses but also to service some amount of debt.

The plan that the debtors have filed is premised on a set of financial projections.  In substance, the equity of the reorganized debtor would go to the DIP lender on account of exit financing that it would provide.[12]  All of the prepetition secured creditors would have their claims bifurcated under § 506(a) and reduced to the value of their collateral.  The reorganized debtor would then pay those claims over five years.  For several years, the prepetition secured creditors would receive only interest on account of their claims (running at five percent annually).  Several years in, they would begin receiving principal and interest payments.  Most of the amounts due, however, would not be paid until a balloon payment becomes due five years after the effective date.

### Jurisdiction

Both the motion to convert and the motion to appoint an examiner arise under the Bankruptcy Code – §§ 1112 and 1104, respectively.  As such, these motions are within the district court's "arising under" jurisdiction set forth in 28 U.S.C. § 1334(b).  That jurisdiction has been referred to this Court under 28 U.S.C. § 157(a) and the

---

[12] D.I. 350 at 21.

district court's February 29, 2012 standing order of reference.  Both motions are core matters under 28 U.S.C. § 157(b)(2)(A).

## Analysis

**I.     While "cause" under § 1112(b)(4)(A) would likely otherwise exist, the debtors' commitment to file a plan that will "toggle" to a going concern sale if their reorganization is not confirmable means that the debtors have a substantial likelihood of rehabilitation; there accordingly is not "cause" to convert.**

Section 1112(b) of the Bankruptcy Code provides that where "cause" is shown, then, "on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate."[13]  The statute goes on to add, however, that even if cause is shown, if "the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate," the court may elect to appoint a trustee or an examiner instead.

The upshot of this language is that if "cause" is shown, while the court retains flexibility – it can appoint a chapter 11 trustee or an examiner rather than convert the case to chapter 7 if it concludes that doing so would make more sense than conversion – it is required upon a showing of "cause" to do *something*.  It cannot decide that it would rather just allow the debtor to proceed with its plan process.  Rather, the only exceptions that would permit the court to decline to act, despite a showing of "cause," would be (a) if "the court finds and specifically identifies unusual

---

[13] 11 U.S.C. § 1112(b)(1).

circumstances" showing that that such action is contrary to the best interests of creditors and the estate; and (b) the debtor is "a farmer or a corporation that is not a moneyed, business, or commercial corporation."[14]

So what is "cause"? Well, cause "includes" the items enumerated under § 1112(b)(4), the first of which is "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation."[15] Here, the debtors' substantial or continuing losses have been stipulated to. But because the provision is written in the conjunctive (it says *and*), the U.S. Trustee must *also* show the absence of a reasonable likelihood of rehabilitation in order to establish cause.

The question of what counts as "rehabilitation" has given rise to some confusion in the caselaw, particularly with respect to how it relates to the debtor's ability to confirm a chapter 11 plan. As this Court sees it, the likelihood that a debtor will be able to confirm a chapter 11 plan is neither necessary nor sufficient to establish a likelihood of "rehabilitation."

"Rehabilitation," the cases tell us, means "to put back in good condition; re-establish on a firm, sound basis."[16] Rehabilitation "involves establishing a cash flow

---

[14] *Id.* § 1112(b)(2); *id.* § 1112(c).

[15] *Id.* § 1112(b)(4)(A). Note that because § 1112(b)(4) provides examples of what cause "includes," courts have found that the absence of good faith also "constitutes 'cause' though it does not fall into one of the examples of cause specifically listed in the statute." *In re LTL Mgt., LLC*, 64 F.4th 84, 100 (3d Cir. 2023) (citing *In re SGL Carbon Corp.*, 200 F.3d 154, 159-162 (3d Cir. 1999)).

[16] *In re Kanterman*, 88 B.R. 26, 29 (S.D.N.Y. 1988). *See also In re Midwest Properties of Shawano, LLC*, 442 B.R. 278 (Bankr. D. Del. 2010) (dismissing for cause based on lack of a plan to rehabilitate the debtors).

from which current obligations can be met."[17]  It is clear that the ability to confirm a plan by itself does not amount to "rehabilitation."   The Bankruptcy Code would permit a debtor to confirm a plan that provided for the piecemeal liquidation of its assets.  Such a liquidation, even if it were to occur under a confirmed chapter 11 plan, would not constitute "rehabilitation."[18]

But nor is the confirmation of a traditional chapter 11 plan under which a reorganized debtor will emerge *necessary* for a debtor to be "rehabilitated" within the meaning of § 1112(b)(4)(A).  It is true that in Judge Carey's opinion in *Midwest Properties of Shawano*, he cited to the Supreme Court's decision in *Timbers* that talks about "a reasonable possibility of a successful reorganization within a reasonable time frame."[19]   That should not be read to suggest, however, that a traditional reorganization is a necessary part of what it means to "rehabilitate."  *Timbers* by its own terms was not about § 1112(b) at all.  It was addressing the requirement of § 362(d)(2) that requires that a secured creditor be granted relief from the stay if there is no equity in the property and "such property is not necessary to an effective reorganization."[20]  In that context, the *Timbers* Court endorsed the conclusions of many lower courts that a purely speculative hope of a reorganization is insufficient. This Court does not, however, read Judge Carey's citation of *Timbers* to mean that a

---

[17] *Kanterman*, 88 B.R. at 29.

[18] *See* 7 *Collier on Bankruptcy* ¶ 1112.04 (16th 2026).

[19] *Midwest Properties of Shawano,* 442 B.R. at 286 (citing *United Sav. Ass'n v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 376 (1988)).

[20] 11 U.S.C. § 362(d)(2).

debtor must be able to complete a successful traditional reorganization in order for it to be "rehabilitated."

It is of course now well accepted that a bankruptcy case can be filed by a debtor that intends to use the bankruptcy process to maximize creditor recoveries by conducting a free-and-clear going-concern sale of substantially all of its assets to a buyer.[21]   A successful going concern sale operates to "rehabilitate" the debtor's business in a way that is similar to a traditional reorganization.  In both cases, the business emerges free of pre-bankruptcy indebtedness, such that an otherwise profitable business whose problem is that it saddled with too much indebtedness can succeed without the old debt.  In a traditional reorganization, the owners of the new business are typically the prior creditors.  In a sale case, the owner is typically whomever is willing to pay the most at an auction to acquire the assets.  But as an economic matter, both operate to "rehabilitate" the business in essentially the same way.

That is not to say that it would be impossible to make a contrary argument. Section 1112(b)(4)(A) requires a "rehabilitation" but is silent on what the subject of that rehabilitation must be.  The analysis above presumes that the statute is talking about the rehabilitation of the debtor's business operations.  But if the subject of the rehabilitation required by § 1112(b)(4)(A) is the formal legal entity that is the

---

[21] *See In re TWA,* 322 F.3d 283 (3d Cir. 2003) (authorizing sale of substantially all, free and clear of successor liability claims); *In re AIO US, Inc.*, No. 24-11836, 2025 WL 2426380, at *16 (Bankr. D. Del. Aug. 21, 2025) (while chapter 11 "is intended to permit an otherwise viable business facing financial distress to reorganize," the chapter 11 process "may also properly be used, such as in cases like this one, to maximize value by permitting a going concern sale").

prepetition debtor, then a going concern asset sale might not count as a rehabilitation. After an asset sale, the prepetition debtor, as a legal entity is typically left behind as an empty corporate shell. That entity remains liable, in light of § 1141(d)(3), on the prepetition debt.[22] In such a case, therefore, the prepetition debtor, as a legal entity, is not "rehabilitated."

The text of the statute, however, does not require such a reading. Indeed, § 1112(b)(4)(A) is silent on the question of who or what must be "rehabilitated." And in light of the Code's purpose of maximizing value and the absence of any sensible reason to care whether the prepetition legal entity was reorganized, dissolved, or simply left behind, the Court will read the statutory language to include a going concern sale in which an otherwise viable business is freed of the prepetition debt as a "rehabilitation" for this purpose.

Applying those principles to the case at hand, the Court is satisfied that the debtors' business has a reasonable likelihood of rehabilitation. That would be a much closer question if the only means of rehabilitation were to confirm the current form of the debtors' plan. The Court believes that the debtors are entitled to have their day in court to argue in favor of confirmation of their plan. So the Court is not prejudging that question now. And the debtors have made clear that, in any event, they intend to revise and improve the current form of plan before seeking confirmation.

---

[22] 11 U.S.C. § 1141(d)(3) (providing that a liquidating debtor in chapter 11 does not receive a discharge).

12

But there are certainly serious obstacles that the debtors would need to clear to obtain confirmation of their current plan. *First*, the plan's proposed treatment of the secured creditors depends on the debtors prevailing in a valuation dispute over the value of the secured creditors' collateral. *Second*, the debtors' proposed plan proposes to push most of the secured creditors' recovery until a balloon payment comes due five years after the effective date. The plan proposes to pay a cram-down interest rate of five percent. The Second Circuit addressed the question of an appropriate cram-down rate of interest in *Momentive*, where it held that, at least in some contexts, market rates may be relevant to assessing an appropriate rate.[23] Again, while the Court does not resolve this issue today, it is at least not entirely obvious that a plan proposing to pay a five percent rate of interest (at a time when the risk free rate of interest for a comparable time period is in the range of four percent) is appropriate in view of the various risks and challenges the reorganized debtors' business may face.

*Finally*, it bears note that the plan hinges on reducing the secured creditors' claims down to the value of their collateral using the tool of bifurcation under § 506(a)(1). Judge Ambro's dissenting opinion in *Philadelphia Newspapers* explains, however, the foundational role that § 1111(b)(2) plays in protecting secured creditors from the risk of judicial undervaluation. This provision "allows [an undersecured] secured creditor to forgo [its] deficiency claim and instead elect to have its claim

---

[23] *In re MPM Silicones, LLC*, 874 F.3d 787, 801 (2d Cir. 2017).

treated as if it were fully secured."[24]  Just like the right to credit bid protects secured creditors from having their collateral undervalued in a bankruptcy sale, the right to make a § 1111(b)(2) election protects secured creditors from the risks associated with a potential judicial undervaluation when the reorganized debtor intends to keep the secured creditors' collateral.  The net result is that subject to the exceptions provided (for collateral of "inconsequential value"), to cram down a plan under § 1129(b)(2)(A) over the objection of a secured creditor that makes a § 1111(b)(2) election, the plan must provide for the payment in full, at least in nominal dollars, of the secured creditor's claim.  And the present value of the plan's stream of payments must be no less than the (judicially determined) value of the collateral.

The debtors insist that their current form of plan is fully confirmable and that there is sufficient "wiggle room" in their projections to account for some of these concerns.  But it is at least not obvious to this Court that the debtors have fully taken account of these various statutory protections afforded to secured creditors.  For that reason, had the Court been required to conclude based only on the plan currently on file whether there was a "reasonable likelihood" of the debtors' rehabilitation, the Court might well have concluded that there was not.

---

[24] *In re Philadelphia Newspapers, LLC*, 599 F.3d 298, 333 (3d Cir. 2010) (Ambro, J., dissenting).  The Supreme Court later adopted the construction of the statute urged by Judge Ambro in his *Philadelphia Newspapers* dissent.  *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639 (2012).  *See also In re Houston Regional Sports Network, L.P.*, 886 F.3d 523, 526 (3d Cir. 2018) ("§ 1111(b) … permits an undersecured creditor – a secured creditor whose collateral is worth less than its claim – to elect to have its claim treated as fully, rather than partially, secured.").

14

The debtors, however, have effectively solved for that problem by agreeing to amend their plan, by no later than May 15, 2026, to provide that if the Court concludes that the reorganization they propose does not satisfy the confirmation requirements, they will promptly pivot to conducting a going concern sale of their business. And the record before the Court was more than sufficient to establish that the debtors' business, while it faces challenges, has sufficient potential value that it would likely generate value in a going concern sale. For that reason, the Court is satisfied that there is a reasonable likelihood that the debtors' business can and will be rehabilitated. Accordingly, while the Court appreciates the work done by the U.S. Trustee in bringing this motion and thus advancing these cases forward, the Court will deny the U.S. Trustee's motion to convert.

## II.     Under the Bankruptcy Code, there is no such thing as an examiner with powers that expand beyond conducting an examination.

Eastern Funding, one of the debtors' secured creditors, moved the Court to appoint an examiner with expanded powers to conduct a sale of the debtors' business.[25] Kannegeisser, another secured creditor, joined in that motion.[26] Eastern Funding points to one case from outside this jurisdiction in which a court appointed an examiner and "expanded" the examiner's powers to include conducting a sale of the debtor's business.[27]

---

[25] D.I. 340.  Eastern Funding, LLC is referred to as "Eastern Funding."

[26] D.I. 341.

[27] *In re GTI Capital Holdings, LLC*, No. 2-03-bk-07923, 2005 WL 8245434 (Bankr. D. Ariz. Nov. 21, 2025).

15

Simply as a practical commercial matter, the Court has its doubts about the wisdom of appointing an independent third party to conduct a sale while the debtor that is opposed to such a sale remains in possession and continues to operate the business. But those doubts are overtaken by the fact that the law in this jurisdiction is clear that the role of an examiner is simply to conduct an examination.

The case for expanding the powers of an examiner would presumably stem from the language of § 1104(c) stating that where the statutory requirements are met, a bankruptcy court shall appoint an examiner "to conduct such an examination of the debtor as is appropriate."[28] The argument for expanding the power of an examiner to conduct a sale is presumably that if such a sale is "appropriate," it is authorized by this language.

In its decision in *FTX*, the Third Circuit rejected such a capacious reading of the "as is appropriate" language. There, the bankruptcy court had concluded that although the statutory requirements were met, the appointment of an examiner would not be "appropriate" and therefore denied the motion to appoint one. The Third Circuit rejected that reading. In doing so, the court made clear what that language means. "'[A]s is appropriate' refers to the nature of the investigation, not the appointment of the examiner."[29]

That same point defeats the argument that it might be "appropriate" to have the examiner sell the debtor's business. The "as is appropriate" language gives the

---

[28] 11 U.S.C. § 1104(c).

[29] *In re FTX Trading Ltd.*, 91 F.4th 148, 154 (3d Cir. 2024).

bankruptcy court wide discretion to set the parameters of the investigation. But there is just no getting around the fact that an examination and an asset sale are different things. Nothing in § 1104 authorizes the bankruptcy court to appoint an investment banker disguised as an examiner. The motion will accordingly be denied.

### Conclusion

For the foregoing reasons, the motions to convert and to appoint an examiner with special powers will be denied. As set forth on the record on April 17, 2026, the parties are directed to settle orders so providing.

Dated: April 22, 2026

_____
CRAIG T. GOLDBLATT
UNITED STATES BANKRUPTCY JUDGE