# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| DEQSER LLC, *et al.*,[1] | Case No. 25-10687 (CTG) |
| | (Jointly Administered) |
| Debtors. | |

## AMENDED DISCLOSURE STATEMENT FOR AMENDED

## JOINT PLAN OF REORGANIZATION

### of

## DEQSER LLC, AND KNY 26671 LLC

**MAYERSON & HARTHEIMER, PLLC**
136 E. 64th St., Suite 11E
New York, NY 10065
(917) 446-6884
Sandra E. Mayerson, Esq.
David H. Hartheimer, Esq.

**GELLERT SEITZ BUSENKELL & BROWN LLC**
1201 N. Orange Street, Suite 300
Wilmington, DE 19801
Ronald S. Gellert, Esq.
*Counsel for Debtors and*
*Debtors-in-Possession*

**SPENCER FANE**
1233 20th St., NW
Suite 600
Washington DC 20036
Lauren McKelvey, Esq.
*Counsel for CSV Capital Partners LLC*

---

[1] The Debtors in these Chapter 11 cases, along with the last four (4) digits of their federal tax identification numbers, are: (i) Deqser LLC (8269) and (ii) KNY 26671 LLC (9132) (collectively, the "**Debtors**"). The Debtors' mailing address is: c/o Cooperative Laundry, 1 Eastern Road, Kearny, NJ 07032.

THIS DISCLOSURE STATEMENT IS THE ONLY DOCUMENT AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE *AMENDED JOINT PLAN OF REORGANIZATION OF DEQSER LLC, AND KNY 26671 LLC* (THE "**PLAN**") PROPOSED BY DEQSER LLC, KNY 26671 LLC AND CSV CAPITAL PARTNERS LLC. *NO OTHER REPRESENTATIONS CONCERNING THE DEBTORS, THE VALUE OF THEIR ASSETS, OR BENEFITS OFFERED UNDER THE PLAN HAVE BEEN AUTHORIZED.*

THE APPROVAL OF THIS DISCLOSURE STATEMENT MEANS THAT THE BANKRUPTCY COURT HAS FOUND THAT THE DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION TO PERMIT CREDITORS OF THE DEBTORS TO MAKE A REASONABLY INFORMED DECISION IN EXERCISING THEIR RIGHT TO VOTE UPON THE PLAN. COURT APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A RECOMMENDATION ON THE MERITS OF THE PLAN. A COPY OF THE PLAN IS ANNEXED HERETO AS **EXHIBIT 1** AND DESCRIBED HEREIN.

THERE HAS BEEN NO INDEPENDENT AUDIT OF THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT EXCEPT AS EXPRESSLY INDICATED HEREIN. THIS DOCUMENT WAS COMPILED FROM INFORMATION OBTAINED BY AND FROM THE DEBTORS AND FROM OTHER SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTORS' KNOWLEDGE, INFORMATION, AND BELIEF. CERTAIN OF THE FINANCIAL INFORMATION CONTAINED HEREIN IS FORWARD LOOKING AND NECESSARILY THERE CAN BE NO GUARANTEE OF THE ACCURACY OF THE INFORMATION.

THIS DISCLOSURE STATEMENT CONTAINS ONLY A SUMMARY OF THE PLAN. ALL CREDITORS AND OTHER INTERESTED PARTIES ARE ENCOURAGED TO REVIEW THE FULL TEXT OF THE PLAN AND TO READ CAREFULLY THE ENTIRE DISCLOSURE STATEMENT, INCLUDING ALL EXHIBITS, BEFORE DECIDING TO VOTE TO ACCEPT OR REJECT THE PLAN.

## SECTION I: INTRODUCTION

### A. Overview

KNY 26671 LLC, a Delaware limited liability company ("**KNY**") one of the two debtors and debtors-in-possession Along with Deqser LLC ("**Deqser**"), a New Jersey limited liability company, in this jointly administered chapter 11 case (KNY and Deqser shall be collectively referred to as the **Debtors**), and CSV Capital Partners LLC, the DIP Lender in the jointly administered case ("**CSV**") (the Debtors, together with CSV shall be collectively referred to as the "**Plan Proponents**") submit this Disclosure Statement (the "**Disclosure Statement**"), as the Plan Proponents,  pursuant to Section 1125 of Title 11 of the United States Code (the "**Bankruptcy Code**"), to Creditors and Interest Holders of the Debtors in connection with the: (i) solicitation of acceptances of the *Amended Joint Plan of Reorganization of Deqser LLC, and KNY 26671 LLC* dated June 9, 2026, as amended from time to time  [Docket No. 438] (the "**Plan**"), and (ii) the hearing on Confirmation of the Plan. Unless otherwise defined herein, all capitalized terms contained herein shall have the meaning ascribed to them in the Plan.  If a capitalized term is not defined in the Plan, it shall have the meaning ascribed to it in the Bankruptcy Code. A copy of the Plan is attached hereto as **Exhibit 1**.  Deqser, KNY and CSV are the Plan Proponents  and are recommending that Holders of Claims vote to accept the Plan.

This Disclosure Statement describes the Plan and explains the Debtors' pre-bankruptcy operating and financial history, the events leading up to the commencement of these Chapter 11 Cases, significant events during these Chapter 11 Cases, and the anticipated results if the Plan is Confirmed and becomes effective. This Disclosure Statement also describes terms and provisions of the Plan, including certain effects of Confirmation of the Plan, certain alternatives to the Plan, and the manner in which Distributions will be made under the Plan. In addition, this Disclosure Statement discusses the Confirmation process and the voting procedures that

Holders of Claims and Interests entitled to vote under the Plan must follow for their votes to be counted.

This Plan is unusual in that it contains two alternatives, a Reorganization Transaction and a Sale Transaction, each of which has different consequences for Creditors. It is the intention of the Plan Proponents to seek Confirmation and implement the Reorganization Transaction; *however,* if the Bankruptcy Court does not make a finding that the Reorganization Transaction is Feasible on or before August 12, 2026, then the Debtors will immediately start to implement the Sale Transaction. Accordingly, when you vote to accept or reject this Plan, you are voting to accept or reject *both* alternatives. If the Plan is Confirmed, there would be no further court action required for the Debtors to pivot to a Sale Transaction if the requirements for such a change of course are met. Accordingly, it is important that you read the entirety of the Plan and understand your rights under both alternatives.

## B.  The Plan Confirmation Process

This Plan is for both Debtors Deqser and KNY. The Debtors are being combined into one entity pursuant to this Plan. This Plan is a "toggle plan", meaning that it presents two different alternatives for reorganization, and if one alternative is not successful, the plan automatically "toggles" to the second alternative. In this case, the Plan Proponents are seeking for the Debtors to reorganize pursuant to the Reorganization Transaction set forth herein, but if the Bankruptcy Court has not ruled that the Reorganization Transaction is Feasible by August 12, 2026, the Debtors will automatically toggle to a Sale Transaction as described herein.

The Plan divides Creditors and Interest Holders into eleven (11) classes and specifies the Distributions which will be made to the members of that Class under each of the two Plan alternatives. The first ten (10) classes are Creditors, and Class 11 is for Interest Holders. *Ballots are being provided only to creditors in Classes 1 through 10.* Such Creditors are deemed Impaired and entitled to vote. Class 11 is made up of the Holders of Equity Interests in both

3

KNY and Deqser. As their equity is being canceled upon Confirmation and they are receiving nothing under the Plan, they are deemed to have rejected the Plan, and, therefore, are not entitled to vote. Class 11 will not receive Ballots.

[The Bankruptcy Court has approved this Disclosure Statement as containing adequate information to permit Creditors and Interest Holders to make a reasonably informed decision in exercising the right to vote upon the Plan. Approval of this Disclosure Statement does not, however, constitute a determination by the Bankruptcy Court as to the fairness or merits of the Plan. Each Creditor, Interest Holder and party-in-interest should read both this Disclosure Statement and the Plan in their entirety.]

In accordance with Section 1128 of the Bankruptcy Code, the Bankruptcy Court has scheduled a hearing to consider Confirmation of the Plan on August 5, 2026, at 10:00 a.m. (the "**Confirmation Hearing**") before the Honorable Craig T. Goldblatt, Judge of the United States Bankruptcy Court for the District of Delaware, 3rd Floor, 824 North Market Street, Wilmington, Delaware 19801. Further information on the Confirmation process is in Section XV below.

C. **Representations and Limitations**

NO PERSON IS AUTHORIZED IN CONNECTION WITH THE PLAN OR THE SOLICITATION OF VOTES THEREON TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS ANNEXED HERETO, OR INCORPORATED HEREIN BY REFERENCE OR REFERRED TO HEREIN, OR AS OTHERWISE APPROVED BY THE BANKRUPTCY COURT, AND IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MAY NOT BE RELIED UPON BY YOU AS HAVING BEEN AUTHORIZED BY THE DEBTORS OR THE BANKRUPTCY COURT.   ANY REPRESENTATIONS OR INDUCEMENTS TO

SECURE YOUR ACCEPTANCE OF THE PLAN OTHER THAN AS CONTAINED HEREIN SHOULD NOT BE RELIED UPON BY YOU.

THE INFORMATION CONTAINED HEREIN HAS BEEN PREPARED BY THE DEBTORS IN GOOD FAITH, BASED UPON UNAUDITED INFORMATION AVAILABLE TO THE DEBTORS AS OF THE DATE HEREOF. THE PLAN PROPONENTS, INCLUDING, THE DEBTORS, BELIEVE THAT THIS DISCLOSURE STATEMENT COMPLIES WITH THE REQUIREMENTS OF THE BANKRUPTCY CODE.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE OF THE PLAN, UNLESS ANOTHER TIME IS SPECIFIED HEREIN. DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT CREATE ANY IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE FACTS SET FORTH HEREIN SINCE THE DATE OF THIS DISCLOSURE STATEMENT AND/OR THE DATE THAT THE MATERIALS RELIED UPON IN PREPARATION OF THIS DISCLOSURE STATEMENT WERE COMPILED.

IT IS THE PLAN PROPONENTS' POSITION THAT THE DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN, AND NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE ADVICE ON THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON HOLDERS OF CLAIMS AGAINST OR EQUITY INTEREST IN THE DEBTORS.

THE DESCRIPTION OF THE PLAN CONTAINED IN THIS DISCLOSURE STATEMENT IS INTENDED AS A SUMMARY ONLY AND IS QUALIFIED IN ITS

5

**ENTIRETY BY REFERENCE TO THE PLAN ITSELF. EACH CREDITOR AND EQUITY INTEREST HOLDER IS ENCOURAGED TO READ, CONSIDER, AND CAREFULLY ANALYZE THE TERMS AND PROVISIONS OF THE PLAN.**

**THE PLAN PROVIDES FOR INJUNCTIVE RELIEF AS TO THE DEBTORS. THE PERMANENT INJUNCTION SET FORTH IN THE PLAN WILL APPLY TO HOLDERS OF ANY CLAIM, EQUITY INTEREST, LIEN, ENCUMBRANCE OR DEBT, WHETHER SECURED OR UNSECURED, WHETHER PRIORITY STATUS OR NONPRIORITY, OR AN EQUITY INTEREST IN THE DEBTORS, EXCEPT AS OTHERWISE SET FORTH IN THE PLAN. CREDITORS AND EQUITY INTEREST HOLDERS WILL BE BOUND BY THIS INJUNCTIVE RELIEF UNLESS THEY TIMELY FILE OBJECTIONS IN ACCORDANCE WITH THE PROVISIONS SET FORTH HEREIN, APPEAR AT THE CONFIRMATION HEARING TO PROSECUTE AN OBJECTION, AND HAVE THEIR OBJECTION SUSTAINED.**

This Disclosure Statement has been neither approved nor disapproved by the Securities and Exchange Commission (the "**SEC**"), nor any state securities regulator, and neither the SEC nor any state securities regulator has passed upon the accuracy or adequacy of the statements contained in this Disclosure Statement. The Debtors do not have any public securities, nor does the Plan contemplate issuing public securities.

**D. <u>Your Review of This Document</u>**

The purpose of the Disclosure Statement is to set forth information that (i) summarizes the Plan and alternatives to the Plan, (ii) advises Holders of Claims and Equity Interests of their rights under the Plan, (iii) assists Creditors entitled to vote in making informed decisions as to whether they should vote to accept or reject the Plan, and (iv) assists the Bankruptcy Court in determining whether the Plan complies with the provisions of chapter 11 of the Bankruptcy Code and should be confirmed.

6

You are urged to read the Disclosure Statement to determine what rights you may have to vote on or object to the Plan before making any decision on any such course of action. Particular attention should be directed to the provisions of the Plan affecting your rights as they existed before the institution of these Chapter 11 Cases. Please note, however, that this Disclosure Statement cannot tell you everything about your rights. For instance, this Disclosure Statement cannot and does not provide a complete description of the financial status of the Debtors, all of the applicable provisions of the Bankruptcy Code, or other matters that may be deemed significant by Creditors and other parties-in-interest. You are also encouraged to consult with your lawyers and/or advisors as you review and consider the Disclosure Statement and the Plan to enable you to obtain more specific advice on how the Plan will affect you.

Be sure to read the Plan as well as the Disclosure Statement. If there are any inconsistencies between the Plan and the Disclosure Statement, the Plan provisions will govern. Bankruptcy Code Section 1125 requires that a Disclosure Statement contain "adequate information" concerning the Plan. The term "adequate information" is defined in the Bankruptcy Code as "information of a kind, and in sufficient detail," about a debtor and its operations "that would enable a hypothetical reasonable investor typical of holders of claims or interests" of the debtor to make an informed judgment about accepting or rejecting the Plan.

### E. Brief Explanation of Chapter 11

The commencement of a bankruptcy case creates an estate composed of all the legal and equitable interests of a debtor as of the date it filed for bankruptcy protection. The Debtors filed their petitions for Chapter 11 relief on April 10, 2025. In a chapter 11 case, a debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession" unless the Bankruptcy Court orders the appointment of a trustee. The principal purpose of a chapter 11 case is to permit the debtor to reorganize its business. To further that

7

interest, the debtor or a party-in-interest may submit a plan, which is a proposal for ultimately settling and/or satisfying the Claims against the debtor.

### F. Important Dates

The Bankruptcy Court approved this Disclosure Statement by and through the Disclosure Statement Order (defined below) entered on [_____], after notice and a hearing and in accordance with Section 1125 of the Bankruptcy Code. The Bankruptcy Court found that the information contained herein is sufficiently detailed to enable a hypothetical, reasonable investor typical of the class being solicited to make an informed judgment concerning the Plan. **HOWEVER, THE BANKRUPTCY COURT HAS NOT CONFIRMED THE PLAN, NOR IS THE DISCLOSURE STATEMENT OR THE DISCLOSURE STATEMENT ORDER TO BE CONSTRUED AS APPROVAL OR ENDORSEMENT OF THE PLAN BY THE BANKRUPTCY COURT.**

As stated in the Plan, the Bankruptcy Court has scheduled a hearing to consider Confirmation of the Plan for August 5, 2026, at 10:00 a.m. Holders of Claims and Equity Interests and other parties-in-interest may attend this hearing. Objections to Confirmation of the Plan must be filed with the Bankruptcy Court on or before [_____], with two courtesy copies sent to the Chambers of the Honorable Craig T. Goldblatt, and served to be actually received by [_____], upon: (a) counsel to the Debtors, Mayerson & Hartheimer, PLLC, at sandy@mhlaw-ny.com and david@mhlaw-ny.com, with a copy to rgellert@gsbblaw.com; the Office of the United States Trustee for Region 3, serving the District of Delaware (Attn: Jon Lipshie, Esq.) at jon,lipshie@usdoj.gov; (b) counsel to the Official Committee of Unsecured Creditors, Fox Rothschild, at mherz@foxrothschild.com and Sward@foxrothschild.com; (c) counsel to the Debtors' lenders: (i) Eastern Funding, Pannone Lopes, at jdiorio@pldolaw.com, with a copy to dklauder@bk-legal.com (ii) Kannegiesser GmbH, Felhaber Larson, WTansey@felhaber.com, with a copy to KBuck@mccarter.com; (iii)

Merchant Financial Corporation, Esbrook, PC, Scott.leonhardt@esbrook.com; and CSV, Spencer Fane, lmckelvey@spencerfane.com; and(d) any party entitled to notice pursuant to Bankruptcy Rule 2002 as of the time of service (together, the "**Objection Notice Parties**").

All Ballots with respect to the Plan must be completed in full and signed to be counted in the tabulation of votes and must be received by Stretto, Inc., the Solicitation Agent, no later than 5:00 P.M., prevailing Eastern time, on July 31, 2026.

Completed and signed ballots should be returned by first class mail, overnight mail, hand delivery or email to the Solicitation Agent at the below address.

A.  If by regular mail, hand delivery or by overnight mail:

KNY 26671 LLC. Ballot Processing
C/O Stretto
410 Exchange, Ste 100
Irvine, CA 92602

B.  If by the E-Ballot Portal:

Submit your Ballot via the Claims and Solicitation Agent's online portal by visiting https://forms.stretto.com/, clicking on "E-Ballot" under "Case Actions" and following the instructions to submit your Ballot.

### G. Solicitation Procedures

Creditors holding Claims that are Impaired have the right to vote to accept or reject the Plan. Generally speaking, a Claim or Equity Interest is Impaired if the Plan alters the legal, contractual or equitable rights of the Holder of the Claim or Equity Interest. A Class of Creditors accept the Plan when Creditors holding two-thirds in amount and more than one-half in number of the Claims in such Class which actually vote, vote to accept the Plan. If no Claims in a Class vote, then that Class is deemed to accept the Plan. Similarly, if Class has no Allowed Claims on the Voting Record Date, such Class is deemed to have accepted the Plan.

In these Chapter 11 Cases, the Plan consists of ten (10) Classes of Claims and one (1) Class of Equity Interests. The Plan provides that Holders of Claims in Classes 1 through 10 who hold Allowed Claims on the Record Date for Voting are entitled to vote and will receive Ballots. If you believe that you are in one of these groups and do not receive a Ballot, you should contact the Solicitation Agent or counsel to the Debtor, David H. Hartheimer, at david@mhlaw-ny.com.  Only Claims that are Allowed as of the Record Date for Voting are entitled to vote and will receive of Ballot.

Holders of Equity Interests in Class 11 will receive nothing under the Plan. Accordingly, as a matter of law, they are deemed to have rejected the Plan. Accordingly, they will not receive Ballots.

### H. **Recommendation**

Since filing the Petition on April 10, 2025, and suffering a huge downturn in their hospitality business due to the global Covid pandemic and other exigencies, the Debtors have worked very hard to turn around and stabilize their business. As a result of its efforts, the Debtors have been able to propose the Plan which provides distributions to every creditor. The Debtors believe that without this reorganization process, no unsecured creditors would have received any Distributions, and the Debtors' Secured Creditors would only have received partial Distributions. A liquidation analysis supporting this opinion is attached hereto as **Exhibit 2**. The Debtors have secured significant Exit Financing in an amount sufficient to pay all amount that will be due on Effective Date or shortly thereafter. This funding will not be available absent Confirmation of the Plan. Thus, it is the Plan Proponents' opinion that the treatment of Creditors and Interest Holders under the Plan contemplates a greater recovery than that which is likely to be achieved under any alternative for reorganization or liquidation of the Debtors' business.  Accordingly, the Plan Proponents submit that Confirmation of the Plan is in the best interest of the Debtors' Creditors and recommends that all Holders of Claims vote

to accept the Plan. **The Plan Proponents strongly urge each Holder of a Claim to vote such Claim to accept the Plan.** If the Plan is not accepted and subsequently Confirmed, the Debtors may well be liquidated, which would provide no return for unsecured creditors or Interest Holders, and only a partial return to Secured Creditors.

### I.   Inquiries

If you have any questions about the packet of materials that you have received, please contact the Claims and Solicitation Agent, by Stretto, Inc, by email at TeamDEQSER@stretto.com, or Debtors' counsel at david@mhlaw-ny.com.

### J.   Exhibits

**The following exhibits are annexed hereto and expressly incorporated herein.**

Exhibit 1:  A copy of the Plan.

Exhibit 2:    A copy of the Debtors' Liquidation Analysis

Exhibit 3:  A copy of the Debtors' Financial Projections.

All exhibits to the Plan and Disclosure Statement are incorporated into and are a part of the Plan and Disclosure Statement as if set forth in full therein.

### K.   Rules of Construction

The Rules of Construction and provisions for Computation of Time set forth in the Plan shall apply equally to the Disclosure Statement.

### SECTION II: HISTORY AND ORGANIZATION OF THE DEBTORS

### A.   Description of the Debtors' Business

KNY is a state of the art commercial laundry located in Kearny, New Jesey which was envisioned as being the most technologically forward laundry in North America. KNY services the hotel and restaurant industry located primarily in New York City. KNY utilizes a fully automated laundry facility. KNY has approximately 180 workers, through a Professional Employer Organization ("**PEO**"), of which 40 are clerical and 140 are non-clerical. KNY has

11

one subsidiary, Deqser LLC. Deqser (LLC) was incorporated as a Delaware limited liability company. It serves solely as a holding company. It was originally envisioned that there would be a roll up of multiple commercial laundries into Deqser, but that has not occurred. Deqser filed for chapter 11 protection in the District of Delaware on April 10, 2025, the same day as KNY filed its Chapter 11 Case. Deqser and KNY's bankruptcy cases are jointly administered.

The business opened in the fourth quarter of 2018. The business was very successful and by the summer of 2019, KNY was operating at full capacity. As a result, KNY decided to take on additional debt and raise equity in the summer of 2019 to increase its footprint by 50%. That summer KNY raised a total of $7.5 million for its expansion.

The Debtors commenced their Chapter 11 Cases to obtain a breathing spell and facilitate financing. Through the breathing spell afforded by the chapter 11 filing, and the opportunity chapter 11 provided to facilitate additional financing, KNY was able to perform required repairs and maintenance of their facility to optimize their laundry facility to increase its capacity and efficiency.  The breathing spell afforded by chapter 11 also allowed KNY to increase its customer base. KNY increased the amount of laundry its processing from a low of 8,000 rooms after filing these Chapter 11 Cases to a projection of 12,750 rooms on or around the effective date of the Confirmation. The increased volume is projected to result in increased revenue. This increased revenue coupled with the increase efficiency, lowering operating expense, is the key to the revitalization of KNY's business and their return to profitability. In short, the Debtors were able to accomplish the goals for which it filed their Chapter 11 Cases.

**B. Prepetition Capital Structure and Debt Obligations**

### 1. Secured Debt

As of the Petition Date, the Debtors had secured debt of approximately $17 million.[2] to the extent Deqser has secured debt, it is for guarantees of the below debt of KNY 26671 LLC. The larger secured claims of KNY 26671 LLC are as follows:

| Creditor | Amount |
|---|---|
| Merchant Financial Corporation | $3,500,000 |
| Feenix Venture Partners | $1,672,260 |
| Irazuk LLC | $1,974,000 |
| Eastern Funding | $5,326,140 |
| Deutche Leasing USA, Inc (Kannegiesser) | $3,757,759 |
| CSV Capital Partners LLC | $4,500.000[3] |

### 2. Unsecured Debt

As of the Petition Date, the Debtors consolidated unsecured debt was approximately $15 million, with the largest claims as follows:

| Creditor | Claim Amount |
|---|---|
| Kuzari Asset Management LLC | $1,900,000 |
| Sang Cho | $1,100,000 |
| KPIP Urban Renewal I LLC | $625,223 |
| MCA Servicing Company | $631,907 |

---

2 This is exclusive of merchant loans, which purport to be true sales, but which also purport to be secured. In any event, Debtors believe that such arrangement, if loans, are "out of the money" and would not be secured, and, if loans, may be usurious and hence voidable if they are deemed to be loans.

3 This amount is not currently owed, but is expected to be the principal amount of the DIP Obligations by the Confirmation Date.

| Amtrust Audit United States | $573,514 |
|---|---|
| Eastern Funding | $14,202,091.49[4] |

By listing the amounts Claims in these tables, the Debtors are not admitting that such amounts are owed and undisputed.

### 3. Equity Holders

The equity of Deqser is owned 60% by Benjamin Gerut and 40% by Sang Cho, the founders of the Debtors. The equity of KNY is owned 51% by Deqser and 49% by Kuzari Investor 26671 LLC.

### SECTION III: EVENTS LEADING TO THE CHAPTER 11 CASES

Several events and factors severely impacted the profitability of the Debtors' laundry business, ultimately leading to the litigation issues and liquidity pressures that precipitated the Debtors' decision to commence these Chapter 11 Cases.

KNY began building its laundry facility in 2017, and ordered equipment from Herbert Kannegeiser GmbH ("**Kannegiesser**"). It was KNY's understanding that this would be the first complete assembly line of Kannegiesser equipment in the United States, and that the Kannegiesser equipment was more technologically advanced than anything currently existing in the US.

The business opened in the fourth quarter of 2018, and was a state-of-the-art commercial laundry. The business was very successful and by the summer of 2019, KNY was working at full capacity. As a result, KNY took on additional debt and raised equity in the summer of 2019 to increase its footprint by 50%. That summer KNY raised a total of $7.5 million for its expansion.

---

[4] Although Eastern has filed an unsecured proof of claim against Deqser for $20,464,466.73, as a result of substantive consolidation, such Claim would be reduced to $14,202,091.49.

KNY's expanded facilities came online in February 2020, and KNY expected to fully utilize the expanded facility. Unfortunately, immediately upon opening the expanded facility, the Covid pandemic hit, which affected all of KNY's clients, since all of its customers were in the hospitality industry. KNY immediately went from 120,000 pounds of laundry a day to 20,000 pounds or less of laundry a week, which was disastrous for its business.

For the next three and half years, KNY's business was extremely volatile and unpredictable, and KNY struggled to survive. KNY was starting to do better, just when the Omnicron variant of the Covid virus hit, and took KNY's business back down to zero.

Finally, in the summer of 2023, KNY's business was starting to return to pre-Covid levels. Just when it appeared that KNY had turned the corner, KNY suffered a massive equipment failure in August 2023 due to a software issue. As a result, all of KNY's dryers went down, which forced a stoppage of service for 3 to 4 days. The effect on the business was catastrophic. KNY could not deliver laundry to its customers, and as a result, KNY permanently lost a huge number of customers and suffered reputational damage.

While KNY was still reeling from the repercussions of the software failure, in March 2024, there was an electrical fire in the KNY's primary ironer. There was horrible smoke damage throughout the facility, and KNY could not operate for several days until the building was cleared of smoke. KNY's inability to deliver laundry for several days exacerbated the reputational damage started by the software failure. In just a few days, KNY lost approximately one third of our customer base.

Without ironers, it was difficult for KNY to service its clients. KNY looked to find a way to service its clients to protect the customer base from further erosion. Without a primary ironer, and with the damage to the facility, KNY could not operate efficiently, and had to incur substantial overtime, which cut into KNY's profits. KNY also had to outsource

15

a lot of its laundry, which virtually eradicated all profit margins. KNY hoped this would be extremely temporary, and it was willing to operate at a loss to protect the customer base for a short time; however a new ironer did not come online until December 2024. The holiday season, which is KNY's busiest season, was missed due to the KNY replacement ironer not becoming operational until December. Missing the holiday season was catastrophic.

As a result of the fire, KNY filed two insurance claims, one against KNY's policy on the plant and equipment, and one against KNY's business interruption policy.  For reasons that the Debtors believes had no merit, the insurance company claimed it had to "investigate" and did not pay the claims immediately. Eventually the claims with respect to the plant and equipment were paid, but not until KNY suffered severe continued losses from not having the money to replace ruined equipment. The business interruption claim of approximately $5 million has not been paid to this day, nor has it been denied. The insurance company continues to "investigate" baseless allegations. The Debtors believe that, had the insurance company timely paid the two insurance claims, KNY's business would be in a strong position today.

Given the perfect storm of the delay in payment on the plant and equipment insurance, no payment on the business interruption insurance, slow delivery of the replacement ironer, and the already eroding customer base due to the software failure, it became apparent that the company could not continue in business and meet its obligations. Not surprisingly, many of KNY's lenders brought suit against the company, and trying to defend such suits in different fora became expensive and untenable. In a desperate attempt to bring cash into the business, KNY sold the proceeds of its business interruption insurance claim for $1 million. This proved to be only a temporary fix, and with the continuing problems, it became apparent that something must be done, or the entire value of the company would be consumed in the various lawsuits.

16

Accordingly, the Debtors tried their best to orchestrate an out-of-court sale process. Although it went very far down the road with two separate potential buyers, eventually the sales fell through, partly because Kannegiesser would not agree to release its lien in an out-of-court sale, and partly because of the Debtors' deteriorating financial condition.

In the meantime, KNY fell behind on its facility lease payments, and the facility is integral to its business. Counsel to the landlord sent a notice to terminate the lease effective March 21, 2025. After extended negotiations, the termination date was extended to April 11, 2025. At the time of the negotiations, the Debtors believed it would have a signed Asset Purchase Agreement before that date which would provide sufficient comfort to the landlord to not terminate the lease. When the potential buyer walked away, it became apparent that the Debtors' only choice was to file for protection pursuant to Chapter 11, but the Debtors did not have sufficient funds on hand to finance a successful chapter 11. The potential buyer had made a deposit of $275,000, to which the Debtors became entitled if they walked away. KNY had expected that if worse came to worse and they walked away, they would have this amount to finance chapter 11 filings; however, the buyer alleged that the Debtors breached the agreement, and have demanded that the deposit be returned. Although KNY was confident that it did not breach the agreement, and the deposit rightfully belonged to the KNY, under the circumstances, the deposit was not released from the trust account of Debtors' attorneys. After the filing of the Chapter 11 Cases, the Debtors settled with the potential purchaser and KNY received a portion of the deposit.

Management, therefore, looked diligently for DIP Financing, but was unable to find financing on any terms, due to the many secured liens against the Debtors. KNY even went to a company that specializes in placing DIP loans, and they could not help the Debtors.

As a result, some industry leaders who believe in KNY, as well as some insiders, put together an SPV to be the DIP Lender. The only way KNY could file for chapter 11 protection

17

was that the SPV provided a bridge loan to fund all the necessary payments to get into Chapter 11, with the expectation that it would be rolled up into the DIP Loan. KNY would not have been able to file without this bridge loan, as it paid for the preparation of the bankruptcy materials, retainers to professionals, and payroll to keep the Debtor going until filing. Despite the fact that the SPV was the Debtors' only potential source of DIP Financing, the SPV agreed to very reasonable terms which were in the best interests of the Debtors.

The DIP Loan, not only funded the operations necessary to get to an effective reorganization, but allowed KNY to update and repair its equipment, so that, KNY was able to operate optimally leading to larger profit margins than it was operating before the filing of this Chapter 11 Case. Returning to optimal operating levels is the key to this successful reorganization.

## SECTION IV: SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASES

### A. First Day Motions

Soon after the Petition Date, the Debtors filed a number of motions and other pleadings (the "**First Day Motions**") to ensure an orderly transition into Chapter 11, including (i) a motion for joint administration of the Debtors' Chapter 11 Cases, (ii) a motion (a) to approve use of cash collateral, (b) to approve debtor-in-possession financing, (c) for adequate protection and (d) other relief, (iv) a motion for approval of adequate assurance of payment to utility services and for continuation of service, (v) a motion to authorize the Debtors to (a) Pay Certain Employee Compensation and Benefits, (b) Maintain and Continue Such Benefits and Other Employee-Related Programs, and (ii) Granting Related Relief, and (vi) a motion to pay (a) Authorizing Debtors to Pay Prepetition Claims of Critical Vendors and (b) Granting Related Relief. The Bankruptcy Court ultimately granted the First Day Motions with certain adjustments or modifications to accommodate the concerns raised by the Bankruptcy Court,

18

the United States Trustee, and other parties-in-interest.   Subsequent to the approval of the critical vendor motion, KNY entered into critical vendor agreements with three vendors.

Most important among these First Day Motions was the motion for use of cash collateral, debtor-in-possession financing, and adequate protection. Pursuant to this motion, the Debtors were granted the use of cash collateral upon the terms specified therein, and received approval to borrow a debtor-in-possession revolving credit facility that was initially up to $2,500,000.00 from CSV Capital Partners LLC (the "**DIP Lender")** to be loaned to the Debtors consistent with a revolving 90 day budget. The DIP loan was later increased to an amount up to $4,500,000. The DIP Lender was made up of both existing investors in the Debtors and members that had no prior relationship with the Debtors. To secure the debtor-in-possession financing, the DIP Lender was provided with super priority claims in accordance with Sections 364(c)(1) and 507(b) of the Bankruptcy Code and a valid, perfected first priority lien, and a junior lien, on substantially all of the pre-petition and post-petition assets of the Debtors, subject to pre-existing liens, the Replacement Adequate Protection Liens of the existing lenders, and the Carveout for professionals. In order to consent to the DIP Loan, certain existing secured creditors were granted Adequate Protection Replacement Liens in post-petition collateral which mirrored the extent and priority of their pre-petition liens, as well as adequate protection payments. There is a Carveout from the liens of the DIP Lender in the amount of $150,000 for the benefit of professionals and the U.S. Trustee Fees. There is an additional carve out for counsel to the committee of unsecured creditors. The DIP Loan bears interest at 8% per annum and has a 2% commitment fee, which are payable in kind. The maturity date is the earliest of (i) the date which a plan of reorganization for either of the Debtors becomes effective, (ii) the day on which the DIP Obligations become immediately due and payable pursuant to the terms of the DIP Credit Agreement or by court order, or (iii) the date that substantially all of the assets of RMB are sold, transferred, or alienated in any way.

During these Chapter 11 Cases, the Debtors have gone back to Court on occasion to increase the amount of the DIP Loan. The current amount approved by the Court is $4.5 million.

**B.     Schedules of Assets and Liabilities and Claims Bar Date**

On May 15, 2025, both of the Debtors filed their Schedules of Assets and Liabilities and Statement of Financial Affairs [Docket No. 97]. On July 16, 2025, KNY filed amended schedules and Statement of Financial Affairs [Docket No. 166].

On July 29, 2025, the Debtors filed a motion seeking entry of a Bar Date for filing Claims in these Chapter 11 Cases [Docket No. 173], On August 7, 2025, the Bankruptcy Court entered an order approving the motion and setting September 8, 2025, as the general Claims Bar Date and October 7, 2025, as the governmental Claims Bar Date [Docket No. 189].

**C.   Appointment of a Committee of Unsecured Creditors**.

On April 30, 2025, the Office of the United States Trustee filed its Notice of Appointment of Committee of Unsecured Creditors [D.I. 55].The Committee retained the Law firm of Fox Rothschild LLP, to represent it in these Chapter 11 Cases.

D. **Motions to Extend Exclusivity**

During the pendency of these Chapter 11 Cases, the Debtors moved to extend the Debtors Exclusive Period within which the Debtors may file a chapter 11 plan and solicit acceptances thereof.  These three motions were granted with the most recent Order entered on May 28, 2026 [D.I. 434].

F. **The United States Trustee's Motion to Convert the Debtors' Chapter 11 Cases to Cases Under Chapter 7.**

On February 4, 2026, the United States Trustee filed the *United States Trustee's Motion for Entry of an Order,  Pursuant to 11 U.S.C. § 1112(B), Converting the Debtors' Chapter 11 Cases to Cases Under Chapter 7* [D.I. 318] (the "**Motion to Convert**").  The Basis for the

Motion to Convert was that the US Trustee alleged that there was a substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation. The Debtors disputed this allegation and opposed the Motion to Convert.  A hearing was held before the Bankruptcy Court. On April 22, 2026, the Honorable Craig T. Goldblatt issued a Memorandum Opinion denying the relief sought in the Motion to Convert.

## SECTION V: SUMMARY OF THE PLAN

### A.  Description of the Plan

The following is a brief summary of certain provisions of the Plan; however, this summary is not comprehensive. The Plan and not the Disclosure Statement is the legally operative document that controls the relationship between the Debtors and their Creditors and Interest Holders. Therefore, the Plan should be read carefully and independently of this Disclosure Statement. Creditors are urged to consult with counsel and other professionals in order to fully resolve any questions concerning the Plan and how it affects them.

### B.  Overview

Deqser LLC and KNY 26671 LLC are the debtors and debtors-in-possession in these jointly administered cases. They are proposing this reorganization plan, together with the DIP Lender, for the resolution of the outstanding Claims and Interests of the Debtors, which, if Confirmed will allow KNY to continue as the sole entity. This Plan is a "toggle plan", meaning that it presents two different alternatives for reorganization, and if one alternative is not successful, the plan automatically "toggles" to the second alternative. In this case, the Plan Proponents are seeking to reorganize pursuant to the reorganization transaction set forth herein, but if the Bankruptcy Court has not ruled that the Reorganization Transaction is feasible by August 12, 2026, the Debtors will automatically toggle to a Sale Transaction as described herein. Accordingly, it is important that you read to the end of this Plan, as the two different alternatives provide very different outcomes for creditors. Your vote on the Plan is a vote to

21

accept or reject both alternatives. If the Plan is Confirmed, and the court has determined that the Reorganization Transaction is Feasible prior to August 12, 2026, the Debtors will implement the Reorganization Transaction which will allow KNY to continue in the commercial laundry business operating under the name: Cooperative Laundry Tri-State. If not, the Debtors will immediately commence offering all of the assets of the Debtors for sale pursuant to the Sale Transaction.

It is important that you understand that when you vote to accept or reject the Plan, you are voting on both alternatives. If the Plan is Confirmed, but the Bankruptcy Court does not find that the Reorganization Transaction is Feasible prior to August 12, 2026, then the Debtors will automatically proceed to the Sale Transaction without a further vote of creditors. Similarly, if the Plan is Confirmed, and the Bankruptcy Court determines that the Reorganization Transaction is Feasible, then the Debtors will automatically proceed with the Reorganization Transaction and will not pursue a Sale Transaction. Please refer to Article 1 of the Plan for the definition of Feasibility.

In order to effectuate the Plan, the Debtors are proposing that all of the assets and all of the liabilities of both companies will be combined through a process known as substantive consolidation, with KNY as the surviving entity emerging from Chapter 11 if the Reorganization Transaction is implemented. Substantive consolidation will eliminate all intercompany debt between KNY and Deqser, which could otherwise be substantial. New Equity issued pursuant to this Plan will be membership interests in the combined company.

The Debtors will issue New Equity Units in exchange for certain debt. Other claimants will receive cash Distributions. The existing Equity will be cancelled by the Plan and will be eliminated. The Plan will be funded by a loan from CSV or  Merchant Financial Corporation ("**Merchant**") of an amount up to $1,800,000. Such amount will be used to fund the Plan

Distributions on the Initial Distribution Date in accordance with the classification and treatment of the Claims contained in the Plan, as well as to provide working capital.

### C. **Claims**

Any Creditor who failed to file a Proof of Claim on or before the appropriate Bar Date and was not listed on the Schedules or is listed as "disputed," "contingent" or "unliquidated" cannot be treated as a Creditor with respect to such Claim for purposes of voting on and receiving a Distribution under the Plan.

All Proofs of Claim filed in these Cases will be reviewed, and to the extent necessary, the Debtors will file objections to the Claims. The Court will retain jurisdiction to adjudicate objections to Claims brought by the Debtors, including any settlements or compromises of such claims.

### D. **Summary of Categories of Claims**

The table below provides a summary of the classification of Allowed Claims under the Plan. The figures set forth in the table below represent the Debtors' best estimate of the total amount of Allowed Claims in these Chapter 11 Cases. These estimates have been developed by the Debtor based on (i) an analysis of the Debtors' books and records and the Claims Docket in these Chapter 11 Cases, and (ii) known Claims and filed Claims. By order of the Bankruptcy Court [D.I. 189], September 8, 2025, was set as the last date for filing Proofs of Claims for prepetition Creditors. Pursuant to the Plan, any Administrative Expense or Claim which is not filed by the Administrative Expense Bar Date is forever barred. The Administrative Expense Bar date is the first Business Date that is thirty (30) days after the Effective Date of the Plan, or such other date as the Bankruptcy Court may order. There can be no assurance of the amount of Claims which may be filed and be Allowed by the Bankruptcy Court. Accordingly, there can be no guarantee that the Allowed Claims in each Class will not exceed the amount set forth or described herein. The Allowed Claims may also ultimately be less than described herein.

Nothing set forth in the schedules shall be deemed an admission by the Debtors as to the existence, validity, priority or amount of any Claim asserted against the Debtors' Estates. The Debtors fully reserve all of their rights to object to Claims.

In the event that the Reorganization Transaction is implemented, each Holder of an Allowed Administrative Expense Claim other than Professional Fee Claims, United States Trustee Fees, and Section 503(b)(9) Claims, will be paid in the ordinary course unless the Holder of the Claim has agreed to a different treatment. Certain Administrative Claimants have agreed to a different treatment. If an Administrative Claim is Allowed after the Effective Date, such Claim will be paid when it is Allowed or as soon as practicable thereafter. In the event that the Sale Transaction is implemented, the Professional Fee Carveout will be paid in full. Thereafter, if there are Net Sale Proceeds, such Proceeds will be used first to pay Professional Fees, then to pay any super priority claims of Merchant, then *pro rata* to all Holders of an Allowed Administrative Expense Claim. Such payments will be made from the Sale Proceeds to Holders of Allowed Administrative Expenses prior to payments to Holders of Allowed Secured Claims.

The classification of Claims against and Equity Interests in the Debtors pursuant to the Plan are as follows:

| Class | Proposed Recovery in Reorganization Transaction | Proposed Recovery in Sale Transaction | Claims/ Interests | Status | Entitled to Vote |
|-------|------|------|------|------|------|
| 1 | Paid in full over time with statutory interest in equal quarterly payments from the Effective Date through April 10, 2030 | Paid in full from Net Sale Proceeds | Priority Non-Tax Claims | Impaired | Yes |
| 2 | For their Allowed Secured Claim, they will receive a Plan Note on the | Merchant will be paid 55% of Accounts Receivable existing on the closing date of the | Allowed Secured Claim of | Impaired | Yes |

| | | | | | |
|---|---|---|---|---|---|
| | Effective Date in the principal amount of $3,000,000, as well as a non-interest-bearing secured promissory note for $350,000, payable on the fifth anniversary of the Effective Date.  The remainder of their Allowed Claim will be treated as an Unsecured Claim. The non-interest bearing secured note will be secured by all of the assets in which Merchant had a lien during the pendency of these Chapter 11 Cases. You are the best! I Artie pushed him off to 630, but if I cannot make that, you are right I need to tell him tomorrow okay sale proceeds part, aha | Sale Transaction from Net Proceeds; provided, that the Accounts Receivable are sold. If the Accounts Receivable are not sold pursuant to the Sale Transaction, 55% of the Accounts Receivable remaining after the Sale Transaction will be delivered to Merchant for collection. To the extent that there are Net Sale Proceeds remaining after payment of the Allowed Secured and Superpriority Claims with priority over Merchant, such amounts will be paid to Merchant up to the total Face Amount of their Allowed Claim. The remainder of their Allowed Claim, if any, will be treated as an Unsecured Claim. | Merchant | | |
| 3 | CSV will receive a Plan Note in the principal amount of the total DIP Obligations on the Effective Date. | CSV will be paid 45% of Accounts Receivable existing on the closing date of the Sale Transaction from Net Proceeds; provided, that the Accounts Receivable are sold. If the Accounts Receivable are not sold pursuant to the Sale Transaction, 45% of the Accounts Receivable remaining after the Sale Transaction will be | Allowed Secured Claim of CSV for DIP Obligations | Impaired | Yes |

25

| | | delivered to CSV for collection. In addition, CSV will be paid from the Net Sale Proceeds the value of its remaining Collateral as determined by either allocation by the Successful Bidder(s); the sale price of relevant lots; agreement among the Debtors, CSV, and the Committee; or a Bankruptcy Court determination of value. To the extent that the DIP Obligations are not paid in full by the above payments, and there are Net Sale Proceeds remaining after payment of the Allowed Secured Claims with priority over the Allowed Secured Claim of CSV for DIP Obligations in the Collateral sold, such amounts will be paid to CSV on its superpriority claim up to the total Face Amount of the DIP Obligations. The remainder of their Allowed Claim, if any, will be treated as an Unsecured Claim | | | |
| 4 | Eastern is electing under Bankruptcy Code 1111(b), but has agreed that the following treatment will be deemed to satisfy the amount owed to them if a | Eastern will be paid from the Net Sale Proceeds the value of their collateral in which they have a first position lien as determined by either allocation by the | Allowed Secured Claim of Eastern | Impair ed | Yes |

| | | | | | |
|---|---|---|---|---|---|
| | Reorganization Transaction is implemented: (a) a Plan Note in the principal amount of $3 million on the Effective Date;  (b) the first $250,000 of the Cash Sweep; and (c) a non-interest-bearing secured promissory note for $500,000 ,payable on the fifth anniversary of the Effective Date. No payments will be due on the $500,000 note prior to the fifth anniversary of the Effective Date, but there are no prepayment penalties. The $500,000 note is secured by all of the equipment in which Eastern has a lien. The remainder of their Allowed Claim against KNY, as well as their Allowed Claim against Deqser, will be treated as Unsecured Claims. | Successful Bidder(s); the sale price of relevant lots; agreement between the Debtors and Eastern; or a Bankruptcy Court determination of value; and for Collateral which Eastern does not have a first position lien, after payment of the Allowed Secured Claims with priority over the Allowed Secured Claim of Eastern with respect to such Collateral sold, Net Proceeds will be paid to Eastern in accordance with their lien position. The remainder of their Allowed Claim will be treated as Unsecured. | | | |
| 5 | CSV, as Assignee of Feenix, will receive a Plan Note in the principal amount of $1.1 million on the Effective Date. The remainder of its Allowed Secured Claim will be converted to such amount's *pro rata* share of the 7000 | CSV, as Assignee of Feenix will be paid from the Net Sale Proceeds remaining after payment of the Allowed Administrative and Priority Claims, and the Allowed Secured Claims with priority over the  Feenix Secured Claim with respect to the | Allowed Secured Claim of CSV as As-signee of Feenix | Impair ed | Yes |

| | | | | | |
|---|---|---|---|---|---|
| | New Preferred Equity Units to be issued on the Effective Date. | Collateral sold, up to the value of their Collateral as determined by either allocation by the Successful Bidder(s); the sale price of relevant lots; agreement between the Debtors and CSV; or a Bankruptcy Court determination of value up to the Face Amount of their Allowed Secured Claim. The remainder of their Allowed Claim will be treated as Unsecured. | | | |
| 6 | HKG will receive a Plan Note on the Effective Date in the principal amount of their Allowed Secured Claim. Any remainder of their Allowed Claim will be treated as Unsecured.  The Debtors expect to be litigating over HKG's Claim at the Effective Date. Should this be the case, payments on the Plan Note and the HKG Unsecured Claim will be paid into the Disputed Claims Reserve until such time as the HKG Claims are allowed by Final Order. | HKG will be paid from the Net Sale Proceeds the value of their Collateral as determined by either allocation by the Successful Bidder(s); the sale price of relevant lots; agreement between the Reorganized Debtor and HKG; or a Bankruptcy Court determination of value. The remainder of their Allowed Claim will be treated as Unsecured. | Allowed Secured Claim of HKG | Impaired | Yes |
| 7 | Pro Rata share of : (a)$300,000, paid over five (5) years in nine (9)  equal | Forty percent of the sale proceeds from the sale of Avoidance Actions and tort | Allowed Non-insider General | Impaired | Yes |

| | | | | |
|---|---|---|---|---|
| semi-annual installments, with the first installment due on the date which is twelve (12) months after the Effective Date; (b) 40% of the proceeds from avoidance actions and prepetition tort claims, which will increase to 65% if the settlement with CSV contained in the Plan is approved; (c) 5% of all Cash Sweeps once Eastern has received $250,000; (d)if all or a substantial portion of the Reorganized Debtor's assets are sold within five years of the Effective Date of the Reorganization Transaction, 5% of the net proceeds from such sale after all sale expenses and payments under the Plan have been made, including payments on the New Preferred Equity Units; and (e ) a percentage of the insurance proceeds paid to CVS on behalf of Irazuk on the business interruption insurance claim as set forth herein with respect to the CSV settlement if such settlement is | claims as determined by either allocation by the Successful Bidder(s); the sale price of relevant lots; agreement between the Reorganized Debtor and the Committee; or a Bankruptcy Court determination of value. In addition, Class 7 will receive the Net Sale Proceeds remaining after all of the Allowed Administrative, Priority, and Secured Claims have been paid in full, up to the Face Amount of the Allowed Non-insider General Unsecured Claims. | Unsecured Claims against Both Debtors | | |

| | | | | | |
|---|---|---|---|---|---|
| | approved. In addition, the Committee expects to reach an agreement with Eastern, pursuant to which Eastern will subordinate all or a portion of its unsecured claims against Deqser until other General Unsecured Creditors receive a certain aggregate payout. Should such an agreement be reached, the details will be disclosed to the Court at or prior to the Disclosure Statement Hearing. | | | | |
| 8 | Pro Rata share of $12,500 on Effective Date | This Class is eliminated if there is a Sale Transaction and will be treated as part of the Class 7 Non-Insider General Unsecured Claims. | Convenience Class for Allowed General Unsecured Claims against Both Debtors of $10,000 or less | Impaired | Yes |
| | | | | | |
| 9 | Conversion to its pro rata share of the 7000 New Preferred Equity Units to be issued on the Effective Date | Payment from the Net Sale Proceeds remaining after payment of the Allowed Administrative and Priority Claims;  and the Allowed Secured Claims with priority over CSV as the assignee of Irazuk with respect to the | Allowed Claim of CSV as assignee of Irazuk | Impaired | Yes |

| | | | | | |
|---|---|---|---|---|---|
| | | Collateral sold, up to the face amount of their Allowed Secured Claim. Any unpaid amounts of their Allowed Claim will be treated as non-insider General Unsecured Claims. | | | |
| 10 | 1500 New Common Equity Units | Payment from the Net Sale Proceeds remaining after payment of the Allowed Administrative and Priority Claims; Allowed Secured Claims of Merchant, Eastern, HKG, CSV as DIP Lender, and CSV as assignee of Feenix and Irazuk Claims, up to the Face Amount of their Allowed Secured Claims; and payment of the Non-Insider General Unsecured Claims up to their Face Amount. | Unsecured Insider Claims for Management Fees | Impaired | Yes |
| 11 | Cancelled on Effective Date | Canceled on Effective Date unless the Successful Bidder(s) purchases equity | Existing Equity Interests in both Debtors | Impaired | No Deemed to Reject |

All of the Secured creditors other than HKG have agreed to their treatment in the Reorganization Transaction, subject to reviewing the exact verbiage of the Plan.

### E.  Treatment of Claims

**TREATMENT OF UNCLASSIFIED CLAIMS**

In accordance with Section 1123(a)(l) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified and thus are excluded from the Classes

of Claims and Equity Interests set forth in Section 5 hereof. These unclassified Claims are treated as follows:

1.    **Administrative Expense Claims.**

(a)    **Administrative Expenses**. In the event that the Reorganization Transaction is implemented, each Holder of an Allowed Administrative Expense Claim other than Professional Fee Claims, United States Trustee Fees, and Section 503(b)(9) Claims, will be paid in the ordinary course unless the Holder of the Claim has agreed to a different treatment. Certain Administrative Claimants have agreed to a different treatment. If an Administrative Claim is Allowed after the Effective Date, such Claim will be paid when it is Allowed or as soon as practicable thereafter. In the event that the Sale Transaction is implemented, the Professional Fee Carveout will be paid in full. Thereafter, if there are Net Sale Proceeds, such Proceeds will be used first to pay Professional Fees, then to pay any super priority claims of Merchant, then *pro rata* to all Holders of an Allowed Administrative Expense Claim. Such payments will be made from the Sale Proceeds to Holders of Allowed Administrative Expenses prior to payments to Holders of Allowed Secured Claims.

(b)    **Merchant Adequate Protection Payments**. The Debtors shall continue to pay adequate protection payments pursuant to the Order approving the DIP Loan through the Effective Date. Any unpaid and outstanding adequate protection payments owed to Merchant on the Effective Date shall constitute an Allowed Administrative Expense Claim and shall be paid in accordance with the preceding paragraph.

(c)    **Statutory Fees**. All fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code, together with the statutory rate of interest set forth in section 3717 of Title 31 of the U.S. Code to the extent applicable ("**Quarterly Fees**") prior to the Effective Date shall be paid by the Debtors on the Effective Date. After the Effective Date, the Debtors, the Reorganized Debtors, and any entity making disbursements on behalf of any Debtor or any

32

Reorganized Debtor, or making disbursements on account of an obligation of any Debtor or any Reorganized Debtor (each a "**Disbursing Entity**"), shall be jointly and severally liable to pay Quarterly Fees when due and payable.  The Debtors shall file with the Bankruptcy Court all monthly operating reports due prior to the Effective Date when they become due, using UST Form 11-MOR.  After the Effective Date, the Reorganized Debtors, and any entity making disbursements on behalf of any Debtor or any Reorganized Debtor or making disbursements on account of an obligation of any Debtor or any Reorganized Debtor, shall file with the Bankruptcy Court separate UST Form 11-PCR reports when they become due. Notwithstanding the substantive consolidation of the Debtors called for in the Plan, each and every one of the Debtors, the Reorganized Debtors, and Disbursing Entities shall remain obligated to pay Quarterly Fees to the Office of the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed or converted to a case under Chapter 7 of the Bankruptcy Code. The U.S. Trustee shall not be required to file any Administrative Claim in the case and shall not be treated as providing any release under the Plan.

(d)      **Professional Fee Claims**. Each Professional who holds a Professional Fee Claim shall be required to File with the Bankruptcy Court, and to serve on all parties required to receive notice, a final Fee Application on or before the Professional Fee Bar Date. The failure to timely File the Fee Application shall result in the Professional Fee Claim being forever barred and discharged. A Professional Fee Claim with respect to which a fee application has been properly and timely filed shall be treated and paid only to the extent Allowed by a Final Order. No Professional Fee Claims shall be Allowed on account of any services rendered by a Professional whose retention with respect to the Chapter 11 Cases has not been approved by the Bankruptcy Court. If the Reorganization Transaction is implemented, Professional Fee Claims shall be paid in full within fourteen (14) days of an Order approving such Professional Fees becoming a Final Order, unless the Holder of such Professional Fee Claim has agreed to

a different treatment. If the Sale Transaction is implemented, Debtor will hold back a sufficient amount to pay the Professional Fee Claims from the Net Sale Proceeds prior to distributions to other Creditors. The Debtors estimate the Professional Fees which may be allowed by Final Order of the Bankruptcy Court in excess of amounts already paid will be approximately $1,300,000.

(e)     **Section 503(b)(9) Claims**. If the Reorganization Transaction is implemented, Allowed Section 503(b)(9) Claims will be paid in full within thirty (30) days of the Effective Date of the Plan, unless the Holder thereof agrees to a different treatment. If the Sale Transaction is implemented, after the payment of Professional Fees and any super priority claims of Merchant, the Net Sale Proceeds will then be paid pro rata to all Holders of an Allowed Administrative Expense Claim, including the Allowed 503(b)(9) Claims.

(f)     **Administrative Expense Bar Date**. Requests for payment of Administrative Expense Claims other than Professional Fees must be filed by the Administrative Expense Bar Date. Holders of Administrative Expense Claims that do not File such requests by the Administrative Expense Bar Date shall be forever barred from asserting such Administrative Expenses against the Debtors, the Reorganized Debtor, or any of their Assets; provided, however, if the Holder of an Administrative Claim has executed a Critical Vendor Agreement, such Holder does not need to file any request for payment in order to be paid in accordance with such Critical Vendor Agreement. The Debtors reserve the right to pay Administrative Expenses in the ordinary course of its business, whether or not the Holder of such Administrative Expense Claim has filed a Claim. Invoices from vendors currently doing work with the Debtors shall be sufficient to establish an Administrative Expense Claim.

(g)     **Administrative Claims of Landlord**.

If the Reorganization Transaction is implemented, any Allowed Administrative Claims of the Landlord will be paid in accordance with the term sheets previously approved by

34

the Bankruptcy Court. If the Sale Transaction is implemented, and there is a Successful Bidder to assume the Lease to which the Landlord has consented, the Landlord will receive the consideration provided by the Successful Bid.

## 2. Administrative and Priority Tax Claims.

If the Reorganization Transaction is implemented, Administrative and Priority Tax Claims of any taxing authorities, to the extent they are Allowed Claims, will receive, unless the Holder of such Allowed Claim agrees to a different treatment, on account of such Allowed Claims regular instalments on a quarterly basis beginning the first full calendar quarter after the Initial Distribution Date in Cash:

> (A) of a total value, as of the Effective Date of the Plan, equal to the Allowed amount of such Claim;
>
> (B) over a period ending not later than April 9, 2030; and
>
> (C) in a manner not less favorable than the most favored nonpriority unsecured provided for by this Plan;

provided, however, that the Debtors may pay any Allowed Administrative and/or Priority Tax Claims in full at any time without premium or penalty. Nothing herein shall prevent the Debtors from utilizing any settlements they may have against Allowed Priority Tax Claims.

If the Sale Transaction is implemented, Administrative and product Priority tax claims of any taxing authorities, to the extent that they are Allowed Claims will be paid *pro rata* with all other Administrative Expenses from the Sale Proceeds prior to any payments to non-Administrative or non-Priority Claimants.

## 3. Classification And Treatment Of Claims And Interests

Pursuant to Section 1122 of the Bankruptcy Code, set forth below is a designation of classes of Claims against and Equity Interests in the Debtors. A Claim or Equity Interest is

placed in a particular Class for the purposes of voting on this Plan and/or receiving Distributions pursuant to this Plan only to the extent that such Claim or Interest is an Allowed Claim or an Allowed Equity Interest in that Class, and such Claim or Equity Interest has not been paid, released, or otherwise settled prior to the Distribution Date for such Claim or Equity Interest. In accordance with Section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, and Priority Tax Claims of the kinds specified in sections 507(a)(1) and 507(a)(8) of the Bankruptcy Code, respectively, have not been classified, and their treatment is set forth in above in this Section V of this Disclosure Statement.

**SECTION VI: MEANS FOR IMPLEMENTATION OF THE REORGANIZATION TRANSACTION**

The goal of the Plan Proponents is to proceed with the Reorganization Transaction. As set forth below, they will only change course and do the Sale Transaction instead if the Bankruptcy Court does not find that the Reorganization Transaction is Feasible by August 12, 2026, or such earlier date as the Bankruptcy Court finds that the Reorganization Transaction is not Feasible, and the Plan Proponents decide not to amend the Plan to try to make the Reorganization Transaction Feasible. The means for implementing the Reorganization Transaction are set forth below.

1. **Substantive Consolidation**

The Plan provides for substantive consolidation of the Debtors' Estates. The Plan constitutes the Plan Proponents' request that the Bankruptcy Court authorize and approve substantive consolidation of the Debtors. Thus, if this Plan is Confirmed, KNY and Deqser will be merged and become a single consolidated entity for all purposes.

The Debtors have a strong basis, both legally and practically, for substantive consolidation. First, the Debtors operated as one single business. Originally, Deqser was set up as a holding company of KNY because it was anticipated that there would be further

36

acquisitions of businesses complementary to KNY. This has not really happened[5], and the

Debtors do not plan further acquisitions of other businesses at this time. Moreover, all Creditors

typically dealt with the Debtors as if they were one legal entity. To Debtors' knowledge, no

entity ever relied on the separate creditworthiness of Deqser, which was just a shell to hold the

Equity Interests in KNY. Therefore, there is no reason to continue with the structure of a parent

and subsidiary company operating a single business, and no reason to continue to have a buffer

between KNY and its Equity Holders. Second, Deqser is serving no purpose. Its only asset is

its equity interest in KNY, so it is completely dependent upon the value of KNY to have any

value. Third, most, if not all, of the debt of Deqser is a joint liability of both Debtors; since,

virtually all of the debt at the Deqser level is for guarantees of KNY debt or borrowings for the

benefit of KNY. Deqser did not work directly with vendors. For the same reason, a great deal

of the KNY debt is joint debt of KNY and Deqser, because it is debt of KNY guaranteed by

Deqser. All such debt will continue to be a Claim against the substantively consolidated entity,

but absent substantive consolidation, the Holders of such debt would be able to "double dip"

to the detriment of all other Creditors. Furthermore, even if two separate Estates were

maintained, it is unlikely that Deqser would be able to reorganize and provide any distributions

to its Creditors, as virtually its only asset is its Equity Interest in KNY, and such Equity Interests

are being wiped out. Nor would such Equity Interests be likely to have any value if KNY were

to try to Confirm a standalone plan. By consolidating, Debtors will have a huge cost-saving, as

it is not an insignificant cost to maintain Deqser separately, while it serves no purpose. Under

these circumstances, the Debtors concluded that the consolidation of the Debtors for all

---

[5] There is a commercial laundry in Sand Marcos, Texas, which has sufficient overlapping ownership to be defined as and "Affiliate" of the Debtors pursuant to the Bankruptcy Code, but this company was never set up as a subsidiary of either of the Debtors. There have been intercompany cash transfers between the two companies.

purposes is in the best interests of Creditors and the Estates.  The Debtors submit that the Creditors are not harmed, and indeed are benefited, by substantive consolidation.

The one concern is that Eastern has a large unsecured claim against Deqser which will increase the Unsecured Creditor pool; however, the Committee is attempting to avoid any severe adverse consequences to Unsecured Creditors by reaching an agreement with Eastern whereby Eastern will voluntarily subordinate some or all of its Unsecured Claim to other Unsecured Creditors receiving a threshold payout. If such agreement is reached, the details will be provided to the Court prior to the hearing on the adequacy of the Disclosure Statement.

The Third Circuit employs the *Owens Corning* approach (*In re Owens Corning*) to determine allowance of substantive consolidation. It can be distilled into two critical inquiries: absent consent, a proponent of substantive consolidation must prove either that: (i) pre-bankruptcy, the entities to be consolidated "disregarded separateness so significantly that their creditors relied on the breakdown of entity borders and treated them as one legal entity"; or (ii) after filing for bankruptcy, the entities' assets and liabilities "are so scrambled that separating them is prohibitive and hurts all creditors." *See, In re Owens Corning, 419 F.3d 195 (3d Cir. 2005) reversing 316 B.R. 168 (Bankr. D. Del. 2004)*. The Debtors submit that Creditors dealt with the Debtors as a single economic unit, and that the affairs of the Debtors are such that substantive consolidation will benefit all creditors.

The Debtors bear the burden of establishing a *prima facie* case for the substantive consolidation of their respective Estates.  The Debtors submit, without limitation, (i) Creditors have dealt with the Debtors as a single, consolidated enterprise, both before and after the filing of the Chapter 11 Cases, (ii) the Debtors' utilize one central management which acts on behalf of both Debtors simultaneously,  (iii)  the business of the two Debtors is entangled to the point that Deqser has essentially no debt other than its guarantee of the debt of KNY; and (iv) given the interconnection between the two Debtors as detailed above, substantive consolidation will

38

benefit all Creditors. In addition, no creditor could have relied on the creditworthiness of Deqser in extending credit to Deqser, since, Deqser has never had any significant assets other than equity in KNY and has never conducted business. Futhermore, by substantively consolidating, the unsecured claims against Deqser are significantly reduced, and the Committee is expecting to reach agreement with Eastern to further reduce any drain caused by the Unsecured Claims at Deqser by Eastern's agreement to subordinate some or all of its Unsecured Claim against Deqser to a minimum payout to other Unsecured Creditors. If the Committee is able to finalize this agreement, there would be very little adverse consequence to dealing with the creditors from substantive consolidation, if any. Further, respective assets and liabilities of Deqser separately would be burdensome and divert professional resources that are more properly directed elsewhere, diluting creditor recoveries as a result of increased professional fees. Without substantive consolidation, it is unlikely that the Creditors of Deqser would receive any distributions.

If substantive consolidation is granted, entry of the Confirmation Order will constitute approval, pursuant to Sections 105(a) and 1123(a)(5) of the Bankruptcy Code, effective as of the Confirmation Date, of the substantive consolidation of the estates of KNY and Deqser for all purposes. Accordingly, upon substantive consolidation (a) the assets and liabilities of both KNY and Deqser will be deemed to be the assets and liabilities of a single, consolidated entity; (b) each and every Claim listed on the Schedules and/or filed in the Chapter 11 Cases against either Debtor will be considered filed against the consolidated Debtor and will be considered one Claim against, and an obligation of, the consolidated Debtor on and after the Effective Date; (c) all joint obligations of KNY and Deqser, if any, and all multiple Claims against both entities on account of such joint obligations, will be considered a single Claim against the consolidated Debtor; (d) all intercompany Claims and Equity Interests between KNY and

Deqser will be cancelled and extinguished on the Effective Date; and (e) the consolidated Reorganized Debtor will take the name of KNY.

**2.  Sources of Cash for Plan Distributions**

Debtors believe that the Plan is feasible because they will have sufficient cash on the Effective Date required for the payments to be made on or before the Effective Date. All Cash required for payments to be made under the Plan on the Effective Date shall be obtained as follows:

(a)    First, from cash on hand on the Effective Date; and

(b)    Second, converting the non-DIP Facility Claims of CSV to equity will provide additional liquidity, as, it eliminates  millions of dollars of putatively Secured Claims;

(c)    Third, converting the Insider Management Fee Claims to equity will also provide additional liquidity; and

(d)    Forth, from the Exit Financing described below.

Future Distributions will come from operations of the Reorganized Debtors, as well as the financing described below. The Reorganized Debtor is seeking to expand the Debtors' business. This, in turn, should lead to greater profitability and net operating income. Based on the projections contained in Exhibit 3, attached hereto, the Reorganized Debtor expects to refinance its debt prior to the balloon payments required herein.

**1.  Exit Financing.**
Currently, the Debtors have two possible sources of exit financing as discussed below, either of which are sufficient to allow the Reorganized Debtors to make all the payments required on the Effective Date.

**(a) Merchant Financial Corporation**

The Debtors expect to get their Exit Financing from Merchant, and is currently in the process of finalizing a term sheet with Merchant. Under the existing proposal, Merchant would provide a revolving line of credit pursuant to which it would advance up to 85% of

eligible accounts receivable. There would be miscellaneous minimum annual charges and facility fees, and the interest rate would be Prime +2.75%, with a floor of 7.75%. The term would be two years from closing with automatic renewals for subsequent one-year terms. The facility would be secured by a first priority perfected security interest in favor of Merchant in all of the assets of the reorganized Debtor, subject to the prior perfected liens in the Plan. Certain Insiders are being asked to provide "bad boy" guarantees. The final executed term sheet will be included in the Plan Supplement. The Debtors' financial model attached hereto as Exhibit C indicates that the amount available on the Effective Date from the projected accounts receivable would be sufficient together with the Debtors' cash on hand to fund all of the payments due on the Effective Date.

**(b) CSV**

Although the Debtors expect to finalize a transaction with Merchant, as a backup, CSV has committed to provide the necessary Exit Financing for the Reorganization Transaction to be Feasible either by itself or through a new group of investors which will include CSV, subject to definitive documentation.  The Commitment Letter from CSV is attached to the Plan as Exhibit C.

2. **Discharge**

Except as otherwise specifically provided in Section 1141(d) of the Bankruptcy Code, the Plan, or the Confirmation Order, and effective as of the Confirmation Date: (a) the distributions and rights that are provided in the Plan, if any, and the treatment of all Claims and Interests shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Causes of Action, whether known or unknown, including any interest accrued on such Claims from and after the Petition Date, against, liabilities of, Liens on, obligations of, rights against, and Interests in the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to this Plan on account

41

of such Claims, rights, and Interests, including, but not limited to, Claims and Interests that arose before the Effective Date and all debts of the kind specified in Sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (i) a Proof of Claim or Interest based upon such Claim, debt, right, or Interest is filed or deemed filed under Section 501 of the Bankruptcy Code, (ii) a Claim or Interest based upon such Claim, debt, right, or Interest is Allowed under Section 502 of the Bankruptcy Code, or (iii) the Holder of such a Claim, right, or Interest accepted this Plan; (b) the Plan shall bind all Holders of Claims and Interests notwithstanding whether any such Holders failed to vote to accept or reject the Plan or voted to reject the Plan; (c) all Claims and Interests shall be satisfied, discharged, and released in full, and the Debtors' liability with respect thereto shall be extinguished completely, including any liability of the kind specified under Section 502(g) of the Bankruptcy Code; and (d) all Entities shall be precluded from asserting against the Debtors, the Estates, the Reorganized Debtors, their successors and assigns, and their assets and properties any other Claims or Interests based upon any documents, instruments, or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims against and Interests in the Debtors, subject to the occurrence of the Effective Date.

3. **Vesting of Assets of the Estate**

On the Effective Date, subject only to the terms of the Plan, all Assets of the Debtors and their Estates, wherever situated, shall vest in the Reorganized Debtor, free and clear of all Liens, Claims, encumbrances, and Interests except as otherwise provided in the Plan.

4. **General Settlement of Claims and Interests**

Pursuant to Section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, any consideration for the classification, distributions, releases and other benefits provided under the Plan on the Effective Date shall constitute good faith compromise and settlement of Claims

42

and Interests and controversies relating to the contractual, legal and subordination rights that a Holder of the Claim or Interest may have with respect to any Allowed Claim or Interest or any Distribution to be made on account of any such allowed Claim or Interest. With respect to specific settlements outlined in the Plan, the Confirmation Order constitutes the approval by the Bankruptcy Court of such settlements.

### (a) Settlement with CSV

The Debtors have reached a settlement with CSV which will make additional consideration available for the Class 7 Non-Insider General Unsecured Claimants.  This Plan constitutes the Debtors' request that the settlement be approved by the Bankruptcy Court, and the Debtors will ask that the Confirmation Order include approval of the settlement with CSV.

The terms of the settlement are as follows: In exchange for the Estate releasing all claims against CSV, the Debtors, and their affiliates (including their officers, managers, members, and directors), CSV shall pay:

(i)     With respect to the future fire insurance claim proceeds sold to Kuzari Manager 9464 LLC on July 2, 2024 and now owned by CSV ("**Purchased Insurance Claim**"), CSV shall pay the Estate 5% of the net proceeds ("**Estate Insurance Payment**") of the Purchased Insurance Claim after CSV recovers (x) the costs of Purchased Insurance Claim (including the purchase price and attorneys fees and costs incurred in pursuing the Purchased Insurance Claim); and (y) the full amount of its claims in this bankruptcy case (including purchased secured and unsecured claims) ("**Net Proceeds Calculation**").  Any cash amounts CSV receives on account of (y), whether on account of its claims or new equity interests issued on account of such claims, shall proportionally reduce the amount of (y).  If at the time of payment on the Purchased Insurance Claim, the Net Proceeds Calculation results in no Estate Insurance Payment, then CSV shall run the Estate Proceeds Calculation as of the fifth anniversary of the

Effective Date of the Amended Plan and pay to the Estate the Estate Insurance Payment within 30 days' of such date.

(ii)     25% of Avoidance Action Proceeds to the Estate (resulting in the Estate receiving 65% of such proceeds when added to the 40% currently retained by the Estate).

The Reorganized Debtor will provide all funds received from the CSV settlement as further consideration to the Class VI Non-Insider General Unsecured Claims for *pro rata* distribution on the Allowed Claims. The Debtors believe that the settlement is in the best interests of creditors because it provides additional consideration to the Non-Insider General Unsecured Claimants in return for a release of causes of action which the Debtors has analyzed and believes are of very little value. Accordingly, the Debtors believe that the settlement is a proper exercise of its business judgment.

**5. New Equity Units.**

**(a)**     <u>Issuance of New  Equity Units and Operating Agreement</u>.     The Operating Agreement of the Reorganized Debtors will be revised and amended to provide that all existing Equity Interests are canceled, and the Reorganized Debtor is authorized to issue 10,000 New Equity Units, 7,000 New Preferred Equity Units and 3,000 New Common Equity Units. The Reorganized Debtors will issue 1,500 New Common Equity Units to the Holder of Allowed Class 10 Claims. Another 1,500 New Common Equity Units will be reserved for the Management Incentive Program being put into place at Confirmation as discussed below. 7,000 New Preferred Equity Units will be distributed pro rata to the whole Holders of Allowed Class 8 and Class 9 Allowed Claims. The Operating Agreement will be amended to incorporate the terms of the New Common Equity Units as shown in Exhibit A and the New Preferred Equity Units as shown in  Exhibit B. The amendments to the Operating Agreement will also, among other things, prohibit the Reorganized Debtors from issuing non-voting securities, place restrictions on the transfer of the New  Equity Units, prohibit the payment of cash dividends

on the New Equity Units while any payments are still due under the Plan, and appoint KNY Manager LLC as the Reorganized Debtors' nonmember manager. A copy of the Amended Operating Agreement will be included in the Plan Supplement filed with the Bankruptcy Court. On the Effective Date, all recipients of New Equity Units will be deemed to have become a party to the Amended Operating Agreement. On the Initial Distribution Date, the Reorganized Debtors shall issue and deliver all instruments, certificates and other documents necessary to evidence the New Equity Units to the parties entitled to receive the New Equity Units as provided in this Plan.

(b)     Dividends. No cash dividends will be paid on any New Equity Units, so long as, there are still payments due under the Plan. The New Preferred Equity Units may receive PIK dividends as set forth in Exhibit B.

(c)     Exemption from Securities Act Registration Requirements.   To the extent, if any, that the issuance of the New Equity Units would otherwise require registration under any federal, state, or local law, the New Equity Units will be issued without registration under the federal Securities Act or any similar federal, state, or local law in reliance upon Section 1145 of the Bankruptcy Code.

### 6. Corporate Governance

(a)     **Manager**

Currently, Deqser is the Manager of KNY, and Kuzari Group LLC is the Manager of Deqser. As of the Effective Date, KNY and Deqser will be substantively consolidated and Deqser will no longer exist. Accordingly, a new Manager will be appointed for the Reorganized Debtor.  KNY Manager LLC, a Delaware LLC being formed by certain current investors in the Debtors for the purpose of managing the Reorganized Debtor, will be the new non-member manager. It will be entitled to receive the same compensation that has always been provided to KNY's Manager for its services, to wit: two percent (2%) of gross revenue per month;

*provided,* however, that such management fees will not be paid while there are still payments due pursuant to the Plan.  The new manager will have the right to delegate its responsibilities to an outside management company, as did the previous Manager. Any outside manager which is not affiliated with an Insider shall have the right to be paid its customary fees for its services.

**(b)     Officers.**

After the Effective Date, the only officer of the Reorganized Debtor will be Sang Cho, who will serve as Chief Executive Officer. His compensation for the first 12 months following the Effective Date will be $182,520 annually, and he will be eligible to receive a merit-based bonus. His salary will be reviewed once every 12 months by the Manager.

**(c)          Payments to Insiders.**

This Plan sets forth all intended compensation to Insiders, other than dividends on any equity which they may own, which dividends will only be paid as permitted by law and in compliance with Section 5.3(b) of the Plan.

**7.     Preservation of Causes of Action**

**(a)**     Except as expressly provided in the Plan and in any releases granted pursuant to the Plan, including,  and unless expressly waived, relinquished, exculpated, released, compromised or settled in the Plan, the Confirmation Order, any Final Order, or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, the Reorganized Debtors shall exclusively retain and may enforce, as the representative of the Estates under Section 1123(b)(3)(B), and the Debtors expressly reserve and preserve for these purposes, in accordance with sections 1123(a)(5)(B) and 1123(b)(3) of the Bankruptcy Code, any claims, demands, rights, and Causes of Action that the Debtorss or the Estates may hold against any Person or Entity, including, without limitation, Avoidance Actions and actions for Equitable Subordination, which shall vest exclusively in the Reorganized Debtors. Accordingly, no preclusion doctrine, including, without limitation, the doctrines of *res*

46

*judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches shall apply to such Causes of Action by virtue of, or in connection with, the Confirmation, consummation, or effectiveness of this Plan. The Reorganized Debtors or its successors or assigns exclusively may pursue such retained Claims, demands, rights, and Causes of Action.

(b)Except as expressly provided in the Plan and in any releases granted pursuant to the Plan, including, with respect to any Avoidance Action that the Debtors or Reorganized Debtor abandon or choose not to pursue, the Reorganized Debtors reserves all rights including the right under Section 502(d) of the Bankruptcy Code to use defensively any Avoidance Claim, including abandoned Avoidance Claims, as a basis to object to all or any part of a Claim against the Estate asserted by a creditor which remains in possession of, or otherwise obtains the benefit of, the avoidable transfer.

**No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtor will not pursue any and all available Causes of Action against them. The Debtors and the Reorganized Debtor expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise provided in the Plan.**

8.  **Conditions Precedent to the Effective Date of the Reorganization Transaction.**

The following are conditions precedent to the Effective Date of the Reorganization Transaction that must be satisfied or waived by the Plan Proponents:

(a).    Entry of the Confirmation Order and the Confirmation Order having become a Final Order, which Order shall have a finding of fact or conclusion of law that the Reorganization Transaction is Feasible.

(b).      No request for revocation of the Confirmation Order under Section 1144 of the Bankruptcy Code shall be pending.

(c)      The Debtors shall have sufficient funds on hand or binding Exit Financing commitments to make all Cash distributions required to be made on the Initial Distribution Date and to fund operations as of such date.

(d) The settlement with CSV has been approved by the Bankruptcy Court, as such settlement may be modified with the express approval of both CSV and the Debtors.

(e) The Bankruptcy Court approves substantive consolidation in the Confirmation Order.

**9.        Management Incentive Plan**

The Reorganized Debtors intends to institute a Management Incentive Plan (the "**MIP**") to incentivize critical employees to perform at their best and remain with the Reorganized Debtors. The Debtors has set aside 1,500 New Common Equity Units for the MIP. Such Units will be distributed over five years to the participants in the MIP *pro rata* in accordance with their base salary at the time of distribution. Twenty percent of the Units will vest in each calendar year following the calendar year in which the Effective Date occurs. The vested shares will be distributed once annually within three months of the close of the fiscal year. The shares will only vest automatically and be distributed for that year if the Reorganized Debtor meets its Net Profits projections contained in the financial model attached to the Disclosure Statement. In any year in which the Reorganized Debtor fails to meet its Net Profits projections, vesting and distribution is optional at the sole discretion of the Manager. An employee must be an employee on the day that the Units vest in our distributed in order to receive Units for the preceding year. Any Units authorized for the MIP but not distributed will remain as authorized but unissued Units of the Reorganized Debtor. Upon a sale or change of control of the Reorganized Debtor during the five years of the MIP, the Units for the time remaining in the

five-year plan will immediately vest and be distributed. All distributions under the MIP may be accomplished by noting the issuance of the Units on the books and records of the Reorganized Debtor, with a confirming notice to the recipient.

10.     **Cash Sweep.**

Semi-annually in each October and April, beginning with October 2026, for so long as there are payments under the Plan still due and outstanding, the Reorganized Debtors shall sweep all cash out of its accounts (other than payroll accounts and money set aside for withholding tax payments) in excess of One Million Dollars ($1,000,0000). The money swept from the accounts shall be distributed as follows:

(a) The first $250,000 swept from the accounts will be paid to Eastern.
(b) After Eastern has been paid $250,000, 5% of each Cash Sweep will be distributed to Class 7 Non-Insider General Unsecured Claims.
(c) Once Class 7 has received 5% of a  Cash Sweep, the remainder of such Cash Sweep will be paid *pro rata* to the holders of Plan Notes, and such payments will reduce the principal amount of the Plan Notes.

11.    **Sale Pivot.**

If the Bankruptcy Court has not made a finding of fact or conclusion of law that the Reorganization Transaction is Feasible by August 12, 2026, or on such earlier date as the Bankruptcy Court finds that the Reorganization Transaction is not Feasible and the Plan Proponents determine that they do not wish to amend the Plan to try to obtain a finding of Feasibility, the Debtors shall abandon their pursuit of the Reorganization Transaction, and shall immediately commence implementing the Sale Transaction without further order of the Bankruptcy Court.

### SECTION VII MEANS FOR IMPLEMENTATION OF SALE TRANSACTION

1.    **General**

If the conditions for a Sale Pivot in Section 5.11 above are met, the Debtors will immediately start marketing the Debtors for sale. The Debtors will engage an investment

banker, offer the companies for sale in lots and each as a whole. The sale process will lead to an auction. At the conclusion of the auction, the Debtors in consultation with the Committee will determine the highest or best offer or combination of offers, and will make a motion to the Bankruptcy Court to approve a sale(s) free and clear of liens, claims, and encumbrances to the Successful Bidder(s). Once the Sale Transaction closes, the Disbursing Agent will distribute the proceeds of the Sale Transaction in accordance with the Plan. From the date of the Sale Pivot to the closing of the Sale Transaction, the Debtors will be operating on as trimmed down a basis as possible, as the DIP Lender is not likely to lend into a Sale Transaction. The Debtors will complete the Auction process in sixty (60) from the date of the Sale Pivot, and would expect to close no later than October 31, 2026.

2.     **Investment Banker**

The Debtors, together with the Committee and certain Creditors, has interviewed four investment bankers. A four-member committee consisting of one representative from each of the following will select an investment banker to run the sale process and decide upon appropriate terms for such investment banker's engagement: the Debtors, the Committee, Eastern, and CSV. The engagement letter for the Investment Banker will be included in the Plan Supplement. The Debtors do not anticipate having funds to engage an investment banker, since, the DIP Lender has indicated it will not lend money for such purpose. Accordingly, the investment banker's compensation will need to come from the proceeds of the Sale Transaction. The Investment Banker will be retained, subject to Bankruptcy Court approval, at least four weeks prior to the Confirmation Hearing, and will be responsible for establishing the procedures for the sale. The investment banker will work with the Debtors to establish a virtual data room, such that, it can immediately start marketing the Debtors if there is a pivot to a Sale Transaction. It will be the investment banker's decision whether to proceed with a stalking horse bid were an open auction, but any contracts will need to be approved by the Debtors.

50

**Assets to be Sold**

Both Debtors will be offered for sale in their entireties as a going concern, as well as in separate lots. Bidders can bid on the company as a whole, or on the lots. The Debtors in consultation with the Committee and the investment banker will decide what Bid or combination of Bids constitute the Successful Bidder(s) as the highest or best bid, and will then make a motion to the court to prove the Successful Bid(s). The lots are:

i.   Lot 1: Accounts Receivable of KNY

ii.  Lot 2: Intangible Property (including Intellectual Property, General Intangibles, Customer List, Management Agreement with Sang Cho) of both Debtors, but Excluding Real Property Lease and all claims and causes of action.

iii. Lot 3: Real Property Lease

iv.  Lot 4: HKG Equipment

v.   Lot 5: All other equipment and tangible personal property

vi.  Lot 6: All claims and causes of action, of both Debtors including Estate Causes of Action

vii. Lot 7: All of the assets of KNY as a going concern

viii. Lot 8: All of the assets of Deqser as a going concern

Any assets which remain unsold at the conclusion of the auction, other than Lot 6, will be abandoned by the Reorganized Debtor to the Secured Creditor having a lien on same.

## 4. Stalking Horse and Bid Procedures

The Investment Banker will be responsible for working with the Debtors to establish customary bidding procedures for this type of sale, which may or may not include a stalking horse bid. The Debtors will seek approval of the fitting procedures in a separate motion to be heard prior to August 12.

The Bidding Procedures will permit credit bidding by Secured Creditors. All Secured Creditors can credit bid as follows:

(a) With respect to assets in which they have a first lien, up to the full amount of their Claim.

(b) With respect to assets in which they have a junior lien, after bidding sufficient cash to pay all of the liens ahead of them, credit bidding up to the full amount of their Claim.

## 5. Vesting of Assets.

Once the Sale Transaction is concluded, the proceeds from the Sale Transaction will vest in the Reorganized Debtor which will disburse such proceeds as the Disbursing Agent. Any remaining assets which have not been sold, including Causes of Action shall revest in the Reorganized Debtors.

**Conditions Precedent to the Consummation of the Sale Transaction**

a). Entry of the Confirmation Order and the Confirmation Order having become a Final Order, which order includes the approval of substantive consolidation.

(b). No request for revocation of the Confirmation Order under Section 1144 of the Bankruptcy Code shall be pending.

(c) The Debtors were unable to consummate the Reorganization Transaction and were required to pivot to the Sale Transaction pursuant to Section 5.11 of the Plan.

(d) the Bidding Procedures were approved by the Court prior to the auction.

(e) The Court has approved the Successful Bidder(s) as the highest or best Bid(s) by Court Order, and such order shall have become a final order unless the Successful Bidder(s) waives this precondition.

52

### SECTION VIII: MEANS FOR IMPLEMENTATION WHICH APPLY TO BOTH THE REORGANIZATION  TRANSACTION AND THE SALE TRANSACTION

**1.      Nonconsensual Confirmation.**

If any Impaired Class of Claims or Interests entitled to vote does not accept the Plan by the requisite statutory majority provided in Section 1126 of the Bankruptcy Code, the Plan Proponents reserve the right to amend the Plan or undertake to have the Court confirm the Plan under Section 1129(b) of the Bankruptcy Code, or both. With respect to the Class 11 Interests that are deemed to reject the Plan, the Plan Proponents intend to proceed with Confirmation pursuant to Section 1129(b) of the Bankruptcy Code, and submit that the Plan meets the necessary requirements thereof.

**2.   Exemption From Certain Transfer Tax and Recording Fees**

Pursuant to Section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangible or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, sales tax, use tax or other similar tax or governmental assessment to the fullest extent contemplated by Section 1146(a) of the Bankruptcy Code, and upon entry of the Confirmation Order, the appropriate state or local government officials or agents are instructed to forego the collection of any such tax or governmental assessment, and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.  A copy of the Confirmation Order shall serve as evidence that the Debtors are not required to pay any such governmental assessments.

**3.   Closing of the Chapter 11 Cases**

At any time after each Disputed Claim filed against the Debtors has become an Allowed Claim or a Disallowed Claim, and all Final Fee Applications have been adjudicated, the Reorganized Debtor may seek authority from the Bankruptcy Court to close the Chapter 11

Cases in accordance with the Bankruptcy Code and Bankruptcy Rules, and to request the Bankruptcy Court to enter the Final Decree. If not done earlier, once all Cash has been distributed in accordance with the Plan, the Debtors must seek authority from the Bankruptcy Court to close the Chapter 11 Cases and enter the Final Decree.

**4. Objection to Claims and Settlements.**

Prior to the Effective Date, the Debtors shall have the right to make and file objections to Claims; provided, however, to the extent that the Objection is not finally determined prior to the Effective Date, the Objection will be a Cause of Action that vests with the Reorganized Debtor, and may continue to be pursued only by the Reorganized Debtor. The Reorganized Debtor shall have the right to make and to File objections at any time prior to that date which is one hundred twenty (120) days after the Effective Date (the "**Objection Deadline**"). All objections shall be litigated to Final Order unless approval of a settlement or compromise of a Claim objection is obtained pursuant to Bankruptcy Rule 9019.

**5. Estimation of Claims**

The Debtors, or the Reorganized Debtor, may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claims, including any Claim for taxes, to the extent permitted by Section 502(c) of the Bankruptcy Code regardless of whether the Debtors or the Reorganized Debtor, as the case may be, has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtors or Reorganized Debtor may elect

to pursue supplemental proceedings to object to any ultimate allowance of such Claim. All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

### 6. Distributions on Claims and Disputed Claims Reserves

a.     **Distributions.**  Just because a Claim is deemed Allowed on the Record Date for Voting and receives a Ballot does not mean that the Claim will ultimately be Allowed for Distribution purposes. As stated above, the Debtors have the right to object to Claims and to seek estimation of Claims. Distributions to Holders of Claims shall be made by the Debtors only with respect to Claims which have been Allowed.

Distributions to Holders of Allowed Claims shall be made by the Debtors themselves to the address on of Proof of Claim if one has been filed by the Holder, or at the Holder's last known address if no Proof of Claim has been filed, or if the Debtors have been notified in writing of a change of address. If there has not been a Proof of Claim filed, nor a written change of address, then the Reorganized Debtor shall make the distribution to the address reflected in the Schedules. If any Distribution to a Holder of an Allowed Claim is returned as undeliverable, no further distributions to such Holder shall be made unless and until the Debtors are notified in writing of such Holder's then-current address, at which time all missed Distributions made within the last ninety (90) days shall be made to such Holder without interest. The Debtors are only obliged to hold Undeliverable Distributions for ninety (90) days. Claims for undeliverable Distributions must be made no later than ninety (90) days after the Distribution is made, after which time the Unclaimed Distribution will be forfeited. After ninety (90) days, Unclaimed Distributions shall revert to the Reorganized Debtor free of any restrictions thereon, and the Claim of any Holder or successor to such Holder with respect to such property shall be

55

discharged and forever barred notwithstanding any federal or state is escheat laws to the contrary; provided, however, that with respect to any returned Distributions to Holders of Allowed Class 6 Claims or Allowed Class 7 Claims, once the Unclaimed Distribution reverts to the Reorganized Debtor, the Reorganized Debtor will be required to redistribute the unclaimed amounts to the remaining Allowed Claimants in that Class in accordance with the Plan. **Nothing contained in the Plan shall require the Debtors or any professional retained by the Debtors to attempt to locate any Holder of an Allowed Claim. Once a Distribution is returned as undeliverable, neither the Debtors nor any of their Professionals have any obligation to search for an alternative address for the Claimant.**

Checks issued by the Debtors or the Reorganized Debtor for Distributions which are not returned shall be null and void if not negotiated within one hundred eighty (180) days, and will be treated as Unclaimed Distributions in accordance with the above. After one hundred eighty (180) days, if a check has not been negotiated or returned, Claims in respect of such check shall be forever barred, and the proceeds of such check shall revest in the Reorganized Debtor, and be subject to redistribution if appropriate, in accordance with the provisions of the Plan.

Notwithstanding anything in the Plan to the contrary, no payment of fractional cents shall be made. Whenever any payment of a fraction of a cent under the Plan would otherwise be required, the actual Distribution made shall reflect a rounding of such fraction to the nearest whole penny (up or down), with half cents or more being rounded up, and fractions of less than half a cent being rounded down. No distributions of less than Fifteen Dollars ($15.00) will be made on account of Allowed Claims. If a Claimant would be entitled to a payment of less than Fifteen Dollars ($15.00), no Distribution will be made to such Claimant, and the Claim will nonetheless be deemed discharged with respect to the payment.

56

**7.** **Disputed Claims Reserve.** On any Distribution Date, after making Distributions to be made on any such Distribution Date with respect to Allowed Claims, the Debtor shall make a reasonable reserve on account of Disputed Claims, and shall adjust the reserve periodically. The reserve shall be not less than the amount of the Disputed Claims multiplied by the Distribution that would have been made on account of such Claims had they been Allowed as of the Distribution Date. Such Disputed Claim Reserve shall be administered by the Reorganized Debtor. The Reserve shall be closed and extinguished by the Reorganized Debtor upon the determination that all Distributions under the Plan have been made in accordance with the terms of the Plan, and all Claims have either been Allowed, Disallowed, or withdrawn. Upon closure of the Disputed Claim Reserve, all cash in the Reserve attributable to Class 7 Claims and Class 8 Claims shall be subject to redistribution in accordance with the provisions of the Plan. All other cash in the Reserve shall revert to the Reorganized Debtor without restriction.

**8.** **Objection to Claims and Settlements.**

Prior to the Effective Date, the Debtors shall have the right to make and file objections to Claims; provided, however, to the extent that the Objection is not finally determined prior to the Effective Date, the Objection will be a Cause of Action that vests with the Reorganized Debtor, and may continue to be pursued only by the Reorganized Debtor. The Reorganized Debtor shall have the right to make and to File objections at any time prior to that date which is one hundred twenty (120) days after the Effective Date (the "Objection Deadline"). All objections shall be litigated to Final Order unless approval of a settlement or compromise of a Claim objection is obtained pursuant to Bankruptcy Rule 9019.

## SECTION IX: EXECUTORY CONTRACTS UNDER THE PLAN

**1.      Rejection of Executory Contracts**

If the Reorganization Transaction is implemented, all Executory contracts (other than those previously rejected or assumed and/or assigned pursuant to an order of the Bankruptcy Court) shall be deemed rejected on the Effective Date or such other date as may be agreed upon by the Debtors and the counterparties thereto, or ordered by the Bankruptcy Court, and the Debtors and respective counterparties shall be relieved of any further obligation to perform under such agreements. Rejected Contract counterparties that do not oppose this proposed treatment by filing and serving a written objection with the Bankruptcy Court in accordance with the Bankruptcy Code and Bankruptcy Rules by the date objections to Confirmation of the Plan are required to be filed shall be deemed to have consented to rejection of such Executory Contract. This Plan shall constitute a request pursuant to Bankruptcy Code Section 1123(b)(2) and 365(a), and the Confirmation Order (except as otherwise provided therein) shall constitute an order of the Bankruptcy Court, approving the rejection by the Debtors of all Executory Contracts that have not otherwise been rejected or assumed by order of the Bankruptcy Court.

If the Sale Transaction is implemented, the Successful Bidder(s) shall have the right to designate which Executory Contracts (other than those previously rejected, or assumed and/or assigned pursuant to an order of the Bankruptcy Court) such Successful Bidder(s) are assuming, and which ones are being rejected. A Schedule of assumed and rejected Executory Contracts will be filed together with the motion to approve the Successful Bid(s) and will indicate the proposed rejection damages amount for each Executory Contract being rejected. Any counterparty to a rejected Executory Contract who wish to oppose their treatment, including the rejection damages allotted to them, must do so by opposing the motion to approve the Successful Bid(s) and by filing and serving a written objection with the Bankruptcy Court

in accordance with the Bankruptcy Code and Bankruptcy Rules. Anyone who does not file such an opposition shall be deemed to have accepted the assumption or rejection of their Executory Contract.

### a. **Rejection Claims**

If the rejection of a Rejected Contract gives rise to a Claim by the counterparty or parties to such contract or lease, such Claim shall be classified as a Class 6 General Unsecured Claim; provided, however, that any Claim arising from the rejection of a Rejected Contract pursuant to this Article 9 shall be forever barred and shall not be enforceable against the Debtors, the Estates, the Reorganized Debtors, or their properties, unless a Proof of Claim is Filed and served on the Debtors by the Rejection Claims Bar Date.

### 2. **Assumption Prior to Entry of the Confirmation Order**

Prior to the Confirmation Hearing, the Debtors may designate certain executory contracts and unexpired leases which it wishes to assume at Confirmation, rather than reject.; *provided,* the Reorganization Transaction is implemented. The Plan Supplement will contain a Cure Notice listing all such executory contracts and unexpired leases which the Debtors wish to assume at Confirmation, along with the proposed Cure. Such Cure Notice will be served by the Debtors on all counterparties to the executory contracts and unexpired leases which the Debtors wishes to assume. Counterparties who oppose the assumption may do so by filing and serving a written objection with the Bankruptcy Court in accordance with the Bankruptcy Code and Bankruptcy Rules. Failure to file such an objection shall be deemed consent to assumption of such Executory Contract. With respect to the Cure, counterparties shall have fourteen (14) days from service of the Cure Notice to file any objection to the Cure Amount, whether or not they have previously filed an objection to assumption of the contract.

During the pendency of these Chapter 11 Cases, the Debtors have assumed three contracts and have rejected one contract.  By order dated February 6, 2026 [D.I. 326] the

Bankruptcy Court granted Debtors' Motion to assume two energy supply agreements, one with NextEra Energy Services New York, LLC and the other with NextEra Energy Services New Jersey, LLC. By order dated May 4, 2026 [D.I. 410], the Bankruptcy granted Debtors' motion to assume the lease for the facility in which KNY conducts its laundry business. By order dated April 21, 2026 [D.I. 393], the Bankruptcy Court granted the Debtors' motion to reject a lease with HUB Truck Rental Corp of certain Trucks and other transportation equipment.

### SECTION X: PROVISIONS OF THE PLAN REGARDING EFFECT OF CONFIRMATION, INJUNCTIONS, EXCULPATION AND THIRD-PARTY RELEASES

1.      **Effect of Confirmation**

On the Confirmation Date, and except as otherwise provided in the Plan, the Plan binds all Holders of all Claims against the Debtors and all Interest Holders, whether or not such Holder accepts the Plan.

A.      **Injunction Related to the Plan**

To the fullest extent provided in Section 1141 of the Bankruptcy Code, as of the Effective Date, all Persons that have held, currently hold or may hold a Claim or other debt or Liability or interest that is addressed in the Plan are permanently enjoined from taking any action on account of such Claims, debts, Liabilities, or interest, other than actions brought to enforce any rights or obligations under the Plan, and the Debtors' debts are discharge; *provided, however,* that pursuant to section 1141(d)(3), if a debtor's assets are substantially liquidated and the debtor does not engage in business after consummation of the plan, the debtor is not discharged. Accordingly, if the Reorganization Transaction is not implemented, and the Sale Transaction is implemented, the Debtor will not be discharged, and this injunction shall not apply.

1. **Releases**

   a. ***Debtors' Release of Claims Against Officers, Directors, Managing Members, and Professionals of the Debtors*. As of the Effective Date, Debtors shall be deemed to have released all claims and Causes of Action in connection with or related to any action or omission taking place after the Commencement Date and prior to the Effective Date in any way relating to the Debtors, the Chapter 11 Cases, and/or the Plan against the Debtors' present directors, officers, Managing Members, all personnel of the corporate Managing Members, financial advisors, attorneys and professionals; *provided, however,* the foregoing shall not waive or release any Causes of Action arising out of (i) any contractual obligations owing by any such party, (ii) any Avoidance Actions, or (iii) the fraud, willful misconduct, gross negligence, ultra vires acts, malpractice, or misuse of confidential information that causes damages, or criminal conduct of any such party.**

   b. ***No Release Prior to Petition Date*. For the avoidance of doubt and notwithstanding anything to the contrary in this Plan or otherwise, nothing herein shall release any claims that arose prior to the Petition Date against the Debtors' Principals or any related parties, or affiliates of the Debtors, except as set forth in section  (c) below.**

   c. **Debtors Voluntary Releases. If the Reorganization Transaction is implemented, the Debtors shall enter into the releases described in Section 5.6 herein as part of the settlement with  CVS, and such releases shall be valid and binding on the Reorganized Debtors.**

2. **Exculpation.**

61

**To the extent permitted by Section 1125 (e) of the Bankruptcy Code, as of the Effective Date, each (i) Debtors, (ii) each director, officer, managing member, personnel of corporate managing members, and Holders of equity Interests of a Debtors, and (iii) each of the respective financial advisors, attorneys, accountants, consultants, liquidators, and other professionals of each such party (each an "Exculpated Party") shall neither have nor incur, and each Exculpated Party is hereby released and exculpated from, any Exculpated Claim or obligation, cause of action or liability for any Exculpated Claim, except for acts undertaken in bad faith, fraud, gross negligence, willful misconduct, ultra vires acts, malpractice, misuse of confidential information that causes damages, or criminal conduct; but in all respects each Exculpated Party shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under this Plan in their dealings with  Debtors, or in the context of each Debtor's Chapter 11 Case. No Holder of a Claim or Equity Interest or any other party-in-interest, including their respective agents, employees, representatives, financial advisors, attorneys, or affiliates, shall have any right of action against any Exculpated Party relating to, or arising out of the Exculpated Claims, except for such Exculpated Party's own willful misconduct or gross negligence; *provided*, *however*, that nothing in the Plan shall, or shall be deemed to, release or exculpate the Exculpated Parties with respect to their obligation or covenants arising pursuant to the Plan. Nothing herein shall abrogate the provisions of any disciplinary code.**

### SECTION XI: RETENTION OF SUBJECT MATTER JURISDICTION AND CAUSES OF ACTION

The Plan is designed to ensure that even after Confirmation, the Bankruptcy Court shall continue to have subject matter jurisdiction of all matters, and over all persons, arising out of, or relating to, the Chapter 11 Cases. The Plan identifies a panoply of items over which the

Bankruptcy Court maintains jurisdiction, but such list is not meant to be exhaustive. The items

identified in the Plan are:

1.     To consider and rule on compromises and settlement of any Claim against or Causes of Action on behalf of the Debtors or the Estates;

2.     To ensure that Distributions to Holders of Allowed Claims are accomplished as provided in the Plan, including to determine Net Profits in the event there is an objection to the Reorganized Debtor's calculation of same;

3.     To hear and determine any timely objections to the Administrative Expense Claims or to Proofs of Claim filed, both before and after the Effective Date, including any objection to the Classification of any Claim or Equity Interest, and to Allow or disallow any Claim in whole or in part;

4.     To hear and determine any and all applications for the allowance of Professional Fees accrued prior to the Effective Date as provided for in the Plan;

5.     To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

6.     To issue such orders in aid of execution of the Plan, in accordance with section 1142 of the Bankruptcy Code;

7.     To estimate Claims for all purposes under the Plan;

8.     To consider any modifications of the Plan, to cure any defect or omission, or reconcile any inconsistency in the Plan, including any exhibits thereto, or in any order of the Bankruptcy Court, including the Confirmation Order, as may be necessary to carry out the purpose and intent of the Plan and to implement and effectuate the Plan;

9.     To hear and determine matters concerning state, local and federal taxes, including but not limited to those in accordance with §§ 346, 505 and 1146 of the Bankruptcy Code, with respect to either Debtor or any Person;

10.     To compel the conveyance of property and other performance contemplated under the Plan and documents executed in connection herewith;

11.     To enforce remedies upon any default under the Plan;

12.     To enforce, interpret and determine any disputes arising in connection with any orders, stipulations, judgments and rulings entered in connection with the Chapter 11 Cases (whether or not the Chapter 11 Cases have been closed);

13.     To resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation, or enforcement of the Plan

and the documents ancillary thereto, or any Person's obligation incurred in connection therewith;

14. To determine any other matters that may arise in connection with or related to the Plan and Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan or Disclosure Statement;

15. To issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Person with the occurrence of the Effective Date or enforcement of the Plan;

16. To issue such orders as may be necessary or appropriate in aid of Confirmation and/or to facilitate consummation of the Plan;

17. To determine such other matters as may be provided for in the Confirmation Order or other orders of the Bankruptcy Court as may be authorized under the provisions of the Bankruptcy Code or any other applicable law;

18. To hear and determine (a) all motions, applications, adversary proceedings, and contested and litigated matters pending on the Effective Date, and (b) all Claims by or against the Debtors arising under the Bankruptcy Code or non-bankruptcy law, if made applicable by the Bankruptcy Code, whether such Claims are commenced before or after the Effective Date, including, but not limited to, Causes of Action and the Avoidance Actions;

19. To hear and determine all Causes of Action, to the extent not described above;

20. To hear and determine any Claims asserted by: (i) suppliers of goods or services to any of the Debtors; and (ii) any Equity Holder, Insider or Affiliate of any of the Debtors, for any actions or omissions prior to the Commencement Date;

21. To hear and determine any other matter authorized by applicable law; and

22. To enter a Final Decree.

23. To hear and determine all matters in the jointly administered case of Deqser LLC

### SECTION XII: RISK FACTORS

In considering whether to vote to accept or reject the Plan, there are a number of risk factors which can affect the ability of the Debtors to obtain Confirmation and to achieve all of the terms of the Plan which one should consider. Principal among these are:

1. **Realization of Projections**.

The Debtors have prepared the Projections set forth in Exhibit 3 to demonstrate the feasibility of the Plan. Although the Debtors have taken great care in preparing the Projections, the Projections are unaudited and have not been reviewed by a financial advisor. While the Debtors believe that the Projections are conservative and that the Debtors may well exceed the income projected therein, the Projections contain forward-looking numbers and, as such, represent the opinion of the Debtors' management and cannot be guaranteed. The actual results may vary from the Projections either favorably or unfavorably.

2. **Documentation of Exit Financing.**

As pre-conditions to the Effectiveness of the Plan, the Debtors must have sufficient cash to make the Distributions required on the Effective Date, and must have entered into appropriate loan agreements with the DIP Lender and the DIP Lender must be ready and willing to fund. The Debtors believe they will have sufficient cash to pay all of the Distributions required on the Initial Distribution Date; provided, they borrow $1,800,000 from the DIP Lender or before the Effective Date, as anticipated by the Plan. The Debtors do not anticipate any problems in finalizing the loan documentation with the DIP Lenders, and the Debtors are aware that the DIP Lender has the necessary funds to make the proposed loan Nonetheless, the documentation of the agreements between the Debtors and the DIP Lender have not yet been finalized and signed. Accordingly, there can be no guarantee that the Debtors will be able to finalize the documentation with the DIP Lender and obtain the necessary funds.

3. **Confirmation by Cramdown**

As the Class 11 Interest Holders are receiving nothing under the Plan, they are deemed to have rejected the Plan. As a result, the Debtors must seek Confirmation pursuant to the provisions of Bankruptcy Code Section 1129(b), commonly known as the cramdown provision. In order to succeed in Confirming a plan pursuant to the cramdown provision, one must

demonstrate to the satisfaction of the Bankruptcy Court that a plan does not discriminate unfairly and is fair and equitable with respect to the Class which is rejecting the Plan. While the Debtors believe that they can establish that Confirmation is appropriate pursuant to the cramdown provisions, there can be no guarantee that the Bankruptcy Court will agree with the Debtors.

<b><u>SECTION XIII: TAX TREATMENT</u></b>

The Plan is likely to affect each Holder of Claims or Interests differently based on their own tax situation, as well as their treatment pursuant to the Plan. You are urged to consult with your own tax advisor as to the tax ramifications of the Plan for you.

<b><u>SECTION XIV: VOTING</u></b>

**1.   Classes Entitled to Vote on the Plan**

Under the Plan, Classes 1 through 11 are Impaired, but only Classes 1 through 10 are entitled to vote; since, the Class 11 Interest Holders receive nothing under the Plan and are therefore deemed to have rejected the Plan. You should read your Ballot(s) and carefully follow the instructions included in the Ballot(s). Please use only the Ballot(s) that accompany the applicable Solicitation Package. Such Ballots are pre-populated with your Class and the amount of your Claim. If you disagree with the classification or amount, please contact either the Claims and Solicitation Agent at: TeamDEQSER@stretto.com or Debtors' counsel at: david@mhlaw-ny.com. If you did not receive a Ballot and believe you are entitled to vote, you should also contact either the Claims and Solicitation Agent or the Debtors' counsel at the above emails. Finally, if you have any questions as to how to fill out your Ballot, or your Ballot is destroyed or damaged when you receive it, you should contact the Claims and Solicitation Agent at the above email.

If you are a Holder of a Claim and/or Interest in more than one of the Voting Classes, you will receive a Ballot for each Class in which you hold a Claim or Interest. If you have more

than one Claim in a particular Class, your Claims will be aggregated, and you will only receive one Ballot for all of your Claims in such Class.

### 2. Votes Required for Acceptance by a Class

A Class of Claims is determined to have accepted a plan if Creditors holding at least two-thirds (2/3) in amount and a majority in number of the Allowed Claims actually voting in the Class vote in favor of the plan. If, on the Record Date for Voting, there are no Allowed Claims in a particular Class, then that Class is deemed to have accepted the Plan. The Plan provides that if no Claimants in a Class vote, such Class is deemed to have accepted the Plan.

With respect to Interest Holders, a Class of Interest Holders accepts the Plan if at least two thirds in amount of the Equity Interests voting vote to accept the Plan. In the instant case, since the Interest Holders are receiving nothing under the Plan, they are deemed to reject the Plan and will not be provided with Ballots or an opportunity to vote. The Debtors will be required to proceed to seek Confirmation with a non-accepting Class.

### 3. Non-consensual Confirmation

If any Class of Claims or Interests entitled to vote does not accept the Plan by the requisite statutory majority, the Plan Proponents reserve the right to amend the Plan or undertake to have the Court confirm the Plan under Section 1129(b) of the Bankruptcy Code, or both. In the instant case, because the Class 11 Equity Interests are deemed to have rejected the Plan, the Debtor's plan to proceed pursuant to Bankruptcy Code Section 1129(b) which is often called the "cramdown" provision. This means that the Debtors will have to demonstrate to the satisfaction of the Bankruptcy Court that the Plan does not discriminate unfairly and is fair and equitable with respect to the Class 9 Interests. See Section XI.C. below.

### 4. Distribution of the Solicitation Package and Plan Supplement

The Debtors have requested that the Solicitation Agent distribute a Solicitation Package consisting of the most current version of the Plan, the approved Disclosure Statement, a letter

from the Debtors, Notice of the Confirmation Hearing, and, if appropriate, Ballots and instructions for filling out same and a W-2 form, to all Holders of Allowed Claims and/or Interests as of the Record Date for Voting by U.S. regular mail by no later than three (3) business days after the entry of the Order approving the adequacy of the Disclosure Statement on _____. If you are expecting to receive a Solicitation Package and have not done so within a reasonable time after the above date, the Solicitation Package (except the Ballots) may be obtained from the Solicitation Agent by emailing TeamDEQSER@stretto.com. You may also obtain copies of any pleading filed with the Bankruptcy Court for a fee by visiting PACER at https://www.pacer.gov/. The Debtors reserve the right to serve the Solicitation Package on a diskette or a thumb drive, rather than by hard copy. Should you not receive a Ballot, please follow the instructions set forth above.

The Debtors shall file the Plan Supplement with the Bankruptcy Court no later than fourteen (14) calendar days before the Confirmation Hearing. This will also be served on all Holders of Allowed Claims and Interests as of the Record Date for Voting. The Debtors reserve the right to serve the Plan Supplement by diskette or thumb drive, rather than by a hard copy. If you do not receive the Plan Supplement, you may obtain one in the same manner described for obtaining a missing Solicitation Package above. If the Plan, the Disclosure Statement, or the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available on the Debtors' restructuring website.

**5. Voting Procedures**

In order for the Holder of an Allowed Claim in a Voting Class to have its Ballot counted as a vote to accept or reject the Plan, such Holder's Ballot must be properly completed, executed, and delivered either (a) if by regular mail, hand delivery or by overnight mail to KNY 26671 LLC Ballot Processing, C/O Stretto, 410 Exchange, Ste 100, Irvine, CA 92602 or, (b) if by the E-Ballot Portal, submit your Ballot via the Solicitation Agent's online portal by visiting

https://forms.stretto.com, clicking on "E-Ballot" under "Case Actions" and following the instructions to submit your Ballot,  in each case so that such Holder's Ballot is actually received by the Solicitation Agent on or before the Voting Deadline which is July 31, 2026, at 5:00 p.m., Prevailing Eastern Time.

If you hold Claims and/or Interests in more than one Voting Class under the Plan, you should receive a separate Ballot for each Class of Claims, coded by Class number.

IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED UNLESS THE DEBTORS DETERMINE OTHERWISE OR AS ORDERED BY THE BANKRUPTCY COURT.

ANY BALLOT THAT IS PROPERLY EXECUTED BY THE HOLDER OF A CLAIM BUT THAT DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN, OR ANY BALLOT THAT INDICATES BOTH AN ACCEPTANCE AND REJECTION OF THE PLAN, WILL BE COUNTED AS AN ACCEPTANCE OF THE PLAN. ANY CLASS IN WHICH NO ONE VOTES TO ACCEPT OR REJECT THE PLAN WILL BE DEEMED TO ACCEPT THE PLAN.

EACH HOLDER OF THE CLAIM MUST VOTE ALL OF ITS CLAIMS WITHIN A PARTICULAR CLASS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT SUCH VOTES. BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM AND/OR INTEREST HAVE BEEN CAST. IF A HOLDER NONETHELESS CASTS MULTIPLE BALLOTS WITH RESPECT TO THE SAME CLAIM, ONLY THE LAST PROPERLY EXECUTED BALLOT TIMELY RECEIVED WILL BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN AND ALL PRIOR BALLOT(S) WILL BE DEEMED SUPERSEDED AND REVOKED.

## SECTION XV: CONFIRMATION PROCEDURES

### 1.  The Confirmation Hearing

Under Section 1128(a) of the Bankruptcy Code, the Bankruptcy Court, after notice, may hold a hearing to Confirm a plan of reorganization. The Confirmation Hearing is scheduled to be held on August 5, 2026, at 10:00 a.m., Prevailing Eastern time, before the Honorable Craig T. Goldblatt, United States Bankruptcy Judge, United States Bankruptcy Court for the District of Delaware, 824 N. Market Street, Courtroom 7, Wilmington, Delaware 19801. The Confirmation Hearing may be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served in accordance with the Bankruptcy Rules. The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing. Subject to Section 1127 of the Bankruptcy Code, the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing without further notice to parties-in-interest.

### 2.  Objections to Confirmation

Section 1128(b) of the Bankruptcy Code provides that a party-in-interest may object to Confirmation. The Bankruptcy Court has directed that objections, if any, to Confirmation of the Plan, be in writing, filed with the Bankruptcy Court on ECF, with two courtesy copies to Chambers of the Honorable Craig T. Goldblatt, and such objection be served on the Objection Notice Parties, as defined in the beginning of this Disclosure Statement, so as to be received on or before June 24, 2026 by 4:00 PM, prevailing Eastern time.

### 3.  Confirmation Standards

Among the requirements for Confirmation are that the Plan (a) is accepted by all Impaired Classes of Claims and Interests or, if rejected by an Impaired Class, that the Plan

"does not discriminate unfairly" and is "fair and equitable" as to such Class; (b) is feasible; and (c) is in the "best interest" of Holders of Claims and Interests that are Impaired under the Plan.

The following requirements must be satisfied pursuant to Section 1129(a) of the Bankruptcy Code before a bankruptcy court may confirm a plan of reorganization. The Debtors believe that the Plan, and the Debtors as the Proponents of the Plan, fully complies with all of the applicable requirements of Section 1129(a) of the Bankruptcy Code set forth below (other than those pertaining to voting, which has not yet taken place, but which the Debtors expect to comply with).

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or to be made by the Debtors or by a Person issuing Securities or acquiring property under the Plan, for services or for costs and expenses in or in connection with the Chapter 11 Cases, in connection with the Plan and incidental to the Chapter 11 Cases, is subject to the approval of the Bankruptcy Court as reasonable.

- The Debtors have disclosed or will disclose the identity and affiliation of any individual proposed to serve, after Confirmation, as a director or officer, any affiliate of the Debtors reorganized under the Plan, or any successor to the Debtors under the Plan. The appointment to, or continuance in, such office of such individual is consistent with the interest of creditors and equity security holders and with public policy.

- The Debtors have disclosed or will disclose the entity of any insider that will be employed or retained by the Reorganized Debtor and the nature of any compensation for such Insider.

- With respect to each Holder within an Impaired Class of Claims or Interests, as applicable, each such Holder (a) has accepted the Plan or (b) will receive or retain under the Plan on account of such Claim or Interest property of a value, as of the Effective Date, that is not less than the amount that such Holder would so receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

71

- With respect to each Class of Claims or Interests, such Class (a) has accepted the Plan or (b) is Unimpaired under the Plan (subject to the "cram down" provisions discussed in Section VIII.F. herein).

- The Plan provides for treatment of Claims, as applicable, in accordance with the provisions of Section 507(a) of the Bankruptcy Code.

- If a Class of Claims and/or Interests is impaired under the Plan, at least one Class of Claims that is Impaired under the Plan has accepted the Plan, determined without including any acceptance of the Plan by any insider.

- Confirmation is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Reorganized Debtors, or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.

- All fees payable under 28 U.S.C. § 1930 had been paid or the plan provides for the payment of all such fees on the Effective Date.

4. **Best Interest Test / Liquidation Analysis**

As described above, the Bankruptcy Code requires that each Holder of an Impaired Claim or Interest either (a) accept the plan, or (b) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such Holder will receive if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code. Based on the unaudited Liquidation Analysis attached hereto as **Exhibit 2**, the Debtors believe that any Distributions if the Chapter 11 Cases were converted to cases under Chapter 7 of the Bankruptcy Code would be vastly less than the value of Distributions under the Plan. Although the Holders of Class 11 Interests are receiving nothing under the Plan, they clearly would also receive nothing in a liquidation. As a result, the Debtors believe Holders of Claims and Interests in all Impaired Classes will recover at least as much as a result of Confirmation of the Plan as they would recover through a hypothetical chapter 7 liquidation.

THE LIQUIDATION ANALYSIS HAS BEEN PREPARED SOLELY FOR USE IN THIS DISCLOSURE STATEMENT. NOTHING CONTAINED IN THE LIQUIDATION

ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION BY OR ADMISSION OF ANY DEBTOR FOR ANY PURPOSE.

### 5. Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that the Bankruptcy Court find that Confirmation is not likely to be followed by the liquidation, or the need for further financial reorganization, of a debtor or any successor of a debtor under the plan of reorganization unless the plan contemplates such liquidation or reorganization. For purposes of determining whether the Plan meets this requirement, the Debtors have analysed their ability to meet obligations under the Plan. As part of this analysis, the Debtors have prepared the financial Projections, which together with the assumptions on which they are based are attached hereto as **Exhibit 3**. Based on these Projections, the Debtors believe the Plan meets the financial feasibility requirement. The Debtors have tried to be conservative in the Projections, and believe that the results shown in the Projections can be obtained, as do the Debtors' financial advisor who prepared the projections. Nonetheless, the Projections are unaudited and contain forward looking numbers which cannot be guaranteed. However, given the deleveraging of the Debtors' balance sheet accomplished through the Plan and the fact that the number of hotel rooms service by the Debtors have been steadily growing, the Debtors feel confident that the Plan satisfies the feasibility requirement of Section 1129(a)(11) of the Bankruptcy Code.

### 6. Confirmation Without Acceptance by All Impaired Classes

The Debtors will be seeking Confirmation without acceptance by all Impaired Classes; since, the Class 11 Interest Holders are deemed to have rejected the Plan. The Bankruptcy Code permits Confirmation of the Plan even if it is not accepted by all Impaired Classes, as long as (i) the Plan otherwise satisfies the requirements for Confirmation, (ii) at least one Impaired Class of Claims has accepted the Plan without taking into consideration the votes of any Insiders in such Class, and (iii) the plan is "fair and equitable" and does not "discriminate

unfairly" as to any impaired class that has not accepted the plan. These so-called "cram down" provisions are set forth in Section 1129(b) of the Bankruptcy Code.

- **No Unfair Discrimination.** The no "Unfair Discrimination" test applies to Classes of Claims or Interests that are of equal priority and are receiving different treatment under the Plan. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair". The Debtors do not believe the Plan discriminates unfairly against any Impaired Class of Claims or Interests. More importantly, all Holders of Equity Interests in the Debtors are being treated the same. The Debtors believe the Plan satisfies the foregoing requirements for non-consensual Confirmation in the treatment of all Classes of Claims and Interests under the Plan, particularly Class 11.

- **Fair and Equitable Test.** This test applies to Classes of different priority and status (e.g., Secured versus Unsecured) and includes the general requirement that no Class of Claims or Interest receive more than 100% of the amount of the Allowed Claims or Interest in such Class. The Plan specifically provides that there will be no Distributions in excess of the Face Amount of Claims. As to a dissenting Class, the test sets different standards depending on the type of Claims or Interest in such Class. In order to demonstrate the Plan is fair and equitable with requests to a rejecting Class, the plan proponent must demonstrate the following:

- **As to Rejecting Secured Creditors:** Each Holder of a Secured Claim (a) retains its liens on the property, to the extent of the Allowed amount of its Secured Claim, and receives deferred cash payments having a value, as of the Effective Date of the chapter 11 plan, of at least the Allowed amount of such Claim, (b) has the right to credit the amount of its claim if the property is sold and retains its liens on the proceeds of the sale (or is sold, on the proceeds thereof), or (c) receives the "indubitable equivalent" of its Allowed Secured Claim.

74

The Debtors submit that the treatment of all Secured Creditors in the Plan meets these requirements. If a Secured Creditor makes an election pursuant to Bankruptcy Code § 1111(b), and votes against the Plan, their required treatment would be different. Eastern has indicated that it is making and !!!!(b) election, but it has consented to its treatment in the Reorganization Transaction as satisfying such election. If another Secured Creditor makes and1111(b) election, the Plan Proponents may need to make some changes to the Plan prior to Confirmation, but believes that it has the financial wherewithal to make appropriate changes which will allow the Plan to be Confirmed.

- **As to Rejecting Unsecured Creditors**: Either (a) each Holder of an Impaired Unsecured Claim receives or retains under the chapter 11 plan property of the value equal to the amount of its Allowed Claim or (b) the Holders of Claims and Interest that are junior to the Claims of the non-accepting Class will not receive any property under the Chapter 11 plan.

- **As to Rejecting Holders of Interests:** Either (a) each Holder of an Impaired Interest will receive or retain under the chapter 11 plan property of a value equal to the greatest of the fixed liquidation preference to which such Holder is entitled, the fixed redemption price to which such Holder is entitled, or the value of the Interest, or (b) the Holders of Interests that are junior to the non-accepting Class will not receive or retain any property under the Chapter 11 plan.

As to the Class 11 Equity Interests which are deemed to reject the Plan, the Liquidation Analysis shows that the Equity Interests have no value; since, the liabilities of the Debtors far exceed the assets. Accordingly, each Holder of an Equity Interest is receiving the value of such Interest.  The Debtors believe that the Plan, and in particular, the treatment of Class 11 Interests, satisfies the "fair and equitable" requirement.

75

**7.   Alternatives to Confirmation and Consummation of the Plan**

If the Plan cannot be Confirmed, the Debtors may seek to (a) prepare and present to the Bankruptcy Court an alternative plan for Confirmation, or (b) liquidate their assets and businesses under Chapter 7 of the Bankruptcy Code. If the Debtors were to pursue a liquidation in chapter 7, the Debtors would convert the Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code, and a trustee would be appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code. As demonstrated by the Liquidation Analysis attached hereto as Exhibit 2, in a liquidation, the Secured Creditors are likely to receive less than they do in the Plan, the Unsecured Creditors would receive nothing, and the Interest Holders would receive nothing. Theoretically, the

## SECTION XVI: MODIFICATION OF PLAN

**A.   Modification Prior to the Confirmation Order**

The Plan Proponents may alter, amend, or modify the Plan or any exhibits thereto under Section 1127(a) of the Bankruptcy Code at any time prior to entry of the Confirmation Order. The Plan Proponents shall provide parties-in-interest with notice of such amendments or modifications as may be required by the Bankruptcy Code or Bankruptcy Rules or order of the Bankruptcy Court. A Holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, modified or clarified, if the proposed alteration, amendment, modification or clarification does not materially and adversely change the treatment of the Claim of such Holder.

**B.   Modification After the Confirmation Order**

After the entry of the Confirmation Order and prior to substantial consummation (as defined in Section 1101(2) of the Bankruptcy Code) of the Plan, the Plan Proponents may, under Section 1127(b) of the Bankruptcy Code, institute proceedings in the Bankruptcy Court to remedy any defect or omission or to reconcile any inconsistencies in the Plan or the

Confirmation Order, and such matters as may be necessary to carry out the purpose and effect of the Plan, so long as such proceedings do not materially and adversely affect the treatment of Holders of Claims or Interests under the Plan; provided, however, that, to the extent required, prior notice of such proceedings shall be served in accordance with the Bankruptcy Code or Bankruptcy Rules or an order of the Bankruptcy Court. A Holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, modified or clarified, if the proposed alteration, amendment, modification or clarification does not materially and adversely change the treatment of the Claim or Interest of such Holder.

### SECTION XVII: CONCLUSION AND RECOMMENDATION

For all the reasons stated above, the Plan Proponents strongly believe that Confirmation and consummation of the Plan is preferable to all other alternatives and will result in the highest possible return to all Creditors. Consequently, the Plan Proponents urge all Holders of Claims entitled to vote to accept the Plan and to evidence such acceptance by returning their Ballot(s), so that, they will be received by the Claims and Solicitation Agent no later than 5:00 p.m. prevailing Eastern Time on July 31, 2026, at 5:00 p.m. prevailing Eastern time.

Dated: June 9, 2026

GELLERT SEITZ BUSENKELL & BROWN LLC

*/s/ Ronald S. Gellert*
Ronald S. Gellert (DE 4259)
1201 North Orange Street, Suite 300
Wilmington, DE 19801
Tel:(302) 425-5806
rgellert@gsbblaw.com

and

MAYERSON & HARTHEIMER, PLLC
Sandra E. Mayerson, Esq. (admitted *pro hac vice*)
David H. Hartheimer, Esq. (admitted *pro hac vice*)
Mayerson & Hartheimer, PLLC
845 Third Avenue, 11th Floor

New York, NY 10022
Tel: (646) 778-4381
Fax: (646) 778-4384
sandy@mhlaw-ny.com
david@mhlaw-ny.com

*Counsel for Debtors and Debtors in Possession*