# EXHIBIT A

**Final**

sc&h /capital

***PERSONAL AND CONFIDENTIAL***

***August 27, 2026***

Mr. Sang Cho
Chief Executive Officer
Deqser, LLC and KNY 26671 LLC (Debtors) d/b/a Cooperative Laundry Tri-State
1 Eastern Rd.
Kearny, NJ 07032

**Re: Agreement Regarding Advisory Services**

Dear Sang:

SC&H Group (together with its subsidiaries and affiliates, "SC&H" or "we") is pleased to offer the terms and objectives of our engagement to provide Deqser, LLC and KNY 26671 LLC, collectively Debtors in Possession in the United States Bankruptcy Court for the District of Delaware, the "Company" or "you") SC&H's merger and acquisition, asset sale(s), capital raising, financial restructuring and related advisory services described below (the "Services") related to the Company, its business (the "Business") or its assets (the "Assets") and liabilities, all as provided in this letter agreement (the "Agreement"). Additional terms and conditions governing the Agreement are set forth on Attachment A attached hereto and incorporated by reference as part of this Agreement.

1. Services to be Rendered. SC&H will serve as the Company's exclusive advisor to provide Services (as defined below) to advise the Company in connection with a potential transaction or series of transactions that may involve a Sale, Financing and/or Restructuring (as defined herein) (collectively or individually, a "Transaction"); provided, SC&H agrees that the foregoing exclusivity provision does not preclude the Company from using its financial advisor, KCP Advisory Services, to provide financial advisory services in connection with the Transaction.

(a) Scope of Services. In connection with any Transaction and in exchange for the consideration set forth in this Agreement, SC&H will provide the Company with the Services as described herein. For purposes of this Agreement, "Counterparty" means any investor, joint venture or merger partner, lender, equity holder or other acquiror of any or all of the Company's equity, or any of the Company's Assets, or other similar Transaction participant, and such party's affiliates, subsidiaries, successors, assigns, current (at the time of this Agreement) and future officers, directors, principals or other agents.

For purposes of this Agreement, "Services" means consulting and advisory services relating to a Transaction. In connection with this engagement, SC&H may undertake the following Services, as such services are deemed by SC&H to be appropriate for a Transaction:

(i) Familiarize itself with the business, operations, assets, financial condition and prospects of the Company.

SC&H Initial: KWM



Company Initial: SC

(ii) Advise the Company in analyzing its strategic alternatives and structuring and effecting the financial aspects of any Transaction.

(iii) Design the appropriate process to effect and initiate any Transaction, including any analysis of the various alternatives and, if appropriate, the potential Counterparties to be contacted for the Transaction.

(iv) Prepare an information memorandum or other materials about the Company and its Business for consideration by potential Counterparties.

(v) Contact potential Counterparties in connection with a Transaction and require potential Counterparties to execute Confidentiality Agreements in favor of the Company, unless you have instructed us to do otherwise.

(vi) Facilitate the development of a Virtual Data Room (VDR) with appropriate diligence materials for review by potential Counterparties.

(vii) Circulate any information memorandum and marketing materials, provide access to the VDR or send materials to potential Counterparties, after completing confidentiality documents.

(viii) Coordinate diligence with potential Counterparties and negotiate with and solicit offers from potential Counterparties. Advise the Company in structuring a Transaction and make recommendations as to whether a particular Transaction offer should be accepted.

(ix) In connection with a bankruptcy proceeding governing a potential Transaction, provide any relevant testimony and if necessary, provide assistance with the submission of bid procedures to the Court and conduct any auction that may result therefrom.

(x) Conduct a sale process under section 363, or any other applicable section, of Title 11 U.S.C. §§ 101 *et seq*. (the "Bankruptcy Code"), including, if requested by the Company, negotiate a "stalking horse" bid.

(xi) If requested by Company, negotiate with various stakeholders of the Company, including but not limited to, secured and unsecured creditors and equity shareholders, in regard to a Transaction.

(xii) Coordinate with the Company's legal counsel regarding matters related to the Transaction and the closing thereof ("Closing").

Provide such other advisory services as are customarily provided by investment bankers in connection with the analysis, negotiation, and closing of a potential Transaction pursuant to Section 363 of the Bankruptcy Code, including, without limitation, conducting an auction to determine the "highest and best" proposal.

(b) Definitions: For purposes of this Agreement, capitalized terms shall have the following meanings:

(i) "Sale" shall mean the sale or disposition to one or more third parties in one or a series of transactions of (x) some or all of the equity securities (including any type of preferred stock)

of the Company, or (y) substantially all or a portion of the Assets (including the assignment of any executory contracts) or businesses of the Company or its subsidiaries, in either case, including through a sale or exchange of capital stock, options or assets, a lease of assets with or without a purchase option, a merger, consolidation or other business combination, an exchange or tender offer, a recapitalization, the formation of a joint venture, partnership or similar entity for the purpose of effecting a transfer of control of the Company or any similar transaction. For the avoidance of doubt, "Sale" shall include a credit bid by any secured lender, a sale under Section 363 of the Bankruptcy Code or a Plan of Reorganization that incorporates a Sale.

(ii) "Financing" shall mean: (x) any transactions or series of transactions involving the raising of debt or equity capital (including, but not limited to, senior debt, mezzanine and subordinated debt, "debtor in possession financing" or "exit financing" in connection with a case under the Bankruptcy Code) that is not described in subsection (i) above, and (y) any rights offering.

(c) Acknowledgments and Agreements Regarding Information. During this entire process, to the best of your abilities, you agree to provide us with complete and accurate financial and operating information of the Company. SC&H requests from time to time for purposes of performing the Services, inasmuch as potential Counterparties and other interested parties may rely on the information supplied by you. We do not undertake the responsibility to independently verify the accuracy of the information submitted, or conduct any appraisal of Assets or liabilities, and SC&H assumes no responsibility for the accuracy and completeness of any such information. SC&H shall be entitled to rely on, without independent verifications, the accuracy, validity and completeness of all information provided by the Company and its representatives. You will promptly inform us of any changes or events that may materially affect the Company, or if you become aware of any information of the Company previously provided to us becoming materially inaccurate, incomplete or misleading during the term of our engagement. In the event that we determine it is advantageous to prepare and distribute a memorandum and/or other evaluation materials (the "Offering Materials") on behalf of the Company as contemplated by this Agreement, you agree to execute a letter, contemporaneously with our finalizing the Offering Materials, and prior to distribution of the Offering Materials, acknowledging your review and approval of the Offering Materials, substantially in the form attached hereto as Attachment B.

To help the government fight the funding of terrorism and money laundering activities, federal law requires all financial institutions to obtain, verify, and record information that identifies each person party to this Agreement. Accordingly, SC&H will ask for each such person's address and other relevant information in order to comply with this policy.

The Company acknowledges that SC&H is not being retained to provide any tax, legal, accounting or other specialist or technical advice or services under this Agreement. The engagement under this Agreement does not include additional services such as those related to strategic advisory services, rendering a formal valuation, tax advisory services, executive recruitment, or financial review or audit, which would be covered under a separate written arrangement as needed. The parties acknowledge that, except as otherwise required by the Bankruptcy Code, or applicable bankruptcy law, SC&H is not acting in a fiduciary capacity with respect to the Company and that SC&H is not assuming any duties or obligations other than those expressly set forth in this Agreement. SC&H will not be

responsible for the underlying business decision of the Company to effect any Transaction or for the advice or services provided by any of the Company's other advisors or consultants.

(d) Exclusive Agency. The Company agrees that none of it, its controlling equity holders or other affiliates, or its management will proactively initiate discussions regarding a Transaction during the term of this Agreement, except with prior consultation with SC&H; provided, however, that nothing herein is intended to limit the Company's conversations under any existing credit agreement in the ordinary course of business, but the Company agrees that it will use reasonable efforts to coordinate these discussions with SC&H and include SC&H as appropriate. In the event the Company, its controlling equity holders or other affiliates, or its management receives any inquiry regarding a Transaction from any party, the Company shall inform SC&H of such inquiry so that SC&H can assist the Company in evaluating such party and its interest in a Transaction and in any resulting negotiations. Additionally, the Company shall inform SC&H of all potential Counterparties who have been in contact with the Company during the six (6) months prior to the date of this Agreement. For the avoidance of doubt, this section does not preclude CSV Capital Partners, LLC, the Company's debtor-in-possession lender and proposed stalking horse purchaser (collectively, the "DIP Lender"), from discussing the Transaction with its members and other third parties in its role as the DIP lender . Furthermore, nothing in this section or the Agreement shall preclude SC&H from sharing information about the Transaction with the Official Committee of Unsecured Creditors' counsel and financial advisor; provided, that the Company counsel has approved any such written disclosure and is present at any such oral disclosure.

2. Term and Termination. In our role as an independent contractor, we accept the appointment as your exclusive agent to perform the Services. Our activities will commence upon the date of our receipt of your countersignature on this Agreement and will extend for six (6) months, which is the initial term of this Agreement. In connection with our engagement, we will be entitled to fees as described in Section 4 below, including a Transaction Fee should a definitive agreement for a workout or restructuring involving a Transaction (a "Definitive Agreement") be reached, whether or not we were involved in the original introduction of the ultimate Counterparty or other Transaction party to you. The Transaction Fee will be fully earned, due, and payable upon the execution of a Definitive Agreement and consummation of the Transaction ("Closing"). We acknowledge that our engagement must be approved by the Bankruptcy Court pursuant to Bankruptcy Code § 328, and that the payment of our fees will be subject to Bankruptcy Court approval, and cannot be paid until approved by the Bankruptcy Court under the terms set forth in the order approving our engagement. You agree to promptly seek approval of the terms of this engagement upon receipt of a fully executed copy of this Agreement, as more fully described in section 5 of this Agreement.

This Agreement will continue beyond the initial term until either of us provides thirty (30) days' written notice of the intent to terminate the Agreement, or immediately upon a material breach of this Agreement by the other party hereto, upon which the Agreement will be terminated (the "Termination Date"). You agree that we will be the exclusive and sole point of contact for communications and inquiries regarding a Transaction and you agree that you will notify us immediately of any contacts that you initiate, or contacts initiated by potential Counterparties or their agents prior to the Termination Date. We are also entitled to our Transaction Fee should a Definitive Agreement be entered within the first twelve (12) months after the Termination Date with a party with whom contact occurred prior to the Termination Date. On and after the Termination Date, we will seek your good faith cooperation in preparing a list of potential Counterparties of whom we have knowledge and with whom a Definitive Agreement entered into after the Termination Date would entitle us to a Transaction Fee. Upon the Termination Date, all liabilities and continuing obligations of each party

to the other will cease other than provisions, which by their nature are intended to survive, including without limitation representations and warranties provided by the parties hereto, provisions related to compensation or amounts due to SC&H following termination, and those terms and conditions set forth on Attachment A hereto, all of which will survive any termination of this Agreement. No termination of SC&H's engagement hereunder will affect the Company's obligations to pay the compensation pursuant to the terms and conditions of Section 4 below (Compensation and Expenses), and to reimburse SC&H for fees and expenses payable or incurred prior to the Termination Date.

3. Limitations on Services; Post-Termination Services. SC&H's services are limited to the Services specifically provided in this Agreement, or subsequently agreed-upon, in writing, by the parties hereto. SC&H shall have no obligation or responsibility for any other services including, without limitation, any crisis management or business consulting services related to, among other things, the implementation of any operational, organizational administrative, cash management, or similar activities. SC&H is providing the Company with SC&H's Services as an independent contractor, and the parties agree that this Agreement does not create an agency, **or** third-party beneficiary relationship between SC&H, on the one hand, and the Company and/or its creditors or any other person, on the other hand, provided, however, the Company agrees that, in connection with the Transaction, SC&H may execute approved Confidentiality Agreements on its behalf. The Company agrees that the advice rendered to it by SC&H may not be relied upon by any other person or entity or used for any purpose except as contemplated in this Agreement. In performing Services pursuant to this Agreement, SC&H is not assuming any responsibility for the Company's decision to pursue, or not to pursue, any business strategy, or to effect, or not to effect, any Transaction, which decision shall be made by the Company in its sole discretion. If SC&H is required to render services not described herein, but which relate directly or indirectly to the subject matter of this Agreement (including, but not limited to, producing documents, answering interrogatories, attending depositions, giving expert or other testimony, whether by subpoena, court process or order, or otherwise), the Company shall pay SC&H additional fees to be mutually agreed upon for such services, plus reasonable related out-of-pocket costs and expenses, including, among other things, the reasonable legal fees and expenses of SC&H's counsel in connection therewith.

4. Compensation and Expenses. Our compensation includes Monthly Fees and one or more Sale Fee, Financing Fee, and/or Restructuring Fee, (each a "Transaction Fee"). The parties acknowledge that a substantial professional commitment of time and effort will be required of SC&H and its professionals hereunder, and that such commitment may foreclose other opportunities for SC&H. Moreover, the actual time and commitment required for this engagement may vary substantially, creating workload optimization issues for the firm and its employees. Given the numerous issues which may arise in engagements such as this, the variable level of time and effort necessary to address such issues, the expertise and capabilities of SC&H that will be required in this engagement and the market rate for SC&H's Services of this nature, whether in-court or out-of-court, the parties agree that the fee arrangement provided for herein is reasonable, and fairly compensates SC&H.

(a) Monthly Fee. In addition to the other fees provided for herein, during the term of this Agreement, beginning on the first day of the term and continuing on the same day of each successive month thereafter during the term of this Agreement, the Company shall be obligated to pay SC&H, without notice or invoice, a nonrefundable cash fee of $25,000, payable in advance, on the same day of such 30-day period (each, a "Monthly Fee"). Each Monthly Fee shall be earned upon the start of the related 30-day period in consideration of SC&H accepting this engagement and performing services as described herein; provided, however, that should the Closing occur during a thirty (30) day period

which has been paid, such Monthly Fee shall be prorated through the date of the Closing, and any amounts in excess of the prorated amount shall be applied to the Transaction Fee.

(b) Transaction Fees. In addition to the other fees provided for herein, the Company shall pay to SC&H a Transaction Fee in connection with any Closing(s), as described below:

(i) In the event the Company completes a Sale, a fee (the "Sale Fee") to be paid upon the Closing of any Sale once approved by the Bankruptcy Court equal to the sum of:

For that portion of Total Consideration

a. Up to and including $18.0 million - 3.0%, plus
b. Greater than $18.0 million - 4.0%
c. Provided, however, the Sale Fee shall never be less than $500,000 (the "Minimum Transaction Fee").
d. In the event the DIP lender's initial bid designated as a stalking horse is selected as the highest and best offer and subsequently closes (and is not the result of overbidding a third-party bid), the Sale Fee will be reduced to $325,000.

(ii) In the event the Company completes a Financing, (other than (x) any Financing included in the calculation of Total Consideration for a Sale above; or (y) the debtor-in-possession financing facility, up to the amounts available under such facility on the date of this Agreement, a fee (the "Financing Fee"), to be paid upon the Closing of any Financing once such fee is approved by the Bankruptcy Court, equal to the greater of the Minimum Transaction Fee or the sum of:

a. 2.0% of the gross amount of funded or committed indebtedness that is secured by a first lien, plus
b. 2.5% of the gross amount of funded or committed indebtedness that (1) is secured by a second or more junior lien, (2) is unsecured and/or (3) is subordinated; plus
c. 3.5% of the gross amount of any funded or committed preferred or common equity, convertible or otherwise equity-linked securities or obligations.

,

(iii) The parties acknowledge that more than one of both a Sale Fee and Financing Fee may be earned and payable to SC&H pursuant to the provisions herein; provided, however, that both Fees cannot be earned on the same dollars coming into the company. For the avoidance of doubt, only one fee will be charged for any one Transaction.

For purposes of this Agreement, "Total Consideration" includes everything (a) paid or payable, directly or indirectly, (b) canceled, forgiven or converted, (c) assumed or (d) otherwise to be distributed, to or on behalf of the Company or its affiliates, creditors (including holders of any secured, priority and general unsecured claims against the Company) and its equity holders in pursuant to, or in connection with a Transaction. The components of Total Consideration include, but are not limited to, (1) cash, (2) interest-bearing debt (including capitalized leases and public or private bond or similar debt issuances by the Company) and other unfunded liabilities assumed, refinanced, cancelled, forgiven, transferred and/or restructured, (3) assets or businesses retained by the Company, in the event of an asset Sale, or distributed to the Company's equity holders, in the event of a stock Sale, merger or similar reorganization, (4) amounts paid with respect to other assets or businesses in which the Company or its security holders or creditors have an interest and that are included in the Transaction, (5) equity securities, options, warrants and/or extraordinary dividends, issued by the Company, (6)

rights, property or interests, including earn-outs, installment payments and other payments, that are or may be contingent on future events or conditions, (7) any loans, amounts paid in cancellation of stock options and stock appreciation rights or in respect of other employee benefits, and (8) any credit bids made by secured parties.

If a component of the Total Consideration cannot be ascertained at the time of the Closing due to its contingent nature, we will work with you in good faith to attempt to determine the present value of this component of the Total Consideration prior to the Closing, which will then be used to calculate this portion of the Total Consideration calculation. Notwithstanding the foregoing, any Total Consideration that is held in escrow solely to offset a potential indemnification claim against the Company shall not be deemed to be contingent consideration and still be included as a component of Total Consideration. In no event will the amount due at Closing be less than the Minimum Transaction Fee.

The fees and expenses of SC&H under this Agreement, and all other closing costs and/or adjustments, including adjustments and/or payments of whatever kind to lien holders, secured parties, mortgagees or otherwise shall be excluded from the calculations and shall not be deducted when computing Total Consideration or the amount of the Transaction Fee.

(c) Expenses. Whether or not any Transaction is consummated, the Company will pay all of SC&H's reasonable out-of-pocket expenses (including document and presentation material expenses, data room hosting services, travel and lodging, outside research and database charges, delivery charges, and other such out-of-pocket expenses) up to a cap of $20,000 incurred in connection with this engagement. Reimbursement for such expenses shall be paid to SC&H by the Company within ten days of approval of the Bankruptcy Court.

5. Payment. Upon execution of a Definitive Agreement, the Company assigns to SC&H the portion of the Total Consideration equal to the Transaction Fee, which will be due and payable promptly upon the later of the Closing or approval by the Bankruptcy Court at Closing of any Transaction. The Transaction Fee will be paid by cashier's check or bank wire. If the Transaction Fee is not received by SC&H within two (2) business days following the later of the Closing or approval by the Bankruptcy Court, and any unpaid payment (or portion thereof) of any expense or fee payable to SC&H under this Agreement will bear an interest rate of 10% per annum, from the date that such payment is due hereunder to the date that payment is made in full. All fees and expenses payable under this Agreement are payable (a) in United States dollars in immediately available funds, and (b) without giving effect to any withholding or deduction of any tax or similar governmental assessment.

The Company shall promptly file a motion seeking the entry of an order approving this Agreement and authorizing the Company to retain SC&H pursuant to the terms of this Agreement as professional persons pursuant to Sections 327 and 328 of the Bankruptcy Code, the Bankruptcy Rules, and any applicable local rules and order of the Bankruptcy Court and subject to the standard of review provided in section 328(a) of the Bankruptcy Code and not subject to any other standard of review under section 330 of the Bankruptcy Code. SC&H reserves the right to terminate its obligations under this Agreement if the Bankruptcy Court enters an order that is inconsistent with this Agreement or which deletes key provisions of same.

The Company shall use good faith efforts to obtain "carve-outs" from the secured lenders and/or any order from the Court, in each case acceptable to SC&H, that provides that the Monthly Fees, Transaction Fees and other obligations owed to SC&H under this Agreement will be paid either

directly from the proceeds of any Transaction, paid from other cash available to the Company including under new or existing credit lines, or paid from a "carve-out" from the collateral of the secured creditor(s) (the "Fee Protections"). SC&H shall be under no obligation to provide the Services without Fee Protections acceptable to SC&H in its sole discretion, such acceptance not to be unreasonably withheld.

If a Transaction for which SC&H would have been paid a Transaction Fee hereunder is not consummated and the Company receives a break-up fee or other compensation as a result thereof (the "Break-up Fee") in connection therewith, then upon receipt the Company will pay or release to SC&H the lesser of 50% of any Break-up Fee or 50% of the amount of the Transaction Fee that would have been payable to SC&H if the Transaction had been consummated. Payment of this portion of the Break-up Fee will be applied toward the Transaction Fee due to SC&H at any subsequent Closing.

6. Notification of Closing Agent and Cooperation. The Company will cause the existence of this Agreement to be specifically referenced in any Definitive Agreement. The Company will provide notice to its counsel and the Closing attorney or agent, if any, and the Counterparty, of the existence of this Agreement. Upon request, the Company will provide SC&H with true and complete copies of the Definitive Agreement, whether in draft or final form, and any other relevant documents that may be ancillary thereto. The Company will inform SC&H of the name, address and telephone number of the attorney or agent conducting the Closing, as well as the date, time and location of the Closing. The Company hereby authorizes SC&H's attendance or participation at the Closing.

If you are in agreement with the foregoing, please sign and return the attached copy of this Agreement, whereupon this Agreement will become effective as of the date hereof. We look forward to working with you.

Very truly yours,
SC&H

By: Signed by: DDA3E24EE7524B5... ____________________
Kenneth W. Mann, Managing Director

Response:

This letter correctly sets forth our understanding.
Company and Debtors

Decser, LLC and KNY 26671 LLC

By: Signed by: 8CB2F640CF624F1... ________________________
Name: Sang Cho
Title: Chief Executive Officer
Date: August 27.00, 2026

State of Formation: Delaware

**Attachment A to**
**Agreement Regarding Advisory Services**

**TERMS OF ENGAGEMENT**

The following are additional terms and conditions that apply to the engagement by Deqser, LLC and KNY 26671 LLC ("Company") of SC&H Group under that certain Agreement Regarding Advisory Services (the "Agreement"). Capitalized terms not defined herein have the meaning ascribed to such terms in the Agreement. This Attachment A is expressly made part of and incorporated into the Agreement.

1. Cooperation. The Company agrees to cooperate with SC&H to provide any information that may be requested by SC&H from time to time in connection with the Services, including but not limited to access to such financial statements, records or other documents related to the Company, and employees or officers and directors of the Company, as SC&H may reasonably request.

2. Acknowledgment by the Company. The Company acknowledges that SC&H has and will continue to have relationships with parties other than the Company in the industry in which the Company does business, pursuant to which SC&H may acquire information of interest to the Company, which may or may not be confidential or proprietary information of SC&H or a third party. The Company further acknowledges that SC&H will have no obligation to disclose such information to the Company, or to use such information in connection with the provision of the Services. Further, SC&H may now or in the future evaluate or do business with competitors or potential competitors of the Company; provided, however, that SC&H will disclose to the Company its connections with any Counterparties or potential Counterparties to a Transaction. Neither the execution of the Agreement nor SC&H's receipt of any confidential or proprietary information will in any way restrict or preclude such activities nor constitute a breach of any provisions of the Agreement absent some other breach of the provisions hereof.

3. Disclosure of Advice. No advice rendered by SC&H, whether formal or informal, may be disclosed, in whole or in part, or summarized, excerpted from or otherwise referred to without our prior written consent. In addition, neither SC&H's involvement with the potential Transaction nor the terms of this engagement may be otherwise referred to without SC&H's prior written consent, provided, however, SC&H consents to such information in connection with required disclosures or testimony to the Bankruptcy Court.

4. Confidentiality. In connection with the Services, certain confidential, non-public information concerning the Company's business and financial condition ("Confidential Information") has been or may be disclosed to SC&H or its affiliates' employees, representatives and agents ("SC&H Representatives"). SC&H agrees to treat any such Confidential Information as confidential and will use all reasonable efforts not to disclose such Confidential Information except to SC&H Representatives or as authorized by the Company. The term "Confidential Information" does not include any information: (a) that was already in SC&H's possession, or that was available to SC&H on a non-confidential basis, prior to the time of disclosure by the Company to SC&H; (b) obtained by SC&H from a third person which, to SC&H's knowledge, is not subject to any prohibition against disclosure; (c) which is or becomes generally available to the public through no fault of SC&H or any SC&H Representative; or (d) is required to be disclosed under compulsion of law (whether by oral question, interrogatory, subpoena, civil investigative demand or otherwise), or by act of any court or governmental authority; provided that, SC&H will promptly inform the Company of such compulsion and cooperate, at the Company's cost, with attempts to obtain confidential treatment or a protective order for such information. SC&H also may disclose such information to those SC&H Representatives who need to know such information for purposes of performing the Services, and to potential Counterparties or other third parties who have executed confidentiality agreements for the benefit of the Company in a form reasonably satisfactory to the Company. SC&H's obligations under the second sentence of this paragraph will terminate three years from the date of the Agreement.

5. DISCLAIMER OF WARRANTIES. NO WARRANTY IS MADE BY SC&H IN REGARD TO ANY WORK PRODUCT DEVELOPED, OR SERVICES OR DELIVERABLES PROVIDED, UNDER THE AGREEMENT, EITHER EXPRESS, IMPLIED OR STATUTORY, NOR IS ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR USE OF A PARTICULAR PURPOSE GIVEN.

6. Limitation of Liability. In no event will either party hereto be liable to the other for incidental, special or consequential damages arising out of, resulting from, or in any way connected with the performance or breach of the Agreement regardless of the form of action, even if such party has been advised of the possibility of such damages. SC&H's liability to the Company for any cause whatsoever, and regardless of the form of action (including negligence), arising out of, resulting from, or in any way connected with the performances or breach of the Agreement will in no event exceed the amount actually paid for the portion of the Services involved, unless the liability is the result of gross negligence or willful

misconduct as determined by a final, non-appealable order of a court of competent jurisdiction. The Company agrees that SC&H's obligations under this Agreement are to use its best efforts through the period for which it provides the Services. SC&H does not guaranty any success in consummating a Transaction, and except as otherwise provided in this Agreement, SC&H will have no liability to any party under this Agreement if a Transaction does not occur. Neither of us will be liable for any delays or failures in performance due to circumstances beyond our reasonable control.

7. JURY TRIAL WAIVER. EACH PARTY HERETO WAIVES ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY ACTION ARISING OUT OF THE AGREEMENT, THE ENGAGEMENT OF SC&H OR SC&H'S PERFORMANCE OF THE SERVICES CONTEMPLATED BY THE AGREEMENT.

8. Choice of Law; Venue. The Agreement will be governed by and construed in accordance with the laws of the State of New York applicable to agreements made and to be fully performed therein. For the purpose of any suit, action or other proceeding arising out of or based on the Agreement, or the subject matter hereof (an "Action"), each party hereto irrevocably submits to the jurisdiction of the United States Bankruptcy Court for the District of Delaware in any Action brought byany party hereto, and to any court having appellate jurisdiction over such Bankruptcy Court. . Each party hereby waives to the extent not prohibited by applicable law, and agrees not assert, by way of motion, as a defense or otherwise, in any such Action brought in any of the above-named courts, any claim that it is not subject personally to the jurisdiction of such courts, that its property is exempt or immune from attachment or execution, that any such Action is brought in an inconvenient forum, that the venue of such Action is improper, or that the Agreement, or the subject matter hereof, may not be enforced in or by such courts.

9. Indemnification. Since SC&H will be acting on behalf of the Company in connection with this engagement, the Company and SC&H agree to the indemnity provisions and other matters set forth in this Section. The Company acknowledges and agrees that its agreement to these indemnity provisions are a material part of the consideration given to SC&H under the Agreement.

(a) The Company, for itself, hereby indemnifies and hold harmless SC&H, its affiliates and their respective control persons, managers, members, shareholders, directors, officers, employees and agents ("Indemnified Persons") to the fullest legal extent against any and all claims, losses, damages, liabilities, costs and expenses as incurred (including reasonable attorneys' fees and costs of collection) (collectively, "Losses") in connection with, arising out of or in performance of services thereunder related to SC&H's engagement under the Agreement, including but not limited to any pending or threatened claim, right, remedy, cause of action, litigation or other Action by or against the Company and/or SC&H (collectively "Claims"); provided, however, there will be excluded from such indemnification any such Losses that are found pursuant to a final court order to have resulted primarily from willful misconduct or gross negligence on the part of SC&H. If any Action is instituted involving any Indemnified Person, the Company, upon the request of the Indemnified Person, will retain counsel reasonably satisfactory to the Indemnified Person to represent the Indemnified Person in such Action and will pay as incurred the fees and expenses of such counsel related to such Action.

(b) If for any reason any portion of the foregoing indemnity is unavailable or insufficient to hold SC&H and the other Indemnified Persons harmless, then the Company will contribute to amounts paid or payable by such Indemnified Person(s) in respect of such Losses in such proportion as is appropriate to reflect the relative benefits received by the Company, on one hand, and SC&H, on the other hand, and such parties' relative fault in connection with the matters as to which such Losses relate, as well as any relevant equitable considerations, subject to the limitation that in any event the aggregate contributions of all Indemnified Persons in respect of such Losses will not exceed the amount of fees actually received by SC&H pursuant to the Agreement. It is hereby further agreed that the relative benefits to the Company on the one hand and SC&H on the other with respect to any Transaction or proposed Transaction contemplated by this Agreement will be deemed to be in the same proportion as (i) the total value the Transaction or proposed Transaction bears to (ii) the fees paid to SC&H with respect to such Transaction.

(c) The Company agrees that it will not settle or compromise or consent to the entry of any judgment in any pending or threatened Action or payment of any Claim in respect of which indemnification may be sought from the Company by any Indemnified Person (whether any Indemnified Person is an actual or potential party to such Action) unless such settlement, compromise or consent includes an unconditional release of Indemnified Persons hereunder from all liability arising out of such Action and/or Claim, or is consented to in writing by SC&H, w hich consent cannot be unreasonably withheld.

(e) As a condition to and prior to the Company's entering into any Definitive Agreement with respect to, or effecting, any Transaction that does not directly or indirectly provide for the assumption of the Company's obligations under this Section 9, the Company shalluse commercially reasonable efforts to arrange alternative means of providing for the Company's obligations under this Section 9 in an amount and upon terms that are reasonably satisfactory to SC&H, subject to the constraints of the Transaction structure and the consent of the Counterparty, provided, however, that the Company's inability to obtain such assumption or alternative

arrangement after exercising commercially reasonable efforts shall not constitute a default under the Agreement or a basis for SC&H to refuse to close the Transaction.

(f) Notwithstanding any provision hereof to the contrary, the Company shall have no obligation to indemnify an Indemnified Person for any claim or expense that is either: (i) related solely and directly to a contractual dispute in which the Company alleges breach of Indemnified Person's obligations to maintain the confidentiality of non-public information, unless a court of competent jurisdiction determines that indemnification, contribution or reimbursement would be permissible pursuant to *In re United Artists Theatre Co.*, 315 F.3d 217 (3d Cir. 2003); or (ii) settled by the Indemnified Person without the Company's consent prior to judicial determination as to the person's gross negligence, willful misconduct, bad faith or uncontested self-dealing but determined by the a court of competent jurisdiction, after notice and a hearing, to be a claim or expense for which the Indemnified Person should not receive indemnity, contribution under the terms hereof.

10. Representations and Warranties. The Company's representative signing the Agreement hereby represents and warrants to SC&H, that (i) he or she has the unconditional authority to enter into the Agreement on behalf of the Company once approved by the Bankruptcy Court, (ii) if the Company is a business entity, such authority has been granted in accordance with the requirements of the Company's organizational documents, and (iii) the Company owns or has rights to use and sell all assets identified in financial information, and has identified the assets to be subject to a Transaction in information, provided to SC&H for evaluation and presentation. The Company further represents and warrants (a) it expects to sell its assets free and clear of all liens, claims, and encumbrances pursuant to Section 363 of the Bankruptcy Code, and, as such, any existing liens should not impair the negotiation of a Definitive Agreement; (b) the Company will seek an order from the Bankruptcy Court stating the Sale is free of all liens, claims, and encumbrances, so that, existing liens should not impair the Closing of a Transaction; (c) once the Transaction is approved by the Bankruptcy Court, the Company will have all requisite power and authority to enter into the Transaction; and (d) the Company was formed in the State set forth on the signature page of the Agreement. The Agreement has been reviewed by the signatories thereto and their counsel; accordingly, there will be no construction of any provision against SC&H because the Agreement was drafted by SC&H, and the parties waive any statute or rule of law to such effect.

11. Announcement. If a Transaction is consummated, SC&H will have the right to disclose its participation in such Transaction in its marketing materials and advertisements, which may include the reproduction of the Company's logo, provided that such announcements will not disclose the value of the Transaction without the consent of the Company.

12. Securities Laws Compliance. The Company agrees: (a) that the offering or sale of securities in connection with a Transaction will be conducted in compliance with an exemption under the Securities Act of 1933 (i.e., no public solicitation, sophisticated purchaser, etc.) or applicable bankruptcy law which exempts the Transaction from compliance; and (b) that the Bankruptcy Court order approving the sale will specifically provide that no registration or other further compliance pursuant to the Securities Act of 1933 is required.

13. Assignment. Neither party may assign its rights or obligations under the Agreement without the written consent of the other party; provided, however, that in connection with this engagement, one or more affiliates of SC&H may perform a portion of the Services and, to the extent requested by SC&H, the Company will pay a portion of the fees payable to SC&H hereunder to such affiliate(s). The Agreement will be binding upon the parties hereto and their respective successors and permitted assigns. Nothing in the Agreement, express or implied, however, is intended to confer or does confer on any person or entity, other than the parties hereto and their respective successors and permitted assigns, and the Indemnified Persons, any rights or remedies under or by reason of the Agreement or as a result of the Services to be rendered by SC&H under the Agreement.

14. Amendments; Waiver. The Agreement may not be amended and no provision hereof may be waived or modified except in writing and signed by each of the parties hereto. The failure of any party to insist in any one or more instances upon performance of any term or condition of the Agreement will not be construed as a waiver of its future performance. The obligations of either party with respect to such term, covenant or condition will continue in full force and effect.

15. Severability. The invalidity or unenforceability of any provision of the Agreement will not affect the invalidity or enforceability of any other provision of the Agreement, which will remain in full force and effect pursuant to the terms hereof.

16. Integration. The Agreement incorporates the entire understanding of the parties regarding the subject matter hereof, and supersedes all previous oral or written agreements and understandings regarding the same.

17. Counterparts; Electronic Delivery. The Agreement may be executed in one or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument. Further, the Agreement may be executed by transfer of an originally signed document by facsimile or e-mail in PDF format, each of which will be as fully binding as an original document.

SC&H Initial: Initial KWM



Company Initial: Initial SC

**Attachment B to**
**Agreement Regarding Advisory Services**

**MANAGEMENT REPRESENTATION LETTER**

Date: ____________ 2026

SC&H Group
11000 Broken Land Parkway
Suite 500
Columbia, Maryland 21044

**Re: Representations of Management Regarding Confidential Evaluation Materials**

Dear Sirs:

This letter is being provided to you in accordance with Section 1(c) of that certain Agreement Regarding Advisory Services (the "Agreement"), dated August ___, 2026. Capitalized terms not defined herein have the meaning ascribed to such terms in the Agreement. This letter is expressly made part of and incorporated into the Agreement.

In connection with your preparation of the Evaluation Materials and our review of the same, we hereby confirm to SC&H, to the best of our knowledge and belief, as follows:

1. We have made available to you all information requested and all information that we believe is relevant to your engagement. All significant matters of judgment have been determined or approved by us.

2. The financial information furnished to you regarding the Company is true, accurate and complete in all material respects to the best of the Company's knowledge.

3. The Company has no commitments or contingent liabilities, including those arising from litigation, claims and assessments that are not disclosed to you in writing.

4. The Company does business in the States or other jurisdictions set forth in the Evaluation Materials and no other States.

5. We have reviewed the Evaluation Materials and represent that the information about the Company presented therein is accurate and complete to the best of the Company's knowledge.

6. All of the representations and warranties set forth in the Agreement were true and correct as of the date of execution of the Agreement, and remain true and correct as if made on the date of this letter.

Company and Debtors
Deqser, LLC and KNY 26671 LLC

By:_________________________________
Name: Sang Cho
Title: Chief Executive Officer
Date:________________________________