**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>DEQSER, LLC, *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 25-10687 (CTG)<br><br>(Jointly Administered)<br><br>**Related Docket Nos. 481, 511** |

# AMENDED MEMORANDUM OPINION

Hub Truck Rental leased trucks to the debtors, a commercial laundry business, which the debtors used to pick up and deliver laundry to their customers.[1] The parties' relationship has been contentious throughout these bankruptcy cases. Hub Truck Rental has now moved for an order, under § 365(d)(5), directing the debtors to pay amounts due to it that it contends arise in the period beginning 60 days after the bankruptcy filing and running until the time the truck leases were ultimately rejected.

The Court held an evidentiary hearing on the motion on August 17, 2026. This dispute raises essentially three issues.[2] The *first* issue is contractual. The evidence in the record indicates that Hub Truck Rental sent regular weekly invoices to the debtors. The record, however, contains no writing from the debtors in which the

[1] Deqser LLC is a New Jersey limited liability company. Deqser LLC is the manager of KNY 26671 LLC, a Delaware limited liability company, which is the debtors' operating business. The companies are referred to collectively as the "debtors." Hub Truck Rental Corp. is referred to as "Hub Truck Rental" or "Hub."

[2] The Court had originally intended to resolve this motion in a bench ruling. Because, however, the issues turned out to be slightly more complex than the Court had appreciated, the Court is instead issuing this Memorandum Opinion.

debtors took issue with the invoices. The debtors' CEO testified that he believed that Hub Truck Rental had denied the debtors access to the trucks for which they were being billed and disputed the charges on that basis. The record with respect to those objections, however, is general and impressionistic. The debtors' CEO could not point with any particularity to specific bills that, he contended, charged the debtors for specific trucks that the Hub Truck Rental had allegedly reclaimed. And while it is true that debtors' counsel had previously stated during hearings before this Court that the debtors took issue with certain of the Hub charges, the evidentiary record in this contested matter contains no writing in which the debtors specifically challenged any of the invoices.

The contract is subject to New York law. And so the answer to the contract question is governed by the common-law account stated rule. As Judge Cardozo's opinion in *Newburger-Morris* explains, that rule creates a presumption that an invoice that is sent from a vendor to a customer, to which the customer does not timely object, is presumptively valid.[3] The very general testimony offered by the debtors' CEO, not backed by any writing, is insufficient to rebut the presumption created by the account stated rule.

The *second* question relates to the meaning of § 365(d)(5), and how one calculates when an obligation "aris[es]" within the meaning of that provision. That question implicates a point on which courts have divided – whether the period calculated under §§ 365(d)(3) and 365(d)(5) should follow the "accrual" approach or

---

[3] *Newburger-Morris Co. v. Talcott*, 114 N.E. 846 (N.Y. 1916).

the "billing date" approach. Although the Third Circuit has not addressed the issue under § 365(d)(5), its opinion in *Montgomery Ward* adopted the billing-date approach to materially similar language in § 365(d)(3).[4] There is no reason to think that the two statutory provisions should work differently in this regard. Both provisions address obligations "arising" within a defined postpetition period – in § 365(d)(3) it begins on the entry of the order for relief and in § 365(d)(5) it begins 60 days later. The former provision is addressed to non-residential real property leases and the latter to personal property leases. *Montgomery Ward* interpreted "arising" as the time the contractual performance becomes legally due. The Second Circuit decision in *Avianca* relied on *Montgomery Ward* to adopt the same test for § 365(d)(5).[5] Accordingly, Hub Truck Rental's claim for lease payments that it billed within that period are covered by the statute and must be paid by the debtors. Hub Truck Rental's claim for certain legal fees that may have accrued within the statutory period, but were never billed, fall outside of § 365(d)(5). The debtors therefore are not required to pay those amounts immediately.

The *third* issue is whether the exception to the requirement of the debtors' timely performance of their obligations, based on the "equities of the case," is applicable here. The argument is that because there is at least some risk of administrative insolvency, requiring the prompt payment of Hub Truck Rental's claim presents at least a theoretical possibility that Hub will be paid while § 507(b)

---

[4] *In re Montgomery Ward Holding Corp.*, 268 F.3d 205 (3d Cir. 2001).

[5] *In re Avianca Holdings S.A.*, 127 F.4th 414 (2d Cir. 2025).

superpriority claims held by secured creditors (which are entitled to higher priority under the Bankruptcy Code) might go unpaid. For the reasons described below, however, the Court concludes that, at least in the circumstances present here, the equities of the case do not justify shifting that risk to a contractual counterparty, like Hub, that provided goods and services on a post-petition basis and vigilantly took action to protect its rights in the bankruptcy case.

Accordingly, and for the reasons described in further detail below, the debtors are required, within ten days of the issuance of the Court's order, to pay Hub Truck Rental $184,099.46 for the amounts arising within the § 365(d)(5) period. The parties' respective rights regarding any administrative claim that Hub Truck Rental may assert for contractual amounts owed that fall outside this ruling (such as its claim for legal fees) are preserved.

## Factual and procedural background

An earlier opinion in this bankruptcy case, explaining the reasons why the Court denied the U.S. Trustee's motion to dismiss the bankruptcy, provides an overview of the debtors' business and their rather challenging bankruptcy cases.[6] The Court will not repeat that entire story here. The short version is that the debtors' CEO, Sang Cho, has worked diligently in an effort to turn around the debtors' struggling commercial laundry business, with some positive results to show for his efforts. At the same time, the debtors continue to run substantial monthly operating

[6] *In re Deqser, LLC*, No. 25-10687, 2026 WL 1096542 (Bankr. D. Del. Apr. 22, 2026).

losses.[7] This Court denied the U.S. Trustee's motion to dismiss, but not because the Court accepted the debtors' contention that they were likely to confirm a plan of reorganization like the one they had proposed, under which secured creditors would be crammed down based on seemingly aggressive valuations of their collateral. Rather, all of the parties with an economic stake in the case appeared to agree that, despite its current operational losses, the debtors' business had greater value as a going concern than in a liquidation. And so the Court denied the motion to dismiss on the condition that the debtors commit to proposing a plan under which, if their reorganization proposal is found to be unconfirmable, they would pivot to conducting a going-concern sale.

The debtors and the Official Committee of Unsecured Creditors thereafter sought approval to engage in mediation with respect to plan issues.[8] In July 2026, this Court entered an order that appointed Hon. Jeffery Deller, of the U.S. Bankruptcy Court of the Western District of Pennsylvania, as the judicial mediator.[9] At the beginning of the August 17, 2026 hearing, the debtors reported that with Judge Deller's assistance, the debtors have agreed to abandon their proposed reorganization, and instead intend to engage an investment banker to run a sale process.

---

[7] The most recent monthly operating report, docketed at D.I. 514, shows a monthly operating loss of approximately $650,000 for June 2026 and a cumulative operating loss of more than $8.5 million over the life of the bankruptcy case.

[8] D.I. 472.

[9] D.I. 476.

Immediately before the hearing in April of this year on the motion to dismiss, the debtors and Hub were able to reach an agreement that provided for a partial resolution of the disputes that had arisen between them. As footnote 3 of the Court's opinion on the motion to dismiss notes, the debtors had moved to reject the Hub truck leases and Hub moved to allow, and compel payment of, an administrative claim.[10] On the eve of that hearing, the parties had reached a consensual resolution under which the debtors agreed to pay Hub $200,000 of the approximately $280,000 sought as an allowed administrative expense. The parties also agreed that the Hub leases would be rejected and the trucks returned to Hub.

That left unresolved, however, the debtors' obligations to pay amounts that were not covered by the motion to allow an administrative claim, and that had accrued up until the time when the leases were rejected, and the trucks returned to Hub. Hub filed the present motion, seeking payments of those amounts, on July 21.[11] Consistent with this Court's rules, Hub noted that motion for a hearing on August 5.

Debtors' counsel emailed chambers on July 30, the day after the debtors' opposition was due under the rules, to say that (a) Hub had refused to provide discovery that the debtors were seeking in connection with the motion; and (b) the debtors' witness would not be available on August 5. Counsel for Hub responded that while Hub intended to call a witness in support of the relief it sought, it did not see a

[10] *See Deqser*, 2026 WL 1096542, at * 2 n.3.

[11] D.I. 481.

reason why the debtors should be required to call a witness or permitted to take discovery, such as deposing the witness whom Hub intended to call at trial.[12]

The Court set a status conference for the next day. At that status conference, the Court made clear that while Hub was entitled to a prompt hearing on its motion seeking immediate payment, the ordinary rules of civil litigation, as well as basic principles of common sense, would apply. The debtors were entitled to present a witness in support of whatever argument they intended to advance in opposition to the motion. Because the debtors' witness was not available on August 5, the Court moved the hearing to August 13. And the Court made clear that both sides were entitled to reasonable and focused discovery, that was to be conducted on an expedited basis, in view of the August 13 hearing date. To the extent the debtors intended to depose Hub's witness to avoid being surprised at trial by the witness' testimony, they were of course entitled to do so. The Court encouraged the parties to work through the various discovery issues between themselves in the first instance. The Court made clear, however, that it was available to resolve any dispute that might arise. The parties did so without further Court involvement. At the debtors' request, the hearing was thereafter consensually adjourned to August 17.[13]

---

[12] Merchant Financial Corporation (referred to as "Merchant") filed a timely limited objection to Hub's motion. D.I. 494. The debtors filed an objection the day after it was due. D.I. 495. Hub filed a reply in support of its motion on August 11. D.I. 504. The debtors also filed a post-trial letter identifying additional authority. D.I. 526. Hub also filed a post-trial letter. D.I. 525.

[13] The debtors provided Hub, on August 14, with an exhibit that it said it intended to introduce into evidence. Hub filed a motion *in limine* seeking to exclude the document. D.I. 511. During the evidentiary hearing the debtors did not move the admission of the document into evidence. The motion *in limine* is accordingly denied as moot.

During the August 17 hearing, Hub called Donna Blanc, the company's Co-President and Chief Financial Officer, as a witness. Hub introduced into evidence the parties' lease agreement (Exhibit 1) and an account statement that showed the amounts due under the lease (Exhibit 4). Hub also moved into evidence, without objection from the debtors, an analysis that broke the amounts due into categories, along with an explanation (apparently prepared by counsel) that explained the basis for each amount. (Exhibit 7). These categories included an amount due for insurance, for a period in which the debtors' insurance had allegedly lapsed; ordinary weekly lease invoices; damage to the vehicles; and other amounts. Hub also moved into evidence various invoices, along with underlying business records that contained backup for the amounts billed on the invoices. (Exhibits 8 and 9).

Blanc's testimony was careful, precise, and credible. The underlying invoices and account documents show on their face that the debtors owe Hub $184,099.46 for amounts due under the lease. The record suggests that each of these amounts was billed to the debtors in the ordinary course. The Court is persuaded based on its review of the documents and the witness testimony that these are amounts that both accrued, and were billed to the debtors, in the period that began 60 days after the bankruptcy filing and ended at the time the Hub leases were rejected.

Hub also moved into evidence bills and timesheet detail reports from the two law firms who have advised it in connection with its disputes with the debtors. Those statements show $76,316.47 in legal fees accrued in connection with the parties' dispute. Nothing in the record, however, indicates that these amounts had ever been

billed to the debtors. And while there was some suggestion by counsel that certain of these invoices had been submitted by Hub to the debtors in connection with prior disputes, no party moved any such document into evidence, or even pointed to a specific place in the Court's records showing that these bills had been provided to the debtors.

The debtors called their CEO, Sang Cho, as a witness. The Court also found Cho's testimony to be generally credible, though as further described below, it was at too high a level of generality to rebut the specific showing made by Blanc's testimony and the underlying documentary support. He testified that the debtors and Hub had a generally positive relationship for many years until the fall of 2025. He explained that the relationship began to deteriorate at around the time the debtors were unable to make timely lease payments. He said that beginning at around that time, Hub failed to provide the debtors with replacement trucks when the leased trucks were in for maintenance or service, and that Hub took longer than it had in the past to repair trucks that required service. He said that as a result of these delays, the pounds of laundry per driver hour was cut in half, thus driving up the debtors' labor costs.

Cho also testified that Hub effectively took back certain trucks that had gone in for service. On cross examination, Cho said that he had discussed the issue with debtors' counsel but acknowledged that the debtors never took action or sought relief as a result of any alleged violation of its legal rights. Nor did Cho identify the specific trucks that Hub had allegedly taken back.

Most importantly, in response to the contemporaneous invoices and business records provided by Hub, the debtors did not present any documentary evidence suggesting that the debtors had raised a timely objection to the amounts that Hub had billed. Cho said that the debtors disputed the length of time that Hub said its insurance had lapsed, but provided nothing that sought to demonstrate that it had raised a timely objection to Hub's invoice or that the debtors in fact had insurance in place during that period. It contended that trucks that ought to have been made available to it were not, but did not identify specific trucks or point to any document it provided to Hub in response to its invoice in which it asserted that objection.

## Jurisdiction

Hub's motion arises under § 365(d)(5) of the Bankruptcy Code and is thus within the district court's "arising under" jurisdiction set forth in 28 U.S.C. § 1334(b). That jurisdiction has been referred to this Court under 28 U.S.C. § 157(a) and the district court's February 29, 2012 standing order of reference. The motion is a core matter under 28 U.S.C. § 157(b)(2)(B).

## Analysis

### I. Under the "account stated" rule, the amounts billed by Hub are presumptively valid and due under the parties' agreement; the debtors have not rebutted that presumption.

The contract provides that the "laws of the State of New York shall govern the rights, duties, and remedies of the parties herein," and no party has suggested that this Court should not enforce the contractual election of New York law.

New York law has long recognized the common law "account stated" rule. In broad strokes, that rule provides that "an account which has been rendered and to

which no objection has been made within a reasonable time should be regarded as admitted by the party charged as prima facie correct."[14] The rule is, to be sure, subject to exceptions and conditions. For example, as the *Gurney, Becker & Bourne* decision explains, the rule applies only where there is a preexisting relationship between the parties. In substance, however, the rule means that when parties have an existing relationship, such as the vendor-customer relationship that existed here between the debtors and Hub, it effectively becomes incumbent on a customer, upon receipt of an invoice that it contests, to raise its hand and assert its disagreement.[15]

The New York caselaw makes clear that the account stated rule is just a presumption, not an ironclad rule. So, a party that remained silent in the face of an invoice with which it disagreed is not precluded from coming forward with evidence demonstrating that the amount was not in fact due. The account-stated doctrine establishes a prima facie case when the creditor proves that it rendered an account and the debtor retained it without timely objection. The burden of production then shifts to the debtor to identify competent evidence of a timely objection, mistake, fraud, or another basis to contest the account.

Hub established a prima facie account stated by showing that it rendered the invoices and that the debtors retained them without timely objection. Blanc testified

---

[14] *Gurney, Becker & Bourne, Inc., v. Benderson Dev. Co.*, 394 N.E.2d 282, 282 (N.Y. 1979).

[15] *See also Newburger-Morris Co.* 114 N.E. at 846; *Galbreath-Ruffin Corp. v. 40th & 3rd Corp.*, 227 N.E.2d 30 (N.Y. 1967); *Cach, LLC v. Aspir*, 137 A.D.3d 1065, 1066 (N.Y. App. Div. 2d Dep't 2016) ("To establish its prima facie entitlement to judgment as a matter of law to recover on an account stated, a plaintiff must show that the defendant received the plaintiff's account statements for payment and retained these statements for a reasonable period of time without objection.").

that Hub regularly transmitted weekly invoices to the debtors in the ordinary course of the parties' relationship. The debtors' own witness did not deny that the debtors received those invoices (though Cho said that he had not personally seen some of them). Based on the record before it, the Court finds, by the preponderance of the evidence, that the invoices in the record were received by the debtors. The burden of production therefore shifted to the debtors to identify competent evidence of a timely objection, mistake, fraud, or other basis to contest the account. The debtors failed to do so.

Is it *possible* that if one were to take a hard look behind the invoices that Hub sent, one might find that some of the amounts were overstated in some respect? The answer to that question is yes. At trial, Cho's testimony at least raised fair questions about the correctness of certain repair charges. And even after hearing several hours of testimony, it is not perfectly clear to the Court whether Hub in fact provided the debtors with every truck on every day for which it sent the debtors an invoice. But filling in that kind of gap in an evidentiary record is precisely the work done by evidentiary presumptions such as the account stated rule. Because the record does make clear that Hub sent the debtors invoices for the $184,099.46 in lease charges for which it now seeks to recover, the account stated rule shifts the burden to the debtors to have come forward with actual evidence sufficient to rebut that presumption. And despite finding Cho to have been a generally credible witness, the Court does not find that his highly generalized testimony, none of which was backed

by any documentary evidence, is sufficient to meet the debtors' burden to rebut the presumption.

The debtors respond, in a post-trial letter, by arguing that as "Mr. Cho testified, most of the dispute was done orally, so, there are no documents to which to point."[16] That may well be so. But in light of the account statement rule, the consequence of the debtors' being unable to present competent and specific evidence of their disputes is that they cannot rebut the presumption in Hub's favor that the rule creates.[17]

The debtors and their DIP lender also argued that the time the Court provided for discovery in this matter was insufficient to permit the debtors to meet their burden. The Court rejects that argument. Under this Court's rules, a motion in a contested matter must be filed 14 days before the hearing date, with an objection deadline seven days later.[18] At the same time, the rules make clear that every hearing in a contested matter "will be an evidentiary hearing at which witnesses will be required to testify in person in Court with respect to any factual issues in

[16] D.I. 526 at 4.

[17] In its letter submitted after the hearing, the debtors also argue that testimony by Cho at the April 19, 2026 hearing is sufficient to satisfy the debtors' evidentiary burden under the account stated rule. D.I. 526 at 4-5. But the present motion is to be decided based on materials that were admitted into evidence on the hearing on *this* motion. Principles of judicial notice do not allow a court to accept witness testimony offered at a different hearing as evidence of the truth of the matter asserted in the prior hearing. *See Southern Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group, Ltd.*, 181 F.3d 410, 426 (3d Cir. 1999) (explaining the uses and limitations of the judicial notice doctrine).

[18] Local Rule 9006-1(c)(i), (ii).

dispute."[19] And under Bankruptcy Rule 9014(c), the usual federal rules governing the availability of discovery are applicable.[20]

It is true, of course, that under the usual federal rules, parties have longer periods of time to take discovery than is possible in a contested matter that is heard within 14 days of filing. But courts always have discretion to alter the time periods set forth by the rules when the circumstances of the case require.[21] As a practical matter, the practice in this jurisdiction is for the parties to endeavor to negotiate a discovery protocol and to seek the Court's intervention only when a dispute arises. Here, the parties apparently reached a working understanding about how discovery would proceed after this Court ruled on July 31 that the debtors were entitled to take discovery. The 18 days between that ruling and the August 17 hearing, while a short period of time, is longer than the standard period provided under the rules.

Moreover, to the extent the debtors had a valid basis to contest the invoices, they presumably could have presented that evidence at the August 17 hearing even in the absence of obtaining discovery from Hub. The record here suggests that most of the documents that Hub used in its case in chief had been exchanged between the parties long before the August 17 hearing. And Hub's motion was filed on July 21. The nearly four weeks that passed between the filing of the motion and the August 17 hearing ought to have been more than enough time for the debtors to locate any

---

[19] Local Rule 9013-1(d).

[20] Fed. R. Bankr. P. 9014(c).

[21] *Id.* (allowing the Court to order that any Part VII rule apply); Fed. R. Bankr. P. 7016 (adopting Civil Rule 16); Fed. R. Civ. P 16(b)(4) (permitting any discovery schedule to be modified by the Court for "good cause").

documentary evidence that took issue with Hub's invoices and/or to present a witness who was prepared to offer concrete and specific testimony demonstrating that the charges were not supported by the parties' contract.

The Court appreciates, of course, that the debtors were left to do all of this at the same time that they were required to continue their arduous efforts to turn around a struggling business, engage in an active mediation with the Committee, and complete the many other tasks associated with being a debtor in an active chapter 11 case. At a human level, the Court is not unsympathetic to the heavy burdens this imposes on the debtors' management and their professionals. Those burdens, however, are part and parcel of the chapter 11 process. And at the end of the day, this Court's task is to apply the law to the facts as they are established through admissible evidence at the conclusion of a hearing held in accordance with the rules. For the reasons described above, this Court is satisfied that the manner in which the hearing was conducted comported fully with the governing rules. And the application of the principles described herein to the record before the Court leads to the conclusion that the $184,099.46 in amounts that Hub billed to the debtors under the lease are valid and enforceable obligations under the parties' agreement.[22]

[22] The debtors also challenge the reasonableness of the $76,316.47 in legal fees sought by Hub. In view of the Court's disposition in Part II of this Memorandum Opinion, that question need not be addressed at this time. All parties' rights with respect to those issues are preserved.

## II. Applying the "billing date" approach to the § 365(d)(5) period, the debtors are required to pay the $184,099.46 in lease obligations due; they are not required to make immediate payment for Hub's $76,316.47 in legal fees.

As an initial matter, it bears note that at closing argument and in their post-hearing letter, the debtors rely on caselaw regarding the meaning of § 365(d)(5) that is never mentioned in the debtors' opposition to Hub's motion. In other circumstances, the Court might well treat those points as forfeited. At the very least, the Court would be inclined to provide Hub with the opportunity to respond to arguments made and authorities cited by the debtors for the first time during closing argument. In this case, however, it was apparent that counsel for Hub was familiar with the caselaw that debtors' counsel raised at argument and was well positioned to respond to the arguments. Hub has also pressed for a prompt ruling on its motion. The Court's general interest in getting things right also counsels against disregarding relevant authority that the debtors failed to cite. The Court will accordingly address the arguments on their merits.

On the merits, the law is clear that not every dollar that a debtor may owe under a contract is covered by § 365(d)(5) of the Bankruptcy Code. That section provides that the "trustee shall timely perform all of the obligations of the debtor, … first arising from or after 60 days after the order for relief in a case under chapter 11 of this title under an unexpired lease of personal property … until such lease is assumed or rejected notwithstanding section 503(b)(1) of this title, unless the court,

after notice and a hearing and based on the equities of the case, orders otherwise with respect to the obligations or timely performance thereof."[23]

The debtors argue that some of the amounts as to which Hub has sought to compel payment are not obligations that are "first arising from or after 60 days after" the petition date in this case. The parties do not cite, and this Court has not located, any Third Circuit authority construing this language in § 365(d)(5). In substance, however, the question raised by § 365(d)(5)'s language about an obligation "first arising from or after 60 days after" the petition date is essentially the same as that raised by the language in § 365(d)(3), which in the context of nonresidential real property requires the trustee to perform the obligations of the debtor "arising from and after the order for relief." With respect to both paragraphs (3) and (5) of § 365(d), one can take different views about when an obligation "aris[es]".

In the context of § 365(d)(3), the Third Circuit has answered that question. In *Montgomery Ward*, the Third Circuit expressly rejected the approach taken by some courts that had found a claim "arises" when the obligation "accrues."[24] Under this accrual approach, a lease obligation that became due post-petition but that covered a rental period that straddled the petition date would be prorated between a pre-petition portion (that falls outside of § 365(d)(3)) and a post-petition portion (that is covered by the statute). The Third Circuit rejected that view, however, as inconsistent with the statutory text. "In the context of a lease contract, it seems to

---

[23] 11 U.S.C. § 365(d)(5).

[24] *Montgomery Ward*, 268 F.3d at 205. The Sixth Circuit had previously taken the same view. *See In re Koenig Sporting Goods, Inc.*, 203 F.3d 986 (6th Cir. 2000).

us that the most straightforward understanding of an obligation is something that one is legally required to perform under the terms of the lease and that such an obligation arises when one becomes legally obligated to perform."[25] And in the context of the lease, that means that an obligation to pay a bill arises on the day that the bill is due under the terms of the lease.[26]

The *Montgomery Ward* decision acknowledged that it was expressly splitting from the Seventh Circuit's contrary decision in *Handy Andy*, which adopted the accrual approach and thus prorated the amounts.[27] Most recently, the Second Circuit in *Avianca* embraced the billing date approach in connection with a personal property lease under § 365(d)(5).[28] Significantly, in doing so, the Second Circuit relied on the Third Circuit's analysis of the language in § 365(d)(3) in *Montgomery Ward*.[29] To be sure, the statutory language is different in that § 365(d)(5) is limited to obligations *first* arising in the statutory period, while § 365(d)(3) does not include that limitation.

---

[25] *Id.* at 209.

[26] Note that *In re Goody's Family Clothing Inc.*, 610 F.3d 812 (3d Cir. 2010), adds that to the extent that there is an *unpaid* stub period, the fact that such a period is not covered by § 365(d)(3) does not mean that the landlord might not be entitled to an administrative claim for the prorated portion of the period that fell postpetition under § 503(b)(1). The reasoning of *Goody's* also reveals the error in the principal argument the debtors advance in their brief – that Hub would only be entitled to immediate payment of amounts arising under the lease if it *also* established that it held an allowed administrative claim for that amount. *See* D.I. 495 at 5. But both the text of § 365(d)(5) ("notwithstanding section 503(b)(1) of this title") and the Third Circuit's reasoning in *Goody's* make clear that these statutory provisions operate independently of one another.

[27] *See In re Handy Andy Improvement Centers, Inc.*, 144 F.3d 1125, 1127 (7th Cir. 1998). *But see HA-LO Indus., Inc. v. CenterPoint Props. Trust,* 342 F.3d 794 (7th Cir. 2003) (subsequent Seventh Circuit decision that follows *Montgomery Ward*).

[28] *Avianca*, 127 F.4th at 414.

[29] *Id.* at 422 n.6.

That limitation presumably means that an amount that was billed and due *before* the beginning of the 60-day period cannot be roped into § 365(d)(5) by having the creditor repeat its demand for payment. That limitation, however, is not material here. At closing argument, debtors' counsel conceded that none of the amounts Hub presented arose before the statutory period began.

Under the billing date approach, however, the legal fees accrued by Hub but that were not billed to the debtors did not come due within the applicable statutory period. Those obligations therefore fall outside of § 365(d)(5). Here, § 12(c) of the lease states that Hub is entitled to recover its reasonable attorneys' fees incurred in connection with enforcing its rights under the agreement. The lease does not state a date on which those fees are due, and the evidentiary record contains no suggestion that the $76,316.47 that Hub seeks to recover were ever billed to the debtors. Accordingly, the Court finds, under the Third Circuit's "billing date" approach, that these fees are not covered by § 365(d)(5).[30] But as the reasoning of *Goody's* makes clear, that conclusion is without prejudice to Hub's right to seek an allowed administrative claim for those amounts.

[30] This Court reads Judge Walrath's decision in *Muma Services* as similarly holding that amounts due under a real property lease must be timely paid, under the predecessor provision to the current § 365(d)(5) (then codified at § 365(d)(10)), to the extent the obligations became due in the applicable statutory period. *In re Muma Services Inc.*, 279 B.R. 478 (Bankr. D. Del. 2002). On its facts, *Muma Services* expressly states that taxes would be due under the lease only to the extent they were billed. *Id.* at 488. The opinion does not expressly refer to a billing requirement regarding legal fees. *Id.* at 489. There is no suggestion, however, that the court intended to apply a different legal rule to these categories of fees. To the contrary, the rule articulated in *Muma Services* is that (following *Montgomery Ward*) an "obligation arises" for the purposes of § 365(d) "when one becomes legally obligated to perform." *Id.* at 487.

## III. Section 365(d)(5)'s "equities of the case" exception does not require a different result.

Finally, both the debtors and Merchant Financial, a secured creditor that may be entitled to a superpriority claim under § 507(b), argue that the Court should not order the immediate payment of Hub's claim because the statute contains an express exception to that requirement where the Court finds that the "equities of the case" counsel otherwise.[31]

The Court is not persuaded that the "equities of the case" provide a reason, under the facts here, to excuse the debtors from meeting their obligations to pay Hub the amounts that came due during the § 365(d)(5) period. The Court recognizes that § 365(d)(5) affords discretion to alter the obligation or its timing when the equities warrant. But the relevant circumstances here favor enforcement: Hub furnished leased vehicles during the applicable period; the debtors retained the benefits of the leases; Hub promptly pursued its statutory remedy; and the asserted administrative-insolvency concern arises from the debtors' broader decision to continue the case and pursue a sale process, rather than from any conduct by Hub.

The text and structure of the Bankruptcy Code make clear that debtors in chapter 11 are expected, absent the affected creditors' consent, to meet their current obligations during the pendency of the chapter 11 case. The Code provides that

[31] *See In re Federal-Mogul Glob., Inc.,* 222 Fed. Appx. 196, 201 (3d Cir. 2007); *In re Midway Airlines Corp.*, 406 F.3d 229 (4th Cir. 2005).

continuing losses constitute "cause" to dismiss a chapter 11 case, and a plan that does not pay allowed administrative claims in full cannot be confirmed.[32]

The Third Circuit's decision in *Federal-Mogul* (while a non-precedential opinion) counsels against modification here. There, the court of appeals reversed a bankruptcy court's decision to invoke the "equities of the case" exception to relieve a debtor of the full rent due under an equipment lease, explaining that Congress enacted § 365(d)(5) "to end the practice of debtors gaining leverage by forcing lessors to move to compel payment each time they wanted a lease obligation honored."[33] That is precisely what occurred here: Hub was made to file a motion to compel simply to obtain payment of amounts that were not seriously disputed. The Third Circuit also weighed against the debtors in that case the fact that they, not the lessor, controlled the circumstance said to make modification equitable — there, the timing of rejection; here, the decision to continue operating the case, and pursue a sale process.

The Third Circuit was explicit that "[s]imply noting in passing that modification will be convenient or provide minimally more money for reorganization is not enough to rewrite the terms to which the parties agreed."[34] The debtors offer little more than that here.

To the extent that any of the debtors' secured creditors believe that the case is likely to be administratively insolvent and seek the prompt dismissal of the case in

---

[32] 11 U.S.C. § 1112(b)(4)(A); *id.* § 1129(a)(9)(A).

[33] *Federal-Mogul*, 222 Fed. Appx at 201 (citing H.R. Rep. 103-835, at 50, reprinted in 1994 U.S.C.C.A.N. 3340, 3390).

[34] *Id.*

order to minimize the risk that their potential superpriority claims under § 507(b) may go unpaid, those creditors are of course entitled to file an appropriate motion seeking dismissal or conversion. Those creditors have not done so. To the contrary, the secured creditors generally opposed the U.S. Trustee's prior motion to dismiss. They likely did so for good reason. Those creditors seem to believe, sensibly enough, that the bankruptcy process is most likely to preserve the value of their collateral and thereby maximize their recoveries. They accordingly desire to continue the bankruptcy process to permit them to obtain the potential upside of a successful sale process.

There is therefore nothing "equitable" about allowing those parties to shift the downside risk to those creditors who are providing postpetition goods and services to the debtors. In considering the equities, one must bear in mind that a party like Hub was not just an ordinary pre-petition claimant hoping to maximize its recovery on its pre-petition claim. Indeed, Hub was presumably *required* to continue performing on its leases and barred by the automatic stay from taking back its leased trucks.[35] Principles of equity do not require these parties to bear the downside risk of failure in order to provide the upside benefits to others. If anything, bankruptcy's usual pay-the-freight principle is designed to protect such parties from bearing precisely this risk.

---

[35] *See* 11 U.S.C. § 362(a)(3). The debtors alluded during the argument to a potential claim they may have against Hub for violating that requirement. They have not, however, asserted such a claim. All parties' rights with respect to any such dispute are reserved.

Nor does the Court accept Merchant Financial's claim that the Court must adopt its reading of the "equities of the case" exception in order to avoid rendering the equities of the case language of § 365(d)(5) superfluous. There are plenty of other ways to give that statutory language meaning. The law recognizes that a creditor that provides post-petition services may not have an administrative claim at the contract rate if, as a result of a precipitous change in the market, the contract price failed to capture the "actual, necessary costs and expenses of preserving the estate."[36] It is perfectly sensible to read the "equities of the case" language in § 365(d)(5) as providing an analogous safety valve to the trustee's obligation to make timely payment on the debtor's obligations under a personal property lease. Indeed, that is essentially the reading suggested by the Third Circuit in *Federal-Mogul*, where it discussed the debtor's right to seek an equitable adjustment to the terms of a contract.[37] The Court sees no basis for requiring such an adjustment based on the circumstances presented here.

**Conclusion**

For the foregoing reasons, the Court concludes that the debtors were obligated, by § 365(d)(5) of the Bankruptcy Code, to make timely payment of the debtors' contractual obligations to Hub that became due within the applicable period. Based on the record before the Court, that amount is $184,099.46. The debtors must therefore pay that amount to Hub within 10 days of the entry of the order resolving

[36] *See In re Trans World Airlines, Inc.,* 145 F.3d 124, 135–36 (3d Cir. 1998).

[37] *Federal-Mogul*, 222 Fed. Appx at 201.

this motion. All parties' rights with respect to any allowed administrative claims for amounts that are not required to be paid promptly are fully reserved.

Dated: October 2, 2026

CRAIG T. GOLDBLATT
UNITED STATES BANKRUPTCY JUDGE